UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JONATHAN JUNG,

                 Plaintiff,

            - against -

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

          :       05-CV-4286 (MBM)

          ECF Case

## COMPENDIUM OF UNREPORTED CASES
## CITED IN DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION TO COMPEL ARBITRATION AND STAY THIS ACTION

Jung v. Skadden, Arps, Slate Meagher & Flom, LLP et al            Doc. 10 Att. 1

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ATTORNEYS FOR DEFENDANT
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

BOROUGH OF MANHATTAN

CITY OF NEW YORK

NEW YORK 10036-6522

(212) 735-3000

## COMPENDIUM TABLE OF CONTENTS

**TAB**

Alemac Ins. Servs., Inc. v. Risk Transfer Inc., No. 03 Civ. 1162, 2003 WL
    22024070 (S.D.N.Y. Aug. 28, 2003) ........................................................................................ A

Beletsis v. Credit Suisse First Boston, Corp., No. 01 Civ. 6266, 2002 WL
    2031610 (S.D.N.Y. Sept. 4, 2002) ........................................................................................... B

Chamois v. Countrywide Home Loans, No. 02 Civ. 9550, 02 Civ. 9553, 2003 WL
    23022033 (S.D.N.Y. Dec. 29, 2003) ........................................................................................ C

Cicchetti v. Davis Selected Advisors, No. 02 Civ 10150RMB, 2003 WL
    22723015 (S.D.N.Y. Nov. 17, 2003) ....................................................................................... D

Gruber v. Louis Hornick & Co., Inc., No. 02 Civ. 5092, 2003 WL 21222541
    (S.D.N.Y. May 23, 2003) .......................................................................................................... E

HD Brous & Co., Inc. v. Mrzyglocki, No. 03 Civ. 8385, 2004 WL 376555
    (S.D.N.Y. Feb. 26, 2004) .......................................................................................................... F

Moorning-Brown v. Bear, Stearns & Co., Inc., No. 99 Civ. 4130 JSR HBP, 1999
    WL 1063233 (S.D.N.Y. Nov. 23, 1999) .................................................................................. G

Perry v. New York Law Sch., No. 03 Civ. 9221, 2004 WL 1698622 (S.D.N.Y.
    July 28, 2004) ........................................................................................................................... H

Pilanski v. Metro. Life Ins. Co., No. 95 Civ. 10292, 1996 WL 622024 (S.D.N.Y.
    Oct. 28, 1996) ............................................................................................................................ I

Rice v. Brown Bros. Harriman & Co., No. 96 Civ. 6326, 1997 WL 129396
    (S.D.N.Y. Mar. 21, 1997) ......................................................................................................... J

Schuetz v. CS First Boston Corp., No. 96 Civ. 5557, 1997 WL 452392 (S.D.N.Y.
    Aug. 8, 1997) ............................................................................................................................ K

Tuskey v. Volt Info. Scis., Inc., No. 00 Civ. 7410DABGWG, 2001 WL 873204
    (S.D.N.Y. Aug. 3, 2001) ........................................................................................................... L

Wright v. SFX Entm't Inc., No. 00 CIV 5354SAS, 2001 WL 103433 (S.D.N.Y.
    Feb. 7, 2001) ............................................................................................................................. M

# TAB A



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22024070 (S.D.N.Y.)
**(Cite as: 2003 WL 22024070 (S.D.N.Y.))**

Page 1

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
ALEMAC INSURANCE SERVICES, INC., Plaintiff,
v.
RISK TRANSFER INC. and Chris Rhoden, Defendants.
**No. 03 Civ. 1162(WHP).**

Aug. 28, 2003.

Insurance consultant sued seller of wholesale and retail insurance products and its employee, alleging breach of contract, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. Employee asserted counterclaim for alleged unpaid business expenses. Seller moved to compel arbitration, or, alternatively, for either dismissal or transfer on venue grounds. The District Court, Pauley, J., held that: (1) arbitration clause was broad, triggering strong presumption of arbitrability, and (2) claims were subject to arbitration under arbitration clause in parties' partnership agreement.

Motion to compel arbitration granted.

West Headnotes

**[1] Partnership ☞82**
289k82 Most Cited Cases
Arbitration clause in partnership agreement, indicating that "[a]ny dispute or controversy herein shall be settled by arbitration," was broad clause that triggered strong presumption of arbitrability for purposes of determining scope of arbitration clause, which could only be overcome if it could be said with positive assurance that clause was not susceptible of an interpretation that covered parties' dispute.

**[2] Partnership ☞82**
289k82 Most Cited Cases
Insurance consultant's claim against seller of wholesale and retail insurance products for alleged breach of parties' consulting contract touched upon parties' partnership

agreement, and thus was collateral matter within broad scope of partnership agreement's arbitration clause, given that provision of consulting contract allegedly breached concerned funding of offshore captive investment company created by partnership agreement.

**[3] Partnership ☞82**
289k82 Most Cited Cases
Claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty asserted by insurance consultant against seller of wholesale and retail insurance products and its employee, and employee's counterclaim against consultant for unpaid business expenses incurred while employee served as liaison between consultant and seller, arose directly from parties' implementation and management of their partnership agreement and consulting contract, and thus were collateral matters subject to arbitration under partnership agreement's broad arbitration clause.

Michael I. Bayda, Jacobs, Persinger & Parker, New York, NY, for plaintiff.

Stuart A. Krause, Deborah A. Ting, Zeichner, Ellman & Krause LLP, New York, NY, for defendants.

J. Timothy Schulte, Zimmerman, Shuffield, Kiser & Sutcliffe, P.A., Orlando, FL, for defendants.

*MEMORANDUM AND ORDER*
PAULEY, J.

**\*1** Defendant Risk Transfer, Inc. ("Risk Transfer") moves (i) to stay this action and compel arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et. seq.,* or in the alternative (ii) to dismiss the Amended Complaint ("Am.Compl.") for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, or transfer this case to the United States District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, Risk Transfer's motion to compel arbitration is granted.

I. *Background*

Plaintiff Alemac Insurance Services, Inc. ("Alemac"), a New Jersey corporation with its principal place of business in New York, acts as an insurance consultant and develops

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 22024070 (S.D.N.Y.)
**(Cite as: 2003 WL 22024070 (S.D.N.Y.))**

underwriting platforms and alternative market products for its clients engaged in the wholesale and retail brokerage business. (Am.Compl.¶¶ 1, 6.) Risk Transfer, a Florida corporation located in Orlando, Florida is a seller of various wholesale and retail insurance products. (Am. Compl. ¶¶ 2, 7; Declaration of Daryl B. Williams, dated July 2, 2003 ("Williams Decl.") ¶ 3.) Defendant W. Chris Rhoden ("Rhoden") is allegedly a current employee of Risk Transfer who was employed by Alemac from October 1, 2002 to January 15, 2003 at the bequest of Risk Transfer. (Am.Compl.¶¶ 8, 14-18.)

In or about August 2001, Alemac and Risk Transfer entered into an agreement pursuant to which Alemac introduced Risk Transfer to a reinsurance company, now named First Commercial Insurance Company ("First Commercial"), and directed insurance business to First Commercial, thereby generating brokerage commissions to Risk Transfer. (Am. Compl. ¶ 9; Declaration of John C. Harris, dated June 17, 2003 ("Harris Decl.") ¶ 3.) Risk Transfer and Alemac initially agreed to split the commissions 60/40, respectively. (Am. Compl. ¶ 9; Harris Decl. ¶ 3.) In April 2002, at Risk Transfer and First Commercial's request, Alemac pursued excess reinsurance for First Commercial under an initiative called "The Lighthouse Program." (Am. Compl. ¶ 10; Harris Decl. ¶ 4.) In July 2002, at Risk Transfer's request, Alemac reduced its share of the brokerage commissions to 10%. (Am. Compl. ¶ 11; Harris Decl. ¶ 4.) This modified understanding was incorporated into a Business Consulting Contract (the "BCC"), dated November 5, 2002, and executed in New York on December 5, 2002. (Am. Compl. Ex. 1; Harris Decl. ¶¶ 5-6 .) Also on December 5, the parties executed a Partnership Agreement (the "Partnership Agreement"), which was back-dated to September 9, 2002. (Williams Decl. ¶ 4; Declaration of Timothy J. Schulte, dated June 12, 2003 ("Schulte Decl.") Ex. A(2).) Both the BCC and Partnership Agreement were drafted without the assistance of counsel. (Williams Decl. ¶ 4.)

The Partnership Agreement created a partnership between Risk Transfer and Alemac called Leprechaun Holdings, which was to engage in the business of creating, funding and managing an offshore captive investment company. (Schulte Decl. Ex. A(2).) The BCC established Leprechaun

Holdings' initial funding mechanism by providing that 10% of Alemac and Risk Transfer's net commissions received for work performed under the BCC would be paid into Leprechaun Holdings. (Am Compl. Ex. 1 at ¶ 5.) Further, the Partnership Agreement mandated that 49% of such initial capital be paid by Alemac, and 51% of the initial capital be paid by Risk Transfer into the partnership. (Schulte Decl. Ex. A(2) at ¶ 5.) The Partnership Agreement, however, was never funded. (Am. Compl. ¶ 15; Willaims Decl. ¶ 3.) On January 6, 2003, Risk Transfer terminated the BCC and the Partnership Agreement by letter. (Harris Decl. Ex. 1.)

*2 In its Amended Complaint, Alemac alleges an action for breach of contract against Risk Transfer for (a) failure to pay Alemac the 10% of commissions it was due under paragraph 4 of the BCC; (b) terminating the BCC without proper notice pursuant to paragraph 2 of that contract; and (c) Alemac's 49% *pro rata* share of an additional 10% of commissions payable by Risk Transfer into Leprechaun Holdings, pursuant to paragraph 5 of the BCC. (Am.Com pl.¶¶ 19-23.) Alemac also brings a claim for breach of fiduciary duty against Rhoden, who worked as an intermediary between Risk Transfer and Alemac in implementing the BCC and the Partnership Agreement. Finally, Alemac appends a claim for aiding and abetting breach of fiduciary duty against Risk Transfer and Rhoden. (Am.Compl.¶¶ 24-27.) On May 8, 2003, Rhoden also filed an amended counterclaim against Alemac for $2,966 in unpaid business expenses he incurred in November and December 2002 while working for Alemac.

The crux of the present dispute involves an arbitration clause in paragraph 14 of the Partnership Agreement and its applicability to Alemac's lawsuit, which stems in part from Risk Transfer's breach of the BCC. Paragraph 14 of the Partnership Agreement states:

*Any dispute or controversy herein* shall be settled by arbitration in accordance with the Arbitration Act and judgment upon the award rendered may be entered in the court having jurisdiction in the State in which the head office of the partnership is located.

(Schulte Decl. Ex. A(2) at ¶ 14) (emphasis added). Unlike the Partnership Agreement, the BCC does not contain an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3
Not Reported in F.Supp.2d, 2003 WL 22024070 (S.D.N.Y.)
**(Cite as: 2003 WL 22024070 (S.D.N.Y.))**

arbitration clause or any other remedy provision. (*Compare* Schulte Decl. Ex. A(2) at ¶ 14 *with* Am. Compl. Ex. 1.)

As a preliminary matter, Alemac filed its original complaint in this action on February 21, 2003. That complaint asserted four claims: breach of contract under the BCC, breach of contract under the Partnership Agreement, breach of fiduciary duty and aiding and abetting breach of fiduciary duty. (Schulte Decl. Ex. A.) Alemac amended its complaint on April 15, 2003, deleting its breach of the Partnership Agreement claim but otherwise asserting the same facts described in its original complaint. That Alemac omitted its breach of Partnership Agreement claim from its Amended Complaint is of no moment as this Court must "determine whether the factual allegations underlying the claims and defenses [are] within the scope of arbitration regardless of the legal labels given the causes of action." *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 319 (4th Cir.1988) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 622, 105 S.Ct. 3346, 87 L.Ed.2d 444 n .9 (1985)).

II. *Motion to Stay and Compel Arbitration*

A. *Applicable Legal Standards*

"When a contract contains a written arbitration clause and concerns a transaction involving commerce, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.* (2003), governs." *In re Currency Conversion Fee Antitrust Litigation,* 265 F.Supp.2d 385, 400 (S.D.N.Y.2003). The FAA "establishes a liberal policy in favor of arbitration as a means to reduce 'the costliness and delays of litigation." ' *Campaniello Imports, Ltd. v. Saporiti Italia S.p .A.,* 117 F.3d 655, 665 (2d Cir.1997) (Pollack, J., by designation) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987)).

*\*3* Section 2 of the FAA states that written arbitration agreements "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The United States Supreme Court has recognized a strong policy favoring arbitration, and has advised courts that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Contr. Corp .,*

460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *accord ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.,* 307 F.3d 24, 29 (2d Cir.2002); *New York's Heath & Human Serv. Union v. NYU Hosp. Ctr.,* 02 Civ. 9165(WHP), 2003 WL 1475777, at \*1 (S.D.N.Y. Mar. 20, 2003). A court should compel arbitration unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Tech., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *accord Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 223 (2d Cir.2001).

Section 3 of the FAA provides that courts must stay any suit or proceeding until arbitration has been completed if the action concerns "any issue referable to arbitration" under a written agreement for such arbitration. 9 U.S.C. § 3; *accord Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.,* 98 Civ. 7181(WHP), 1999 WL 637236, at \*4 (S.D.N.Y. Aug. 20, 1999). If, however, all of the plaintiff's claims are subject to arbitration, "no useful purpose will be served by granting a stay of ... [the] claims," and the case may be dismissed. *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.,* 239 F.Supp.2d 332, 336 (S.D.N.Y.2002) (dismissing action where all of plaintiff's claims were subject to arbitration).

In reviewing the arbitrability of claims that do not involve federal statutes, the court must determine (i) whether the parties agreed to arbitrate; and (ii) whether the scope of the agreement encompasses the claims asserted. *ACE Capital,* 307 F.3d at 28; *Campaniello Imports,* 117 F.3d 655. Additionally, if the court concludes that some, but not all, of the claims in the case are arbitrable, the court must decide whether to stay the balance of the proceedings pending arbitration. *Oldroyd v. Elmira Savings Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998). Here, the parties do not dispute the validity of their agreement to arbitrate, but instead spar over whether the scope of the clause encompasses the claims asserted in the Amended Complaint.

In determining whether a dispute falls within the scope of an agreement's arbitration clause, this Court must initially classify the particular clause as either broad or narrow. *Louis Dreyfus Negoce,* 252 F.3d at 224 (citing *Mehler v. Terminix Int'l Co.,* 205 F.3d 44, 49 (2d Cir.2000)). "An

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 22024070 (S.D.N.Y.)
**(Cite as: 2003 WL 22024070 (S.D.N.Y.))**

arbitration clause is broad if the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause," whereas a narrow arbitration clause is "designed to play a more limited role in any future dispute." *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.,* 58 F.3d 16, 25 (2d Cir.1995). If the arbitration clause is broad, a presumption of arbitrability arises, and "arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the rights and obligations under it." *ACE Capital,* 307 F.3d at 34. Moreover, when parties use broad language "in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated." *ACE Capital,* 307 F.3d at 24 (quoting *Collins & Aikman,* 58 F.3d at 23).

B. *Discussion*

**\*4** [1] Turning to the arbitration clause at issue, paragraph 14 of the Partnership Agreement states in relevant part: "Any dispute or controversy herein shall be settled by arbitration...." This arbitration clause, and specifically the phrase "[a]ny dispute or controversy herein" is the paradigm of an expansive clause, and therefore this Court characterizes the arbitration clause as broad. Indeed, Courts routinely find that this type of language evinces a broad clause. *See, e.g., ACE Capital,* 307 F.3d 33-34 (finding the phrase "any dispute [that] shall arise between the parties ... with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" to be broad) (citing *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.1993) (finding no substantive difference between the phrases "relating to," "in connection with," or "arising from," and holding that such language did not limit the scope of arbitration and forum selection clauses to allegations of contractual violations)); *Louis Dreyfus Negoce,* 252 F.3d at 225 (finding arbitration clause stating "[a]ny dispute arising from the making, performance or termination of this Charter Party" to be broad); *Oldroyd,* 134 F.3d at 76 (finding the phrase "[a]ny dispute, controversy or claim arising under or in connection with [the agreement]" to be broad); *In re Currency Conversion Fee Antitrust Litigation,* 265 F.Supp.2d at 405-06 (finding

phrase "[claims] arising out of or relating to ... [the] Account" broad); *Flor Daniel Intercontinental,* 1999 WL 637236, at \*7 (finding arbitration clause "all disputes arising in connection with this Agreement" broad). In light of the Partnership Agreement's broad arbitration clause, this Court must apply a strong presumption of arbitrability in determining the scope of the arbitration clause. *Oldroyd,* 134 F.3d at 76. That presumption of arbitrability is only overcome "if it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that it covers the asserted dispute." *Oldroyd,* 134 F.3d at 76; *accord Flor Daniel Intercontinental,* 1999 WL 637236, at \*7.

[2] Thus, this Court must consider whether the claims in the Amended Complaint are "on [their] face within the purview of the clause, or over some collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Louis Dreyfus Negoce,* 252 F.3d at 224. Given the presumption of arbitrability created by the broad clause here, arbitration of all collateral matters is appropriate. *See Collins & Aikman,* 58 F.3d at 23. The current dispute arises in part out of Risk Transfer's alleged breach of the BCC, which does not contain an arbitration clause. In its claim against Risk Transfer for breach of the BCC, however, Alemac seeks between \$320,000 and \$430,000 for Risk Transfer's failure to pay its share of 10% of net commissions into Leprechaun Holdings, pursuant to paragraph 5 of the BCC. (Am.Compl.¶ 21.) Paragraph 5 of the BCC states:

**\*5** An additional 10% of the Net Commissions associated with the program for work performed under this agreement shall be paid into Leprechaun Holdings. Terms of Leprechaun Holdings are spelled out under separate agreement.

(Am.Compl.Ex. 1.)

Although the BCC and Partnership Agreement are two separate, albeit related documents, Alemac's allegation in its Amended Complaint that Risk Transfer breached paragraph 5 of the BCC clearly "touches upon" the Partnership Agreement. It is undisputed that the "separate agreement" to which paragraph 5 of the BCC refers is the Partnership Agreement. In essence, the BCC established the funding

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 5
Not Reported in F.Supp.2d, 2003 WL 22024070 (S.D.N.Y.)
**(Cite as: 2003 WL 22024070 (S.D.N.Y.))**

mechanism for the operation of Leprechaun Holdings, which was created by the Partnership Agreement. Additionally, this Court notes that the BCC and the Partnership Agreement were signed nearly simultaneously and that the BCC does not contain any type of remedy clause. Accordingly, as the BCC "touches upon" the Partnership Agreement, Alemac's breach of contract claim is properly classified as a "collateral matter" that falls appropriately within the purview of the Partnership Agreement's broad arbitration clause. *See Campaniello Imports,* 117 F.3d at 668; *see also Louis Dreyfus Negoce,* 252 F.3d at 228-29 (finding letters of indemnity within the scope of an arbitration clause in a charter party agreement and stating that a "collateral agreement" is "a separate, side agreement, connected with the principal contract which contains the arbitration clause"); *In re Currency Conversion Fee Antitrust Litigation,* 265 F.Supp.2d at 406 (finding plaintiffs' antitrust claims "touch [ed] matters" covered by the agreement containing the arbitration clause).

[3] Additionally, Alemac's claims for breach of fiduciary duty against Rhoden, and for aiding and abetting breach of fiduciary duty against Risk Transfer and Rhoden, as well as Rhoden's amended counterclaim for unpaid business expenses, arise directly from the parties' implementation and management of both the Partnership Agreement and the BCC. Thus, both of Alemac's breach of fiduciary duty claims and Rhoden's amended counterclaim are also collateral matters that fall within the scope of the Partnership Agreement's broad arbitration clause. *See Collins & Aikman,* 58 F.3d at 23 (stating that the presumption of arbitrability associated with a broad arbitration clause asks whether collateral matters "implicate ... issues of contract construction or the parties' rights and obligations under [the agreement with the clause]"); *Campaniello Imports,* 117 F.3d at 668 (finding plaintiff's fraud and unjust enrichment claims "touched matters" involved in the agreement containing the arbitration clause); *J.J. Ryan & Sons,* 863 F.2d at 319-22 (affirming referral of all claims to arbitration because the factual allegations of the dispute arose "in connection with" the contract containing the arbitration clause). Alemac specifically alleges that its breach of fiduciary duty claims arose from its employment of Rhoden as a liaison with Risk Transfer, and

alleges that his duties entailed "overseeing Alemac's interest for both the Business Consulting Contract as well as the Leprechaun Holdings Partnership." (Am. Compl. ¶¶ 15-18, 24-27; Schulte Decl. Ex. A(2); Harris Decl. ¶ 8.) Additionally, Rhoden's disputed business expenses occurred during his three month employment at Alemac while administering the Partnership Agreement and the BCC, and acting as a liaison between Alemac and Risk Transfer during their partnership. (Am. Counterclaim ¶¶ 31-33; Declaration of W. Chris Rhoden, dated July 2, 2003 ("Rhoden Decl.") ¶ 1; Am. Compl. ¶¶ 15, 24-27.) Thus, this Court cannot say with "positive assurance" that the arbitration clause at issue is "not susceptible of an interpretation" that Alemac's breach of fiduciary duty claims and Rhoden's amended counterclaim "touch matters" within the Partnership Agreement. *See Campaniello Imports,* 117 F.3d at 668- 69 (finding scope of arbitration agreement covered collateral matters and extending arbitration clause to disputes between the corporate parties and their employees or disclosed agents); *In re Currency Conversion Fee Antitrust Litigation,* 265 F.Supp.2d at 406 (finding plaintiffs' antitrust claims related to agreement containing arbitration clause). Accordingly, Alemac's breach of fiduciary duty claims and Rhoden's amended counterclaim are collateral matters falling within the scope of the parties' broad arbitration agreement.

### Conclusion

**\*6** Since the broad arbitration clause in the Partnership Agreement encompasses all pleadings before this Court, Risk Transfer's motion to compel arbitration is granted. Further, Risk Transfer's motion to dismiss or to transfer venue is denied as moot. The Clerk of the Court is directed to close this case.

Not Reported in F.Supp.2d, 2003 WL 22024070 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv01162 (Docket) (Feb. 21, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB B

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 2031610 (S.D.N.Y.)
(Cite as: 2002 WL 2031610 (S.D.N.Y.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Cleo BELETSIS, Plaintiff,
v.
CREDIT SUISSE FIRST BOSTON, CORP., Defendant.
**No. 01 CIV. 6266(RCC).**

Sept. 4, 2002.

Liddle & Robinson, L.L.P., By Laurence S. Moy, New
York, for Plaintiff.

Shearman & Sterling, By James R. Warnot, Jr., Esq, Alex
V. Chachkes, Esq., Moss & Boris P.C., By Richard S. Boris,
Esq., Neal D. Haber, Esq., New York, for Defendants.

MEMORANDUM & ORDER
DUFFY, D.J.

*1 Plaintiff Cleo Beletsis ("Beletsis" or "Plaintiff") brings
this action pursuant to Title VII of the Civil Rights Act of
1964, as amended, 42 U.S.C.A. § 2000e et seq. ("Title
VII"); the Age Discrimination in Employment Act, 29
U.S.C. § 621 et seq. ("ADEA"); the Federal Equal Pay Act,
29 U.S.C. § 206; the New York State Human Rights Law,
N.Y. Exec. Law § 296; the New York State Equal Pay Law,
N.Y. Labor Law § 194; and the New York City Human
Rights Law, N.Y.C. Admin. Code § 8-107. Beletsis alleges
that defendant Credit Suisse First Boston Corporation
("CSFBC" or "Defendant") unlawfully discharged her
because of her age and gender. CSFBC now moves to stay
proceedings and compel arbitration pursuant to the Federal
Arbitration Act, 9 U.S.C. 1, et seq., ("FAA"). This
memorandum and order will address the above motion and
for the reasons explained below, the motion is granted.

*BACKGROUND*

Beletsis began working for CSFBC in early 1996. In
December of 1997, CSFBC distributed to all U.S.
employees a memorandum captioned "Re: Credit Suisse
First Boston Employment Dispute Resolution Program"

(hereinafter "1997 Memorandum"). (Millard Aff. ¶ 4 and
Ex. D.) The memorandum announced that CSFBC was
adopting an employee dispute resolution program
(hereinafter "EDR Program"), (Millard Aff., Ex. D), and
stated that effective January 1, 1988 all employment related
claims would be subject to arbitration as a condition of
employment. (*Id.* at 1-2.) Attached to the memorandum
was a complete copy of CSFBC's EDR Program, entitled
"Statement of Policy, Credit Suisse First Boston,
Employment Dispute Resolution Program." (Millard Aff.,
Ex. D.) In October of 1998, CSFB distributed to all its U.S.
employees a "U.S. Employment Policies and Practices
Handbook" (hereinafter "Employee Handbook"). (Millard
Aff. ¶ 6 and Ex. B.) The Employee Handbook contained
both a summary of the EDR Program and a complete copy
attached as Appendix A. (*Id.,* Ex. B at 7-8, Appendix A.)

The EDR Program attached to the 1997 Memorandum and
included in the Employee Handbook states that all
employment related claims will be subject to mandatory
arbitration. The EDR Program specifically defines Title VII,
ADEA, and other civil rights claims as employment-related
claims subject to arbitration. (Millard Aff. ¶ 9.)

In early 1999, CSFBC distributed a "Compliance
Certification" document to all U.S. employees. (Millard Aff.
¶ 7.) The document states that the employee is "familiar
with all policies, procedures, and ethical standards of
[CSFBC], including ... the U.S. Employment Policies and
Practices Handbook and the Statement of Policy regarding
the Dispute Resolution Programs" and that the employee
will "agree to comply fully with these policies, procedures
and standards." (Millard Aff., Ex. A at 2.) On February 24,
1999, Beletsis signed the Compliance Certification. (Millard
Aff. ¶ 8 and Ex. A at 2.)

On March 1, 2000, CSFBC terminated Plaintiff's
employment. Thereafter, Plaintiff brought this suit in federal
court. Defendant subsequently filed this motion to stay
proceedings and compel arbitration. Defendant argues that
pursuant to CSFBC's EDR Program and in accordance with
the FAA, Beletsis cannot bring her claim in federal court
but must resolve the dispute through arbitration.

*2 Plaintiff's argument against the motion is twofold. First

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                        Page 2
Not Reported in F.Supp.2d, 2002 WL 2031610 (S.D.N.Y.)
(Cite as: 2002 WL 2031610 (S.D.N.Y.))

she alleges that by signing the Compliance Certification she did not consent to the arbitration of her civil rights claims. Second, she asserts that the EDR Program improperly restricts the arbitrator's authority to award attorney's fees to Plaintiffs under both the ADEA and Title VII: "An employee who chooses to be represented by counsel will be responsible for paying the fees and disbursements of such counsel." (EDR Program at 5; *see id.* at 6.) Plaintiff contends that because the above clause is unlawful, the entire arbitration agreement must be voided.

Defendant argues that the EDR Program does not unlawfully restrict plaintiff's remedies and cites the following clause contained in the EDR Program:

[The arbitrator] will be bound by and will be required to apply all applicable law, including that relating to the allocation of the burden of proof and remedies for violations of such law, if any, as well as all points of substantive law. He or she will have no authority either to abridge or to enlarge substantive rights available under existing law ....

(EDR Program at 6.) Defendant further argues that even if the arbitration agreement does unduly limit the plaintiff's remedies, only the offending clause and not the entire agreement should not be voided.

*STANDARD FOR MOTION TO STAY PROCEEDINGS AND COMPEL ARBITRATION*

CSFBC's motion, to stay proceedings and compel arbitration, falls within the scope of the FAA. *Circuit City Stores v. Adams*, 532 U .S. 105, 121 (2001) (holding that employment contracts, except for those covering workers engaged in transportation, are covered by the FAA). Section 3 of the FAA provides for a stay of proceedings where the court is satisfied that the issue before it is arbitrable under the agreement, and Section 4 of the FAA directs a federal court to compel arbitration if there has been a " 'failure, neglect, or refusal' of any party to honor an agreement to arbitrate." *Genesco v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 844 (2d Cir.1987) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)); 9 U.S.C. §§ 3, 4. The Supreme Court has read these provisions to "manifest a 'liberal federal policy favoring arbitration agreements." ' *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25

(1991) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The Court has held that there is no reason to depart from this policy where a party bound by an arbitration agreement raises claims founded on statutory rights. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). The FAA simply requires that a court enforce a written arbitration agreement as it would any other contract: "[a] written provision to settle by arbitration a controversy shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also Gilmer* 500 U.S. at 24.

*3 Accordingly, in deciding whether to stay proceedings and compel arbitration, the Second Circuit in *Genesco* held the court must consider the following factors: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; and third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable. 815 F.2d at 844. [FN1]

> FN1. *Genesco* also held that a court should consider a fourth factor if a plaintiff's claim does not satisfy the three factors described above. 815 F.2d at 844. For the reasons explained below, all of the plaintiff's claims satisfy the first three *Genensco* factors and therefore the fourth factor need not be addressed. *E.g. Chanchani v. Salomon/Smith Barney, Inc.*, No. 99 CIV 9219 RCC, 2001 WL 204214, *2 (S.D.N.Y. Mar. 1, 2001).

I. Agreement to Arbitrate

In determining whether parties have agreed to arbitrate, courts generally apply accepted principles of contract law. *Id.* at 845. Beletsis alleges that by signing the Compliance Certification she did not agree to the arbitration of her civil rights claims. It is axiomatic however, that a party who signs a contract in the absence of fraud or other wrongful acts on the part of another contracting party, is presumed to know its contents and to have assented to them. *Id.; see also DeGaetano v. Smith Barney, Inc.*, No. 95 Civ. 1613(DLC), 1996 WL 44226, *7-8 (S.D.N.Y. Feb. 5, 1996)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 2031610 (S.D.N.Y.)
(Cite as: 2002 WL 2031610 (S.D.N.Y.))

*DeGaetano I* "). The court must not inquire "on whether there was subjective agreement as to each clause in the contract, but on whether there was an objective agreement with respect to the entire contract." *Genesco*, 815 F.2d at 846. The plain and unambiguous language of the signed Certification Agreement along with the Employee Handbook, evidences an objective manifestation of assent; Beletsis's subjective understanding is irrelevant. "Courts in this district routinely uphold arbitration agreements contained in employee handbooks where, as here, the employee has signed an acknowledgement form." *Chanchani*, 2001 WL 204214 at *3 (citing *Arakawa v. Japan Network Group*, 56 F.Supp.2d 349, 352 (S.D.N.Y.1999)); *see also Degaetano*, 1996 WL 44226, at *7-8.

*Chanchani* additionally notes that when an arbitration agreement is a condition of employment, as it is here, an employee "will be deemed to have accepted" an arbitration agreement when she continues to work after the promulgation of the arbitration policy. 2001 WL 204214 at *3. In this case, Plaintiff not only signed the Compliance Certification she also continued to work after the 1997 Memorandum announced that the EDR Policy would go into effect. Because Plaintiff alleges no special circumstances, such as duress or coercion, the parties have agreed to arbitrate all employment-related claims. *See Gilmer*, 500 U.S. at 33; *Genesco*, 815 F.2d at 845-46.

II. Scope of the Agreement

A mere agreement to arbitrate is not sufficient to compel arbitration; the plaintiff's claims must also fall within the scope of that agreement. *Genesco*, 815 F.2d at 844. In determining the scope of the EDR Policy, the federal policy favoring arbitration requires that the court construe arbitration clauses as broadly as possible, and that "arbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *McMahan Secs. Co. v. Forum Capital Mkts. L.P.*, 35 F.3d 82, 88 (2d Cir.1994). In this case the EDR Policy specifically defines Title VII, ADEA, and other civil rights claims, as employment related claims subject to mandatory arbitration. This language is therefore sufficient to ensure

that all the claims raised in this case fall with the scope of the EDR Policy. *Arakawa*, 56 F.Supp.2d at 352-53 (holding that Title VII claims where employment related claims within the scope of an arbitration agreement contained in an employee handbook). In sum, the first two factors of the *Genesco* test demonstrate that contra to Plaintiff's argument, she assented to the arbitration of all claims raised in this case.

III. Arbitrability of Claims

*4 Finally, since the plaintiff raises statutory claims, I must ensure that these claims are not subject to a legislative exception to arbitrability. *Mitsubishi Motors Corp.*, 473 U.S. at 626. It is well settled that civil rights claims such as those in the instant action are not subject to a legislative exception. *See Gilmer*, 500 U.S. at 27-28 (finding ADEA claims arbitrable); *Desiderio v. National Ass'n of Secs. Dealers, Inc.*, 191 F.3d 198, 204-05 (2d Cir.1999) (finding Title VII claims arbitrable); *Fletcher v. Kidder, Peabody & Co.*, 619 N.E.2d 998, 1004, (N.Y.1993) (finding discrimination claims under New York Executive Law § 296 arbitrable); *Rice v. Brown Bros. Harriman & Co.*, No. (Civ.) 96-6326, 1997 WL 129396, at *3 (S.D.N.Y. Mar. 21, 1997) (holding that "*Fletcher's* reasoning would apply also to local law-based discrimination claims").

However, the fact that there is no general legislative exception to the arbitrability of the claims raised does not end the inquiry. A party "[b]y agreeing to arbitrate a statutory claim ... does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp.*, 473 U.S. at 628. The court in *Martens v. Smith Barney Inc.*, 181 F.R.D. 243, 255 (S.D.N.Y.1998), held in dicta that plaintiffs may arbitrate civil rights claims in an arbitral forum that meets three requirements to ensure that the arbitration will not subvert the statutory scheme: first, the arbitration must meet certain standards of procedural fairness; second, the arbitration agreement cannot impose financial burdens on plaintiff's access to the arbitral forum; and third, the arbitration must allow remedies central to the statutory scheme. It should be noted however, that the extent to which a violation of any of *Martens's* requirements actually precludes arbitrability is not agreed upon by courts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 2031610 (S.D.N.Y.)
**(Cite as: 2002 WL 2031610 (S.D.N.Y.))**

in this circuit and therefore should not be viewed as a firm rule. *E.g., Stewart v. Paul, Hastings, Janofsky & Walker, LLP,* 201 F.Supp.2d 291, 292-93 (S.D.N.Y.2002) (holding that "the assertion that [a] cost sharing provision *per se* invalidates the entire agreement is not supported either by the law of this Circuit or by the better considered authorities elsewhere."). Rather, arbitrability should be viewed on a case-by-case basis. *Id.* at 293.

This dispute centers on *Martens'* third requirement for arbitrability. Courts in this district have held that attorney's fees are remedies central to civil rights claims; thus limitations on this remedy have been deemed unlawful. *DeGaetano v. Smith Barney, Inc.,* 983 F.Supp. 459, 468-69 (S.D.N.Y.1997) ("*DeGaetano II* "). Plaintiff argues that CSFB's EDR Policy, in its requirement that "[a]n employee who chooses to be represented by counsel will be responsible for paying the fees and disbursements of such counsel," unlawfully restricts her right to the ADEA and Title VII attorney fee remedy. However, as the defendant compellingly argues, taken in the context of the entire arbitration agreement, the above described attorney fee clause does not in fact limit Plaintiff's potential remedies.

**\*5** The EDR Policy clearly states that the arbitrator "will be ... required to apply all applicable law, including remedies for violations of such law." In resolving the seemingly contradictory meaning of the above clause with the attorney fee clause, it is a cardinal principle of contract interpretation that the intentions of the parties should control. *Klos v. Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997). The parties' intent should be discerned by reading the contract as a whole, and by considering all its clauses together to determine if and to what extent one may modify, explain or limit another. *Allendale Mut. Ins. Co. v. Excess Ins. Co., Ltd.,* 992 F.Supp. 271, 274 (S.D.N.Y.1997). From this it follows that a contract containing two clauses which conflict should, if possible, be read to give meaning to both rather than accept one to the exclusion of the other. *Id.* In this case, the attorney fee clause should be read simply to state the "American Rule", that "parties are ordinarily required to bear their own attorney's fees." *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Res.,* 532 U.S. 598, 602 (2001). In light of the entire

agreement, this attorney fee clause has no bearing on Plaintiff's potential ADEA or Title VII attorney fee remedies and CSFBC has stated that it is prepared to stipulate this before the arbitrator. Therefore, the EDR Program does not infringe upon a plaintiff's right to statutorily prescribed remedies and it does not subvert the Title VI and ADEA statutory schemes.

Even assuming, however, that Plaintiff's assertion regarding the unlawful nature of the attorney fee clause is correct, it would not invalidate the entire EDR Program. Plaintiff urges that the court adopt the Eleventh Circuit's holding in *Perez v. Globe Airport Sec. Services, Inc.,* where the court voided an entire arbitration agreement that required the plaintiff to share the cost and fees of arbitration with the defendant. 253 F.3d 1280 (11th Cir.2001). The *Perez* court however acknowledged that such a decision was in conflict with the law in other circuits. *Id.* at 1286. While the Second Circuit has not ruled on this issue, a majority of courts in this district do not invalidate the entire arbitration agreement for restricting a plaintiff's right to attorney's fees.

In *DeGaetano I,* the court compelled arbitration even when the arbitration agreement was read to restrict the plaintiff's potential remedy and noted that "the mere fact that these statutory remedies may be unavailable in the arbitral forum does not in itself establish that Title VII claims must be resolved in a court of law." 1996 WL 44226, at \*5. Upon review of the arbitrator's actual remedy, the court in *DeGaetano II* held that the extent to which an arbitration agreement does in fact deny an award of attorney's fees "*[t]he relevant portions* of the Arbitration Policy are therefore void as against public policy." 983 F.Supp. at 470 (emphasis added). The court in *DeGaetano II* however did not suggest that the entire agreement should have been invalidated; rather it held only that "relevant portions" of the agreement were unlawful. *Id.* Furthermore, the court in *Raiola v. Union Bank of Switzerland, LLC* stated that arguments in favor of precluding agreements containing a waiver of judicial remedies for violations of Title VII do not overcome the weight of authority in this Circuit. 47 F.Supp.2d 499, 505 (S.D.N.Y.1999).

**\*6** It is true that an overabundance of invalid provisions can void an entire agreement. *Hooters of Am., Inc. v. Phillips,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2002 WL 2031610 (S.D.N.Y.)
**(Cite as: 2002 WL 2031610 (S.D.N.Y.))**

173 F.3d 933, 940 (4th Cir.1999) (Hooters promulgated "so many biased rules" that it created "a sham system unworthy even of the name of arbitration."). In this case, however, the inclusion of a damages-limitation clause does not infect the agreement with any defect that requires invalidation of the entire contract. *See Gannon v. Circuit City Stores, Inc.,* 262 F.3d 677, 681 (8th Cir.2001). As the Eigth Circuit held in *Gannon* the main objective of the arbitration agreement is to require the arbitration of all employment-related claims and not, as Plaintiff implies, to ensure that a CSFBC employee pays her own attorneys fees when she arbitrates those claims. *See id.* The court in *Gannon* ultimately held that severance of the illegal provision rather than invalidating the entire agreement was in line with the Supreme Court's jurisprudence concerning the FAA:

> If we were to hold entire arbitration agreements unenforceable every time a particular term is held invalid, it would discourage parties from forming contracts under the FAA and severely chill parties from structuring their contracts in the most efficient manner for fear that minor terms eventually could be used to undermine the validity of the entire contract. Such an outcome would represent the antithesis of the 'liberal federal policy favoring arbitration agreements.'

*Id.* at 682 (quoting *Moses H. Cone Mem. Hosp.,* 460 U.S. at 24).

The principles outlined in *Gannon* are more closely aligned with the predominant view in this district and are in accordance with generally held principles of contract law. When a contract contains both lawful and unlawful objectives, courts typically enforce legal components of an agreement where the illegal provisions are incidental to the legal aspects and are not the main objective of the agreement. *Peabody & Co., Inc. v. IAG Intern. Acceptance Group N.V.,* 28 F.Supp.2d 126, 139 (S.D.N.Y.1998). In such cases, the illegal provisions of the contract can be severed from the main agreement. *Coolidge Co., Inc. v. Mokrynski,* 472 F.Supp. 459, 463 (S.D.N.Y.1979). Even assuming that the attorney fee clause is unlawful, it can easily be severed allowing the rest of the EDR Policy to remain in full force and effect. In conclusion, Plaintiff's right to statutory remedies will not be infringed upon and therefore the claims are arbitrable under the third prong of

the *Genesco* test.

*CONCLUSION*

In sum the CSFBC's arbitration agreement meets all three prongs of the *Genesco* test and therefore the motion to stay proceedings and compel arbitration is granted.

SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 2031610 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01cv06266 (Docket) (Jul. 11, 2001)

END OF DOCUMENT

# TAB C

**Westlaw.**

Not Reported in F.Supp.2d                                                                                                     Page 1
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
**(Cite as: 2003 WL 23022033 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Alice CHAMOIS, Plaintiff,
v.
COUNTRYWIDE HOME LOANS, Eric DeClercq, Arthur
Anderson, and Bob Brown,
Defendants.
Rachel DOUGLAS, Plaintiff,
v.
COUNTRYWIDE HOME LOANS, Eric DeClercq, Arthur
Anderson, and Bob Brown,
Defendant.
**No. 02 Civ. 9550(MBM), 02 Civ. 9553(MBM).**

Dec. 29, 2003.

**Background:** Former employees each filed individual suits
against their former employer and its employees, alleging
gender discrimination in violation of the Equal Pay Act,
Title VII, and state laws.

**Holding:** On the employer's motion to compel arbitration,
the District Court, J., in a consolidated proceeding, held that
the employees were contractually bound to arbitrate their
claims.
Motion granted.

West Headnotes

**[1] Arbitration ⊱6.2**
33k6.2 Most Cited Cases
Arbitration agreement requiring former employees to
arbitrate their employment discrimination claims was
enforceable, despite their claim that the agreement denied
them their right under Title VII to collect attorney's fees by
leaving that issue to the discretion of the arbitrator; district
court retained discretion to determine whether attorney's
fees should be awarded for a Title VII claim. 9 U.S.C.A. §
3; Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-5(k).

**[2] Arbitration ⊱6.2**
33k6.2 Most Cited Cases
Arbitration agreement requiring former employees to
arbitrate their employment discrimination claims was
enforceable, despite their claim that the costs of arbitration
were prohibitive; the employer had offered to pay almost all
of the costs of arbitration, and thus, the employees failed to
satisfy their burden of showing that prohibitive arbitration
fees were likely. 9 U.S.C.A. § 3.

**[3] Arbitration ⊱7.5**
33k7.5 Most Cited Cases
Even if alleged wrongs of the individual defendants were
unrelated to employer's business, an arbitration agreement
binding former employees covered claims arising from
those acts, and thus, the former employee's claims against
the individual defendants were arbitrable. 9 U.S.C.A. § 3.

**[4] Arbitration ⊱2.2**
33k2.2 Most Cited Cases

**[4] Federal Courts ⊱403**
170Bk403 Most Cited Cases
Federal law determined whether former employees waived
the right to arbitrate their claims against employer where the
parties agreed in the arbitration agreement that the Federal
Arbitration Act (FAA) governed "the interpretation,
enforcement, and all proceedings pursuant to this
Agreement"; the FAA created a body of federal substantive
law of arbitrability, applicable to any arbitration agreement
within the coverage of the Act, and state law had to be
applied to an issue of arbitrability only when that was
clearly the parties' intent. 9 U.S.C.A. § 3.

**[5] Arbitration ⊱23.3(2)**
33k23.3(2) Most Cited Cases
A plaintiff does not waive her right to arbitrate merely by
filing an action in district court, but rather, the earliest point
at which such preclusion may be found is when the other
party files an answer on the merits. 9 U.S.C.A. § 3.
Joseph J. Ranni, Goshen, NY, for Plaintiffs.

Jennifer F. Dimarco, Scott J. Wenner, Little Mendelson,
New York, NY, for Defendants.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
**(Cite as: 2003 WL 23022033 (S.D.N.Y.))**

OPINION AND ORDER

MUKASEY, J.

**\*1** Plaintiffs Alice Chamois and Rachel Douglas have each filed actions against their former employer, Countrywide Home Loans ("Countrywide"), and Countrywide employees Eric DeClercq, Arthur Anderson, and Bob Brown, alleging gender discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206 (2000); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq.; and the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. Plaintiffs also assert New York common law claims of intentional infliction of emotional distress and breach of contract. Defendants move to stay the proceedings in this court and compel arbitration, in accordance with the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. In the alternative, defendants move pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) to dismiss the actions with prejudice on the ground that plaintiffs have waived their right to arbitrate their claims. By agreement of the parties, plaintiffs' cases have been consolidated for the purposes of briefing and deciding these motions. For the reasons stated below, defendants' motion to compel arbitration is granted as to both cases, and the proceedings are stayed pending the completion of arbitration.

I.

Before she was hired as Branch Manager for Countrywide on November 10, 1997, (Chamois Compl. ¶ 11) Alice Chamois signed an arbitration agreement ("Arbitration Agreement") with Countrywide entitled "Mutual Agreement to Arbitrate Claims" on September 2, 1997. [FN1] (DiMarco Letter of 9/10/03, Ex. B ("Arbitration Agreement")) Rachel Douglas signed an identical document on November 28, 1997, [FN2] (id.) and Countrywide subsequently hired her as Assistant Branch Manager on December 29, 1997. (Douglas Compl. ¶ 12)

> FN1. In her affidavit, Karen J. McPhee states that Chamois signed the agreement "[o]n or about January 15, 1998." (DiMarco Aff., Chamois Case, Ex. D, ¶ 3) However, it is clear from the attached copy of the Arbitration Agreement that Chamois in fact signed the agreement on September 2, 1997. (DiMarco Aff., Chamois Case, Ex. D, at Ex. 1)

> FN2. Again, McPhee states in an affidavit that Douglas signed the agreement "[o]n or about December 4, 1997," (DiMarco Aff., Douglas Case, Ex. D, ¶ 3) but the attached copy of the agreement shows that Douglas signed it on November 28, 1997. (DiMarco Aff., Douglas Case, Ex. D, at Ex. 1)

The Arbitration Agreement states, in relevant part:

[T]he Company and the Employee hereby consent to the resolution by arbitration of all claims or controversies for which a federal or state court or other dispute resolution body otherwise would be authorized to grant relief, whether or not arising out of, relating to or associated with the Employee's employment with the Company, or its termination.... The Claims covered by this Agreement include, but are not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant, express or implied; tort claims; claims for discrimination or harassment on bases which include ... sex ...; and claims for violation of any federal, state, or other governmental constitution, statute, ordinance, regulation, or public policy. The purpose and effect of this Agreement is to substitute arbitration as the forum for resolution of the Claims; all responsibilities of the parties under the statues applicable to the Claims shall be enforced.

(Arbitration Agreement ¶ 1) The Arbitration Agreement specifies that "all references to the 'Company' in this Agreement shall include Countrywide Credit Industries, Inc. and all of its subsidiary and affiliated entities, including all former, current and future officers, directors, and employees of all such entities, in their capacity as such and otherwise...." (Id.) The Arbitration Agreement also states that the FAA governs "the interpretation, enforcement and all proceedings pursuant to this Agreement," except as otherwise provided. (Id. ¶ 2)

**\*2** On October 17, 2000, Countrywide distributed an e-mail to all employees informing them of the implementation of a change to the Arbitration Agreement. (DiMarco Reply Aff., Ex. A ¶ 3) Before that date, the Arbitration Agreement provided that Countrywide would pay for the first day of any arbitration proceeding, but that all other arbitration

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
(Cite as: 2003 WL 23022033 (S.D.N.Y.))

costs would be shared equally between the company and the employee. (Arbitration Agreement ¶ 8) The revision provides that Countrywide will pay for all arbitration hearing fees, except that an employee requesting arbitration will be required to pay a filing fee up to a maximum of $125. (DiMarco Reply Aff., Ex. A, at Ex. 1) Accordingly, this unilateral change imposes additional burdens only on Countrywide and relieves Countrywide employees like plaintiffs from most of their obligations to pay arbitration costs.

In mid-October 2001, plaintiffs' attorney informed Countrywide that plaintiffs were considering initiating legal action against Countrywide. (DiMarco Aff., Chamois Case, Ex. C, at Ex. 1; DiMarco Aff., Douglas Case, Ex. C, at Ex. 1) Douglas and Chamois subsequently left their positions at Countrywide on October 18 and October 25, 2001, respectively. (Douglas Compl. ¶ 24; Chamois Compl. ¶ 25) On October 26, 2001, Countrywide informed plaintiffs' counsel in writing that Douglas and Chamois had each entered into the Arbitration Agreement, and Countrywide's legal counsel provided plaintiffs' counsel with a copy of the agreement. (DiMarco Aff., Douglas Case, Ex. C, ¶ 3; DiMarco Aff., Chamois Case, Ex. C, ¶ 3) Notwithstanding the Arbitration Agreements, plaintiffs filed the instant actions in November 2002.

II.

Under § 3 of the FAA, a district court "must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997) (internal quotation marks omitted). In that event, the court must direct the parties to proceed to arbitration on issues covered in that agreement. *See id.*

In deciding whether to stay the proceedings and compel arbitration, this court must determine: (1) whether the parties agreed to arbitrate; (2) the scope of the parties' arbitration agreement; and (3) whether Congress intended any federal statutory claims to be nonarbitrable. [FN3] *Genesco, Inc. v. T. Kakiuchi & Co ., Ltd.,* 815 F.2d 840, 844 (2d Cir.1987).

FN3. In the event that only some claims are arbitrable, *Genesco* requires the court to determine whether to stay the balance of proceedings pending arbitration. 815 F.2d 840, 844 (2d Cir.1987). However, I need not consider this fourth prong of the *Genesco* test because all of plaintiffs' claims are subject to arbitration. *See Arakawa v. Japan Network Group,* 56 F.Supp.2d 349, 353 n. 2 (S.D.N.Y.1999).

First, it is apparent that Chamois and Douglas each entered into an arbitration agreement with Countrywide. Each plaintiff signed the "Mutual Agreement to Arbitrate Claims," which provides for "arbitration of all claims or controversies for which a federal or state court or other dispute resolution body otherwise would be authorized to grant relief." (Arbitration Agreement ¶ 1) Under general contract principles, parties are bound by the provisions of contracts that they have signed, unless they can show special circumstances that would relieve them of their contractual obligations. *Genesco,* 815 F.2d at 845. Plaintiffs argued initially that the Arbitration Agreements in this case were unenforceable because of illegibility (Plaintiffs' Brief in Opposition at 4-7), but they have since conceded that the agreements are legible. (Court Order of 8/12/03) Plaintiffs do not deny that they signed the agreements, do not argue that their consent was improperly obtained, and do not otherwise show special circumstances that would relieve them of their obligations under the Arbitration Agreement. Accordingly, Chamois and Douglas are bound by the provisions of the Arbitration Agreements and have agreed to arbitrate their claims against Countrywide to the extent of those agreements.

*3 The next question is whether plaintiffs' claims fall within the scope of the Arbitration Agreement. Because federal policy favors arbitration as an alternative to litigation, this court is required to construe arbitration agreements "as broadly as possible" and to resolve "any doubts concerning the scope of arbitrable issues ... in favor of arbitration." *Oldroyd v. Elmira Sav. Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998) (internal quotation marks omitted). In this case, the Arbitration Agreement states specifically that it applies to breach of contract claims, tort claims, and sex

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
**(Cite as: 2003 WL 23022033 (S.D.N.Y.))**

discrimination claims (Arbitration Agreement ¶ 1), which covers all of the claims that plaintiffs' have brought in these actions.

Plaintiffs have also failed to demonstrate that arbitration is inappropriate under the third *Genesco* inquiry, which examines whether Congress intended any of their federal statutory claims to be nonarbitrable. *See Genesco, 815 F.2d at 844.* Because plaintiffs are opposing arbitration, they bear the burden of showing that Congress intended to preclude arbitration of their federal statutory claims. *See Bird v. Shearson Lehman / Am. Express, Inc., 926 F.2d 116, 119 (2d Cir.1991).* Plaintiffs do not even argue that Congress intended to preclude arbitration for any of their claims, let alone offer evidence or authority to that effect. Therefore, the three relevant *Genesco* inquiries show that all of plaintiffs' claims are arbitrable.

[1] Plaintiffs contend that the Arbitration Agreement should not be enforced in this case for three reasons. First, plaintiffs claim that the agreement denies them their right under Title VII to collect attorney's fees because it leaves this issue to the discretion of the arbitrator. (Pl. Br. in Opp'n. at 7-8) Second, plaintiffs assert that the costs of arbitration are prohibitive and will effectively prevent them from pursuing their claims through arbitration. (Pl. Br. in Opp'n at 9-10) Finally, plaintiffs argue in the alternative that their claims against individual defendants DeClercq, Anderson, and Brown are not arbitrable and should be severed because these claims do not involve "significant aspects of employment." (Ranni Letter of 9/15/03, at 1) For the reasons discussed below, these arguments are unpersuasive.

Plaintiffs first contend that the Arbitration Agreement impairs their ability to collect the attorney's fees to which they claim they are entitled under the law. (Pl. Br. in Opp'n at 7-8) The relevant portion of the agreement states that "the arbitrator may, in his or her discretion, permit the prevailing party to recover fees and costs only to the extent permitted by applicable law." (Arbitration Agreement ¶ 8) Plaintiffs apparently object to this provision because it invokes the discretion of the arbitrator, when in fact the prevailing plaintiff a Title VII claim is entitled to attorney's fees in the absence of special circumstances. *See Lyte v. Sara Lee Corp., 950 F.2d 101, 103 (2d Cir.1991).* However, a district

court retains discretion to determine whether attorney's fees should be awarded for a Title VII claim, 42 U.S.C. § 2000e-5(k), and Supreme Court precedent establishes a two-step inquiry that guides that discretion. *See Pino v. Locascio, 101 F.3d 235, 237 (2d Cir.1996).* An arbitrator in this case likewise must exercise his discretion in accordance with the same legal guidelines, as the Arbitration Agreement provides that "all arbitrations covered by this Agreement shall be adjudicated in accordance with the state or federal law which would be applied by a United States District Court sitting at the place of the hearing...." (Arbitration Agreement ¶ 2) Accordingly, because attorney's fees are awarded in Title VII claims only at the discretion of the decision-maker and because an arbitrator would be subject to the same legal constraints as this district court, the Mutual Agreement to Arbitrate does not limit plaintiffs' possible remedies in any meaningful way.

*4 [2] Plaintiffs argue also that the Arbitration Agreement is unenforceable because it obligates them to pay prohibitive fees for the arbitration process. Although *Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000),* does suggest that large arbitration costs may invalidate an arbitration agreement, *see id. at 90,* that decision states that a party who "seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive ... bears the burden of showing the likelihood of incurring such costs." *Id. at 91.* In an attempt to satisfy this burden, plaintiffs have provided the court with a fee schedule from the National Arbitration Forum, which allegedly demonstrates that the fees for arbitrating these actions will exceed $15,000. (Pl. Br. in Opp'n at 9; Ranni Aff. Ex. 4) However, Countrywide announced in October 2000 via e-mail that it would pay all arbitration costs that exceeded the $125 filing fee (DiMarco Reply Aff., Ex. A, at Ex. 1), and plaintiffs have presented no evidence to show that they will incur any arbitration costs above that $125 fee. Plaintiffs attempt to argue that the parol evidence rule prevents the October 2000 e-mail from altering the terms of the Arbitration Agreement (Pl. Br. in Opp'n at 7-8), despite the fact that the intended effect of the unilateral revision is to benefit plaintiffs and other employees like them. Even if plaintiffs' argument about the parol evidence rule is correct, the October 2000 e-mail

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
**(Cite as: 2003 WL 23022033 (S.D.N.Y.))**

nonetheless shows that Countrywide intends to pay almost all arbitration costs, which in turn shows that plaintiffs are not likely to incur any great expense from arbitration. Because Countrywide has offered to pay almost all of the costs of arbitration, plaintiffs have failed to satisfy their burden of showing that prohibitive arbitration fees are likely. Cf. *In re Currency Conversion Fee Antitrust Litigation,* 265 F.Supp.2d 385, 411-12 (S.D.N.Y.2003) (citing cases for proposition that plaintiffs cannot show prohibitive arbitration costs when defendants have offered to pay all arbitration fees and to forgo any right to seek prevailing party attorney's fees).

[3] Finally, plaintiffs argue in the alternative that their claims against DeClercq, Anderson, and Brown are not arbitrable and should be severed because these claims are based on "intentional acts" by the individual defendants that were "unrelated to the [corporate] Defendant's business purpose." (Ranni Letter of 9/15/03, at 1) In support of this contention, plaintiffs cite *Singer v. Jeffries & Co., Inc.,* 78 N.Y.2d 76, 571 N.Y.S.2d 680, 575 N.E.2d 98 (1991), for the proposition that claims arising from employment are arbitrable only when they involve "significant aspects of employment." [FN4] (Ranni Letter of 9/15/03, at 1) This reading of *Singer* is too broad. That case was interpreting an agreement which provided for arbitration of "any dispute arising out of the employer's business," and the court simply explained that a claim arose out of the employer's business, and thus was subject to arbitration under that particular agreement, when it involved "significant aspects of employment." See 78 N.Y.2d at 82-83, 571 N.Y.S.2d at 683-84, 575 N.E.2d 98. By contrast, the Arbitration Agreement is broader and applies to claims "whether or not arising out of, relating to or associated with the Employee's employment with the Company." (Arbitration Agreement ¶ 1) The Arbitration Agreement further explains that references to the "Company" include "all former, current and future officers, directors and employees of all [Countrywide] entities, in their capacity as such or otherwise." (*Id.*) Although plaintiffs contend that the phrase "or otherwise" is unenforceably vague, this language plainly signifies that the Arbitration Agreement applies to cases against Countrywide employees both in their capacity as employees and "otherwise," to wit, outside that capacity.

Accordingly, even if the alleged wrongs of the individual defendants were unrelated to Countrywide's business, [FN5] the Arbitration Agreement covers claims arising from these acts, and plaintiffs' claims against DeClercq, Anderson, and Brown are arbitrable.

> FN4. Plaintiffs also cite *Berger v. Cantor Fitzgerald, Inc.,* 240 A.D.2d 222, 658 N.Y.S.2d 591 (1st Dep't 1997), which found that a slander claim "was not arbitrable under the parties' arbitration agreement" because it did not involve significant aspects of employment. 240 A.D.2d at 223, 658 N.Y.S.2d at 592. However, *Berger* never described the arbitration agreement at issue there, and there is no indication that the terms of that agreement are similar to the Arbitration Agreement.

> FN5. Plaintiffs allege that DeClercq, Anderson, and Brown acted unlawfully by hiring and compensating employees in a discriminatory manner, submitting inaccurate job evaluations, and attempting to eliminate any need for plaintiffs' services. (Chamois Compl. ¶¶ 14, 18, 22, 23; Douglas Compl. ¶¶ 15, 18, 22) It is by no means clear that these acts do not involve significant aspects of employment.

**\*5** As discussed above, all of plaintiffs' claims are arbitrable, and the parties should proceed to arbitration. Because the FAA permits this court to stay plaintiffs' actions pending the conclusion of arbitration, *see* 9 U.S.C. § 3, these actions are stayed until the parties have completed arbitration. *See Salim Oleochemicals v. M/V Shropshire,* 278 F.3d 90, 93 (2d Cir.2002) (implying that granting a stay, which is an unappealable interlocutory order, is preferable to dismissing an action because "[u]nnecessary delay of the arbitral process through appellate review is disfavored.").

IV.

[4] Defendants argue that plaintiffs' claims should be dismissed with prejudice because, by filing these civil actions, Chamois and Douglas have waived any right to arbitrate their claims. Defendants contend that New York

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                 Page 6
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
**(Cite as: 2003 WL 23022033 (S.D.N.Y.))**

contract law should govern the question of waiver. (Defendants' Memorandum of Law, Chamois Case, at 11; Defendants' Memorandum of Law, Douglas Case, at 11) As discussed above, the parties agreed in the Arbitration Agreement that the FAA governs "the interpretation, enforcement, and all proceedings pursuant to this Agreement," (Arbitration Agreement ¶ 2) and defendants identify no provision that shows the parties intended state law to govern the issue of waiver. Accordingly, federal law determines whether plaintiffs have waived the right to arbitrate because "the FAA creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act," as state law must be applied to an issue of arbitrability only when that was clearly the parties' intent. *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 130-31 (2d Cir.1997) (internal quotation marks omitted). *See also Allied Sanitation, Inc. v. Waste Management Holdings, Inc.,* 97 F.Supp.2d 320, 334 n. 12 (E.D.N.Y.2000).

[5] "There is a strong presumption in favor of arbitration, and waiver of the right to arbitration is not to be lightly inferred." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.,* 310 F.3d 102, 104-05 (2d Cir.2002) (internal quotation marks and brackets omitted). A plaintiff does not waive her right to arbitrate merely by filing an action in district court; "the earliest point at which such preclusion may be found is when the other party files an answer on the merits." *Chatham Shipping Co. v. Fertex S.S. Corp.,* 352 F.2d 291, 293 (2d Cir.1965). *See also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos,* 553 F.2d 842, 845 (2d Cir.1977) (citing *Chatham* ). In this case, defendants have not filed an answer to plaintiffs' claims on the merits; they have responded to plaintiffs' complaints only by filing the instant motions to enforce the Arbitration Agreement. Accordingly, plaintiffs have not waived the right to arbitrate by filing the instant lawsuits, and plaintiffs' actions are stayed, not dismissed with prejudice.

\* \* \*

For the reasons stated above, the parties should proceed to arbitration, and plaintiffs' actions are stayed pending the completion of arbitration.

**Motions, Pleadings and Filings (Back to top)**

• 7:02cv09553 (Docket) (Nov. 27, 2002)

• 7:02cv09550 (Docket) (Nov. 27, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB D

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22723015 (S.D.N.Y.)
**(Cite as: 2003 WL 22723015 (S.D.N.Y.))**

☞

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Janet CICCHETTI, Petitioner,
v.
DAVIS SELECTED ADVISORS, et al., Defendant.
**No. 02 Civ.10150 RMB.**

Nov. 17, 2003.

Former employee sued employer and her immediate supervisor under Title VII, alleging she was terminated for complaining to her immediate supervisor and to supervisor's superior about sexual harassment directed toward her by her immediate supervisor. Upon employer's motion to compel arbitration, the District Court, Berman, J., held that: (1) former employee's claims against employer were required to be submitted to arbitration pursuant to arbitration agreement that employee had voluntarily signed at commencement of employment, and (2) former employee was estopped from avoiding arbitration of claims against supervisor who was nonsignatory to arbitration agreement.

Motion granted.

West Headnotes

**[1] Arbitration ☞92**
33k92 Most Cited Cases
 (Formerly 160k11(12))
Employee's claims against employer, including that she was terminated in violation of Title VII in retaliation to complaining about immediate supervisor's sexual harassment, were required to be submitted to arbitration pursuant to arbitration agreement that employee had voluntarily signed at commencement of employment; agreement demonstrated intent to arbitrate claims, employee's claims clearly fell within scope of arbitration agreement which covered any claim arising out of or relating to employment included discrimination and harassment, and all of employee's federal and state law were

arbitrable. 9 U.S.C.A. § 2; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; McKinney's Executive Law § 296; McKinney's New York City Administrative Code, § 8-101 et seq.

**[2] Arbitration ☞92**
33k92 Most Cited Cases
 (Formerly 160k11(12))
Employee who alleged that she was terminated in retaliation to complaining of supervisor's sexual harassment of her in violation of Title VII and state law was estopped from avoiding arbitration of claims against supervisor who was nonsignatory to arbitration agreement between employee and employer; scope of arbitration agreement included claims of discrimination, and employee's claims against employer and supervisor were inextricably intertwined because employee would not have claim against employer but for employee's claims against supervisor. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; McKinney's Executive Law § 296; McKinney's New York City Administrative Code, § 8-101 et seq.

*DECISION AND ORDER*
BERMAN, J.

I. Background

**\*1** On or about December 23, 2002, plaintiff Janet Cicchetti ("Plaintiff" or "Cicchetti") filed a complaint ("Complaint") against Davis Selected Advisors, L.P. ("DSA") and Kimmarie Zamot ("Zamot") (collectively, "Defendants") alleging, among other things, that Plaintiff was "terminated from [DSA] on or about August 17, 2001, for complaining to her immediate supervisor, Defendant KimMarie Zamot, and for complaining to her immediate supervisor's superior, Russell Weise, about the sexual harassment that was being directed towards Plaintiff by Zamot" in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.; New York State Executive Law § 296; and Title 8 of the Administrative Code and Charter of New York City. (Complaint ¶¶ 1-2, 12). Plaintiff seeks "injunctive relief, monetary relief (including past and ongoing economic loss), compensatory and punitive damages, attorneys' fees, costs and disbursements for violation of rights." (Complaint ¶ 1).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                        Page 2
Not Reported in F.Supp.2d, 2003 WL 22723015 (S.D.N.Y.)
**(Cite as: 2003 WL 22723015 (S.D.N.Y.))**

On or about June 17, 2003, Defendants filed a Notice of Motion to Compel Arbitration ("Motion"), pursuant to an arbitration agreement signed by Plaintiff and DSA at the beginning of Plaintiff's employment, dated January 23, 2000 ("Arbitration Agreement"), and a Memorandum of Law in Support of Defendants' Motion to Compel Arbitration ("Defs.' Memo"). On or about August 3, 2003, Plaintiff submitted Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration ("Pl.'s Memo"), arguing, among other things, that Plaintiff's claims should proceed before this Court and that "Defendants' Motion to Compel should be denied on the grounds that DSA's Arbitration Agreement is unenforceable as it mandates that Plaintiff pay exorbitant costs to arbitrate her claims against the Defendants.... [T]he claims against Zamot should not be arbitrated and should instead be bifurcated, and remain within this Court, as ... Zamot is not a party to the [Arbitration] Agreement...." (Pl.'s Memo at 1). On or about September 12, 2003, Defendants submitted a Reply Memorandum of Law in Support of Defendants' Motion to Compel Arbitration ("Reply"). The Court heard oral argument on November 17, 2003. For the reasons set forth below, the Defendants' Motion to Compel Arbitration is granted.

II. Standard of Review

"The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ["FAA"], establishes a liberal policy in favor of arbitration...." *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 665 (2d Cir.1997); *see* 9 U.S.C. § 2 ("A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "If ... all of the plaintiff's claims are subject to arbitration, 'no useful purpose will be served by granting a stay of ... [the] claims,' and the case may be dismissed." *Alemac Ins. Services, Inc. v. Risk Transfer Inc.,* 03 Civ. 1162, 2003 WL 22024070, at

*3 (S.D.N.Y. Aug.28, 2003) (quoting *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.,* 239 F.Supp.2d 332, 336 (S.D.N.Y.2002).

III. Analysis

A. *Arbitration of Claims Against DSA*

**\*2** [1] Defendants argue that "[t]here can be no doubt that Plaintiff and DSA agreed to arbitrate. Plaintiff voluntarily signed an Arbitration Agreement at the commencement of her employment with DSA ." (Def's Memo at 5). Plaintiff does not dispute that she voluntarily signed the Arbitration Agreement but argues that the Arbitration Agreement is unconscionable and unenforceable because Plaintiff "would be responsible for significant arbitration costs, which would not be incurred in a judicial forum." (Pl's Memo at 8). *See Ball v. SFX Broadcasting, Inc.,* 165 F.Supp.2d 230, 240 (N.D.N.Y.2001).

"[A] court asked to stay proceedings pending arbitration in a case covered by the [FAA] has essentially four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 844 (2d Cir.1987) (citations omitted).

First, as noted, Plaintiff and Defendant DSA have agreed to arbitrate. Defendant Zamot did not sign the Arbitration Agreement but, as will be shown, may compel arbitration against Plaintiff.

Second, Plaintiff's claims clearly fall within the scope of the Arbitration Agreement; each relates to her employment and termination. [FN1] (Complaint ¶¶ 33-76). *See Rice v. Brown Brothers Harriman & Co.,* No. 96 Civ. 6326, 1997 WL 129396, at *2 (S.D.N.Y. Mar. 21, 1997) ("[The Arbitration Agreement] is broad and therefore must be read to include all employment disputes.").

    FN1. "The parties agree that any controversy or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 22723015 (S.D.N.Y.)
**(Cite as: 2003 WL 22723015 (S.D.N.Y.))**

claim arising out of or relating to (1) Employer's employment of Employee (including without limitation claims of discrimination and/or harassment), (2) Employee's voluntary termination of his or her employment, and/or (3) Employer's termination of Employee's employment ..., shall be resolved by arbitration in accordance with the Code of Arbitration Procedure of the National Association of Securities Dealers.... Employee understands and agrees that this Agreement applies to all claims Employee may assert against Employer whether sounding in tort, contract or statute." (Arbitration Agreement at 1).

Third, Congress clearly did not intend claims like Plaintiff's federal statutory claims to be nonarbitrable. *See Gilmer,* 500 U.S. at 26 ("Although all statutory claims may not be appropriate for arbitration, having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.") (citation omitted); *Desiderio v. National Association of Securities Dealers, Inc.,* 191 F.3d 198, 206 (2d Cir.1999) (concluding that "the arbitration provision [in employment contract] ... may be applied to [Plaintiff's] Title VII claims."). Plaintiff's state statutory and common law claims are also arbitrable. *See* New York Executive Law § 296 and Title 8 of the Administrative Code and Charter of New York City; *see also AFP Imaging Corp. v. Ross,* 780 F.2d 202, 205 (2d Cir.1985) ( [Plaintiff's] "common law ... claim against [Defendant], ... is arbitrable."); *Rice,* 1997 WL 129396, at *3 ("[S]tate law discrimination claims under New York Executive Law § 296 ... are arbitrable.... [D]iscrimination claims under New York City Human Rights Law [Administrative Code § 8-101 *et seq.*] also are arbitrable.").

*\*3 Fourth, it is not necessary to decide whether nonarbitrable claims should be stayed pending the outcome of arbitration because all of Plaintiff's claims are arbitrable. *See Rice,* 1997 WL 129396, at *3. [FN2]

> FN2. Plaintiff's claim that she "would be responsible for significant arbitration costs, which would not be incurred in a judicial forum" (Pl's Memo at 8; *see also* transcript of proceedings held

November 17, 2003) is not persuasive because, among other reasons, she will not be responsible for arbitration costs here. The Arbitration Agreement provides that "Employer agrees to pay all fees charged by the arbitration authority to the extent such agreement is required by law as a condition to the enforcement of this Agreement." (Arbitration Agreement at 1). The Court (and DSA) interpret that provision to mean that DSA will pay Plaintiff's arbitration fees. (Reply at 1).

**B.** *Arbitration of Claims Against Zamot*

[2] Defendants argue that "although Zamot is not a signatory to the Arbitration Agreement between Plaintiff and DSA, Zamot is nevertheless entitled to enforce the Arbitration Agreement as to Plaintiff's claims against her ... [because] [b]ut for the allegations against Zamot, Plaintiff would have no claim against DSA, thus inextricably intertwining the Defendants and the causes of action alleged against them." (Defs.' Memo at 9). Plaintiff responds that Zamot may not compel arbitration because "Zamot is not a party to the Arbitration Agreement between Plaintiff and DSA, her 'Employer." ' (Pl.'s Memo at 11).

A signatory, such as Plaintiff, may be estopped "from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 98 (2d Cir.1999); *see also Gambardella v. Pentec, Inc.,* 218 F.Supp.2d 237, 242 (D.Conn.2002) ("[C]laims against an individual employee that arose out of the relationship between plaintiff and that individual's employer, which was the subject of a mandatory arbitration agreement, were also subject to mandatory arbitration."). Here, Plaintiff's claims against DSA and Zamot involve the very same issues and circumstances and are "all directly related to [Zamot's] employment with [DSA] and to [Plaintiff's] claims against [DSA], which are indisputably within the scope of the arbitration agreement at issue here." *Gambardella,* 218 F.Supp.2d at 242. [FN3] They should be resolved together.

> FN3. Because the Court has concluded that Zamot

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 4
Not Reported in F.Supp.2d, 2003 WL 22723015 (S.D.N.Y.)
**(Cite as: 2003 WL 22723015 (S.D.N.Y.))**

> may enforce the Arbitration Agreement under an
> estoppel theory, there is no need to analyze here
> Plaintiff's alternative theories as to why Zamot may
> not compel arbitration. *See Thompson-CSF,* 64
> F.3d at 776; *see also* <u>Genesco, 815 F.2d at 856</u>.

IV. Conclusion & Order

For the reasons set forth above, the Defendants' Motion to
Compel Arbitration is granted, and the parties are directed
to proceed to arbitration. The Complaint is dismissed. The
Clerk is respectfully requested to close this case.

Not Reported in F.Supp.2d, 2003 WL 22723015 (S.D.N.Y.)

**Motions, Pleadings and Filings <u>(Back to top)</u>**

• <u>1:02cv10150</u> (Docket) (Dec. 23, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB E

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 21222541 (S.D.N.Y.)
**(Cite as: 2003 WL 21222541 (S.D.N.Y.))**

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jenny GRUBER, Plaintiffs,
v.
LOUIS HORNICK & CO., INC., Louis Hornick, Steven
Berger and Steven Rand
Defendants.
**No. 02 Civ. 5092(SHS).**

May 23, 2003.

Former employee brought Title VII action against employer, alleging sexual harassment and retaliation. On employer's motion to compel arbitration, the District Court, <u>Stein</u>, J., held that arbitration provision in employment agreement was enforceable.

Motion granted.

West Headnotes

**[1] Arbitration ☞6.2**
33k6.2 Most Cited Cases
Under New York law, employer's requirement that employee sign employment agreement as condition for continued employment did not, without more, give rise to duress such as would render arbitration clause in agreement unenforceable.

**[2] Arbitration ☞6.2**
33k6.2 Most Cited Cases
Fee schedule for arbitrating former employee's sexual harassment claim against employer was not so high as to constitute barrier to vindication of employee's Title VII rights, and thus was not ground for declining to enforce arbitration provision in parties' employment agreement. Civil Rights Act of 1964, § 701 et seq., <u>42 U.S.C.A. § 2000e</u> et seq.

**[3] Arbitration ☞6.2**

33k6.2 Most Cited Cases
Possibility that, under arbitration rules, Title VII plaintiff might be assessed employer's attorney fees even if her sexual harassment claim was not frivolous did not constitute barrier to vindication of plaintiff's statutory rights, and thus was not ground for declining to enforce arbitration provision in parties' employment agreement. Civil Rights Act of 1964, § 701 et seq., <u>42 U.S.C.A. § 2000e</u> et seq.

*OPINION AND ORDER*

<u>STEIN</u>, J.

**\*1** Plaintiff Jenny Gruber brings this employment discrimination action against her employers (collectively "Louis Hornick"), alleging that she was subjected to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the New York City Human Rights Law. Defendants have moved to compel arbitration and stay further judicial proceedings pending arbitration. For the following reasons, that motion is granted.

I. BACKGROUND

Plaintiff was employed by Louis Hornick, a curtain and draperies manufacturer, for 10 months--from April 2001 to January 2002--as an Assistant Designer in its New York City office. As a condition of employment, Louis Hornick requires its employees to sign an "Undertaking and Inducement to Louis Hornick & Co., Inc," ("Agreement") that contains the following agreement to arbitrate:

> Any dispute or controversy between the Company and Applicant relating to or arising out of the employment of Applicant or the termination of such employment for any reason and under any circumstance ... shall be determined in arbitration in the City of New York pursuant to the Commercial Rules then in effect of the American Arbitration Association ... The arbitration award shall be final and binding upon the parties and judgment may be entered thereon in the Supreme Court of the State of New York or in any other court of competent jurisdiction.

(Anatole Aff. Ex.A ¶ 3). On April 4, 2001, plaintiff signed the Agreement, acknowledging that she had read and understood it. [FN1]

> FN1.    The    Agreement    contains    an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d    Page 2
Not Reported in F.Supp.2d, 2003 WL 21222541 (S.D.N.Y.)
(Cite as: 2003 WL 21222541 (S.D.N.Y.))

acknowledgement provision that states "Applicant has carefully read and considered this undertaking and inducement, and understands it, and expressly acknowledges receipt of a copy hereof and the opportunity to discuss it with any person or advisor of her/[his] choosing before signing." (Anatole Aff. Ex A ¶ 4).

On January 18, 2002, for reasons that are in dispute, Gruber was terminated by Louis Hornick. She claims that she was sexually harassed and terminated in retaliation for raising complaints. Defendants argue that Gruber was terminated for proper business reasons. Six months after being terminated, Gruber filed this action, asserting claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a, et seq., and the New York City Civil Rights Law, N.Y. City Admin. Code §§ 8-107 et. seq. Defendants have now moved to compel Gruber to arbitrate their disputes.

## II. DISCUSSION

The Federal Arbitration Act ("FAA") provides that "an agreement in writing to submit to arbitration an existing controversy ... shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a strong federal policy favoring alternative means of dispute resolution, and in light of that policy, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Arakawa v. Japan Network Group,* 56 F.Supp. 349, 352 (S.D.N.Y.1999)(citing *Oldroyd v. Elmira Savings Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998) and *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). In determining whether to compel arbitration pursuant to the FAA, a court considers: 1) whether the parties agreed to arbitrate; 2) what the scope of the arbitration agreement is; and 3) whether Congress intended the federal statutory claims asserted by the plaintiff to be nonarbitrable. *See Genesco, Inc. v. T. Kaiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987).

*2 In response to defendants' motion to compel arbitration, Gruber contends her claims are nonarbitrable because first,

she did not knowingly and willfully enter into the agreement to arbitrate, and second, the arbitration provisions with respect to costs and attorney's fees render the agreement unenforceable in the context of a Title VII suit. The litigants do not dispute the scope of the arbitration agreement.

### A. Gruber Agreed to Arbitrate

[1] In determining whether parties have agreed to arbitrate, courts apply generally accepted principles of contract law. *See id.* at 845. A person who signs a contract is presumed to know its contents and assent to them. *See Arakawa,* 56 F.Supp.2d at 352; *Berger v. Cantor Fitzgerald Securities,* 967 F.Supp. 91, 93 (S.D.N.Y.1997). Plaintiff is bound by the agreement to arbitrate unless she can show special circumstances, such as duress or coercion, which would justify non-enforcement of the contract. *Arakawa,* 56 F.Supp.2d at 352 (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 33, 111 S.Ct. 1647, , 1655, 114 L.Ed.2d 26, L.Ed.2d 26 (1991)).

Gruber contends that she signed the Agreement under duress. She asserts that she was hired on Friday, March 30, 2001, and left her prior employment to begin work for Louis Hornick the following Monday. (Gruber Aff.). In support of her contention of duress, she states merely that the Agreement "was not discussed with me. I was told I had to sign it and return it." (Gruber Aff. ¶ 3) and that, when she was given the Agreement two days after starting work, "I was told that if I did not sign the Agreement, I would not be able to work for [Louis Hornick]" (Gruber Aff. ¶ 5).

In order for a party to show that a contract was signed under duress, she must show "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." *DeGaetano v. Smith Barney, Inc.,* No. 95 Civ. 1613(DLC), 1996 WL 44226 at *5 (S.D.N.Y. Feb.5, 1996)("DeGaetano I"). Despite the inequality in bargaining power between employers and employees, conditioning employment upon an agreement to arbitrate does not by itself constitute duress. *See Gilmer,* 500 U.S. at 33, 11 S.Ct. 1647. Nor does conditioning further employment to a current employee's agreement to arbitrate by itself constitute duress. *See Brennan v. Bally Total Fitness,* 198 F.Supp.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21222541 (S.D.N.Y.)
**(Cite as: 2003 WL 21222541 (S.D.N.Y.))**

Page 3

377, 383 (S.D.N.Y.2002)(holding arbitration agreement invalid because of coercive circumstances of employer's presentation of agreement to employees); *see also Arawaka,* 56 F.Supp.2d at 352 (holding arbitration agreement was not invalid because employee signed it in order to keep her job, absent other allegations of unfairness, oppression or unconscionability.

Here, Gruber has failed to establish or even allege the additional circumstances required to establish that she lacked a meaningful choice in deciding whether or not to sign the Agreement. Her sole allegation is that she was told that if she did not sign, she would not be able to work for defendants. (Gruber Aff. ¶ 5). In contrast to cases where duress has been found in the signing of agreements to arbitrate employment disputes, there are no allegations that plaintiff was not given sufficient time to read the agreement or that defendants misled her about its contents. *See Brennan, 198 F.Supp.2d at 383* (holding arbitration agreement invalid due to duress where plaintiff given insufficient time to review agreement and defendant used additional pressure tactics); *Berger v. Cantor Fitzgerald Securities, 942 F.Supp. 963, 966 (S.D.N.Y.1996)*(ordering discovery on issue of whether plaintiff agreed to arbitrate where plaintiff alleged that he was misled about the arbitration agreement's contents and given insufficient time to review the agreement). Accordingly, the Court holds that Gruber has not shown that the Agreement was signed under duress, and therefore agreed to arbitrate.

B. The Title VII Claims are Arbitrable Pursuant to the Agreement

**\*3** Title VII claims are not subject to a general legislative exception to arbitrability, and are therefore generally arbitrable. *See Desiderio v. National Ass'n of Secs. Dealers, Inc., 191 F.3d 198, 204-05 (2d Cir.1999)*. Such claims, however, cannot be subject to arbitration where the forum requires a party to forgo a substantive right afforded by the statute. *See Gilmer,* 500 U .S. AT 28 (finding ADEA claims arbitrable because substantive rights of the statute could be vindicated in arbitral forum); *Martens v. Smith Barney, In c., 181 F.R.D. 243, 255-56 (S.D.N.Y.1998)*(setting forth requirements to ensure arbitration will not subvert statutory scheme).

The Agreement provides that arbitration is to be held pursuant to the rules of the American Arbitration Association ("AAA"). Gruber contends that two provisions of these rules render the Agreement invalid. First, she contends that the AAA's administrative fee schedule makes the costs to her to arbitrate prohibitive. Second, she contends that the AAA's attorney's fees provisions, which award attorney's fees to employers who prevail against non-frivolous complaints, unduly "chills" plaintiffs from vindicating their substantive rights afforded by the statute.

1. Arbitration Fees

**[2]** The existence of significant arbitration costs may preclude a litigant from effectively vindicating her federal statutory rights in the arbitral forum. *Green Tree Financial v. Randolph, 531 U.S. 79, 90, 121 S.Ct. 513, 522, 148 L.Ed.2d 373 (2000)*. The party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive "bears the burden of showing the likelihood of incurring such costs." *Id. at 92, 121 S.Ct. at 522.*

Plaintiff submits that in an employment dispute such as hers, she would be assessed an initial filing fee of $1250, a case service fee of $750, and an administrative fee of $150 per day of the hearing. In addition, there are daily fees for the rental of hearing rooms and compensation for the arbitrator which can exceed $1,000 per day. (Plt.Exh. 1, pp. 3-4). Louis Hornick responds that Gruber's information is out of date, and that effective November 1, 2002, the AAA adopted a new, lower, administrative fee schedule for employment disputes. (Rudderman Aff. II, Ex.A). Under the new fee schedule, plaintiff's filing fee is capped at $125, and all other expenses, including hearing fees, administrative fees, rental fees, and the arbitrator's compensation are paid by the employer. *Id.*

It is unclear from the competing submissions of the parties what the AAA fee schedule is for this case. Plaintiff's submission provides the AAA administrative fee schedule for disputes arising out of "individually-negotiated employment agreements" as of January 1, 2001. (Gruber Aff. Exh.1). Defendant's submission, on the other hand, is the AAA administrative fee schedule for disputes arising out

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21222541 (S.D.N.Y.)
**(Cite as: 2003 WL 21222541 (S.D.N.Y.))**

of "employer-promulgated plans" as of November 1, 2002. Neither side has provided any information as to whether according to the AAA's rules this employment agreement is "individually-negotiated" or "employer-promulgated."

**\*4** It is clear that under the fee schedule for "employer-promulgated" agreements, plaintiff is not effectively precluded from vindicating her rights due to the fees of arbitrating. The higher, "individually-negotiated" schedule, presents a more difficult question However, plaintiff has not submitted any information that demonstrates what the higher schedule would amount to in this case, or that she would be unable to pay any fees incurred. The record, therefore, is inadequate for the Court to conclude that even the higher fee schedule would constitute a barrier to the vindication of plaintiff's rights. *See Mildworm v. Ashcroft,* 200 F.Supp.2d 171, 180 (declining to invalidate similar arbitration agreement in advance of the arbitration when it was unclear what fees would in fact be assessed). Accordingly, this Court will maintain jurisdiction over any subsequent petition to confirm or vacate the award. *Id.; Arakawa,* 56 F.Supp.2d at 355.

2. Attorney's Fees

[3] Title VII provides for the discretionary award of attorney's fees to the prevailing party. 42 U.S.C. § 2000e-5(k). A prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances. *Chrisitansburg Garment Co. v. EEOC,* 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978). When an action is brought in good faith, a prevailing defendant is only entitled to an award of attorney's fees upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation. *Id.* at 421, 87 S .Ct. at 700. To the extent an arbitration agreement waives a plaintiff's right to obtain attorney's fees, the agreement is invalid. *DeGaetano v. Smith Barney, Inc.,* 983 F.Supp. 459, 468-69 (S.D.N.Y.1997)( "DeGaetano II").

Unlike the agreement in *DeGaetano II,* the AAA's attorney's fees provision does not limit Gruber's right to obtain attorney's fees should she prevail. It is therefore analogous to any other potentially burdensome arbitration cost addressed by the Supreme Court in *Green Tree.* As it is

quite unclear at this point in the litigation whether plaintiff will be assessed defendant's attorney's fees at all and if so, how large those fees will be, plaintiff has not shown the arbitration will be prohibitively expensive because of this provision. *See Arawaka,* 56 F.Supp.2d 349, 355 (holding that plaintiff had not shown a fee splitting arrangement to be a barrier to her statutory rights when it was not yet determined what, if any, amount would be assessed against the plaintiff). The validity of any attorney's fees awarded can be addressed within the context of a petition to confirm or vacate the arbitration award at the conclusion of the arbitration. *See DeGaetano II,* 983 F.Supp. at 470 (granting motion to vacate or modify portion of arbitration award relating to attorney's fees). As noted above, this Court will maintain jurisdiction over any subsequent petition to confirm or vacate the award. *Arakawa,* 56 F.Supp.2d at 355.

III. CONCLUSION

**\*5** Accordingly, defendants' motion to compel arbitration is granted, the complaint is dismissed, and the parties are directed to proceed to arbitration forthwith. This Court will maintain jurisdiction over any subsequent petition to vacate or confirm the award.

**Motions, Pleadings and Filings (Back to top)**

• 1:02cv05092 (Docket) (Jul. 02, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB F

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
HD BROUS & CO., INC. Petitioner,
v.
Roman M. MRZYGLOCKI, Respondent.
**No. 03 Civ.8385(CSH).**

Feb. 26, 2004.

MEMORANDUM OPINION, ORDER, AND ORDER TO
SHOW CAUSE

HAIGHT, Senior J.

*1 This is a petition to enjoin an arbitration currently
pending before the New York Stock Exchange ("NYSE").
For reasons set forth below the petition is denied. The
arbitration sought by Respondent will proceed according to
a schedule set by the arbitrators. Denial of the petition
intimates no view of the Court on Petitioner's proposed
statute of limitations defense, which may be presented to the
arbitrators at Petitioner's discretion. In addition to denying
the petition, the Court will direct an order to show cause to
Petitioner's counsel under Federal Rule of Civil Procedure
11(c)(1)(B).

## I. BACKGROUND

According to the memoranda and supporting papers filed
with this Court by the parties in the above captioned action,
Respondent, Roman Mrzyglocki, was a client of HD Brous
& Co., Inc., Petitioner, from late 1996 until March of 1998.
HD Brous is a financial services organization and a New
York Corporation. Mrzyglocki is a resident of New Jersey.
During the period of their business relationship, Respondent
alleges that he lost over $180,000 as a result of transactions
and investments made by and through Petitioner that were at
odds both with responsible business practices and with
Respondent's expectations and instructions.

As part of the business relationship entered into by
Petitioner and Respondent, Mrzyglocki signed a Margin

Account Agreement (the "Agreement"), which included an
arbitration agreement. A copy of the Agreement has been
provided to the Court as Exhibit C, attached to the sworn
affidavit of Robert Brous, Chief Executive Officer of HD
Brous. In his affidavit Brous testifies that the Agreement
was completed and signed during the course of opening
Respondent's account with HD Brous. Brous Affidavit at 2.
Brous further relies upon Exhibit C, asserting that it, by a
choice of law provision, binds the parties to apply Maryland
law to their disputes. *Id.* at 3. These assertions are repeated
in the petition filed by HD Brous in the State court.

On June 26, 2003 Respondent filed a Statement of Claim, in
accordance with the arbitration rules of the New York Stock
Exchange ("NYSE"), demanding arbitration of claims
against Petitioner arising from HD Brous's alleged
mishandling of his account. In his Claim, Respondent
alleges that Petitioner and its agent, Timothy Mann,
breached their fiduciary duties to Respondent by engaging
in a series of high-risk transactions that resulted in the
above-mentioned losses. Respondent further alleges
violations of National Association of Securities Dealers
("NASD") and NYSE rules and regulations, citing, *inter
alia,* alleged failures to inform Respondent about critical
investment transactions and failures to act on Respondent's
directions.

On July 18, 2003 the NYSE served Petitioner with
Respondent's Statement of Claim. On October 3, 2003 HD
Brous filed a petition before the Supreme Court of New
York, New York County, seeking to enjoin the arbitration
pursuant to Section 7502(b) of the New York Civil Practice
Law and Rules, asserting that Respondent's claims were
time-barred. On that date Justice Emily Jane Goodman
issued an Order to Show Cause wherein Respondent was
directed to appear in New York Supreme Court on October
30, 2003. Justice Goodman declined to issue a Temporary
Restraining Order as part of the Order to Show Cause.
[FN1]

> FN1. A copy of Justice Goodman's Order to Show
> Cause provided to the Court evinces her intention
> to not issue a Temporary Restraining Order. A
> paragraph providing for a temporary restraint
> included in HD Brous's proposed Order was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                 Page 2
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

manually stricken on the Order signed by Justice Goodman.

**\*2** Respondent filed a Notice of Removal in this Court on October 23, 2003. The matter was subsequently referred to me by normal administrative procedures. With the Notice of Removal, Respondent filed his "Memorandum of Law in Opposition to Petitioner's Application to Stay Arbitration" (the "Response"). On November 20, 2003 Petitioner filed a timely Reply (the "Reply"). The events recounted above have put HD Brous's fully-briefed petition before this Court.

In the course of reviewing papers submitted by the parties the Court became concerned with a series of shifts in Petitioner's positions on critical issues of law and fact. Foremost of these was Petitioner's reversal as to whether or not the arbitration agreement, presented to the Court by Robert Brous himself, formed part of a binding contract between the parties. To resolve this question, amongst others, the Court scheduled an oral argument on the petition by an Order dated January 13, 2004 (the "January 13, 2004 Order").

That argument was commenced, as scheduled, on January 21, 2004. At the end of the hearing the Court invited the parties to provide the Court with written submissions detailing any additional cases or other sources of law the Court should consider. Petitioner obliged in the form of a letter dated January 28, 2004. Respondent, in conformance with the directions of the Court, responded with his own letter on February 2, 2004. The Court has given full consideration to the arguments of the parties and the relevant law. For reasons set forth below it declines to issue the requested order enjoining arbitration. This Court makes no comment on the merits of either Petitioner's statute of limitations defense or Respondent's claims. In their present posture, these issues are rightfully the concern of the arbitrators, not this Court.

## II. DISCUSSION

The weight of Petitioner's argument for a court imposed stay on the arbitration pending before the NYSE is borne by the assertion that Respondent's claims are time-barred. Petitioner points out that March 1998 marks the end of its business relationship with Respondent. Therefore, Petitioner

argues, Respondent's claim for arbitration, filed in June of 2003, relies on events more than five years in the past. Petitioner further claims, in its original petition, that this five-year period exceeds the statutes of limitation on Respondent's claims under both federal law and Maryland law. [FN2]

> FN2. Maryland law is of interest because it is named, with federal law, in a choice of law provision, found in paragraph 17 of the Agreement. HD Brous's reference to Maryland law as the controlling substantive law in its petition is in direct contradiction to two assertions that counsel for HD Brous make in the Reply: 1) that New York substantive law should apply and 2) that HD Brous is not bound by the terms of the Agreement.

Mrzyglocki responds, after having removed the petition to this Court, with a series of conditional arguments, beginning with an assertion that HD Brous can neither file a petition under N.Y. CPLR §§ 7502 and 7503 nor rely on New York case law because New York law does not govern the dispute. Respondent contends that New Jersey law should apply in this case and argues that his claim for arbitration is timely under the six-year statute of limitations that governs his claims under New Jersey common law. Next, Respondent argues that, "even if New York law did apply, the issue of whether Mrzyglocki's claims are time-barred is a question for the arbitrators, rather than the courts, to decide" under the broad-form arbitration agreement signed by the parties. Response at 5. Finally, Respondent argues that, even if New York law applies and all issues relating to his claims were not destined for the arbitrators by way of the arbitration agreement, HD Brous was untimely in making its petition under N.Y. CPLR §§ 7502 and 7503.

**\*3** In reply, Petitioner again contends that it may move for an injunction in this Court pursuant to N.Y. CPLR § 7502. In support of this contention counsel point out that the only basis for this Court to assert jurisdiction over the subject-matter in this case is pursuant to 28 U.S.C. § 1332. Thus, counsel conclude, the Court is bound to receive and consider the petition pursuant to N.Y. CPLR § 7502 because, in diversity cases, "state substantive law must be applied." Reply at 1. In their Reply counsel for Petitioner

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

also, for the first time and after having relied upon the Agreement in earlier submissions to the State court, claim that HD Brous is not a signatory to the Agreement and is, therefore, not bound by either the choice of law provisions in numbered paragraph 17, Reply at 11, of the Agreement or the broad-form arbitration agreement in numbered paragraph 19 of the Agreement, Reply at 7-8.

The Court finds that the terms of the Margin Account Agreement are enforceable over Petitioner. Numbered paragraph 19 of the Agreement contains a broad-form arbitration clause in which "[i]t is agreed" that all disputes between Petitioner and Respondent will be resolved in arbitration. This Court is bound to respect this agreement. It will, therefore, decline to grant the petition. Without commenting on the merits of Respondent's claims or Petitioner's proposed defenses, the Court will leave the arbitrators to do their duties.

*A. Petitioner is Bound by the Terms of the Margin Agreement*

Petitioner, through the affidavit of Robert Brous and in its original petition, presents the Agreement as a document forming part of its business relationship with Respondent. In its petition, HD Brous relies upon numbered paragraph 17 of the Agreement to argue that Maryland and federal law should apply to Respondent's claims. In a radical change of position, counsel for Petitioner assert in their Reply that Petitioner is not bound by the terms of the Agreement because it is not a signatory. Counsel repeated this claim at the oral argument and do so again in the letter to their January 28 letter. Counsel's attempts to distance their client from the Agreement are misleading and fruitless. The Agreement serves as evidence that Petitioner agreed, along with Respondent, to arbitrate all controversies between them. Petitioner has also claimed benefits from the Agreement and is, on this basis, estopped from disclaiming the arbitration clause.

*1. The Margin Agreement Documents Terms Affecting Respondent's Business Relationship with Petitioner*

Petitioner is not a signatory to the Agreement. In their Reply, counsel for Petitioner represent that the Agreement is

signed "by a Maryland clearing firm, Alex, Brown & Sons, Inc." Reply at 7. From these facts, counsel would have this Court conclude that the Agreement is a contract between Alex, Brown and Respondent in which Petitioner does not participate, from which Petitioner does not benefit, and by which Petitioner is not bound. Counsel are wrong on all scores.

*4 To start, counsel's claim that Alex, Brown signed the Agreement is not accurate. The agreement is, in fact, only signed by Respondent. Alex, Brown & Sons ("Alex, Brown") is named in the agreement and its corporate name and address appear at the top of the document. There is, however, no signature line for Alex, Brown, its representative, or any parties other than prospective clients. Alex, Brown also does not appear in a first-person speaking role at any point in the Agreement.

The document does not purport to speak for anyone other than Respondent. There are three parties contemplated in the Agreement: the signatory client (Respondent), Alex, Brown, and the client's "Financial Services Organization." At the oral argument, counsel for Petitioner admitted that HD Brous is the Financial Services Organization named in the Agreement. Pursuant to paragraph 1 of the Agreement, all uses of the first-person in the Agreement refer to Respondent. Most of the substantive paragraphs in the Agreement find Respondent acting or reporting in his own voice. By contrast, Alex, Brown and HD Brous are silent in the Agreement. At no point in the document do Alex, Brown or HD Brous speak or take action in the first-person.

In the first unnumbered paragraphs of the document, Respondent acknowledges that he has been informed by HD Brous that Alex, Brown will provide certain services to HD Brous relating to Respondent's account. Respondent also agrees that he has been informed about and accepts certain features of and limitations on his business relationship with Alex, Brown and HD Brous. These features and limitations are documented in the remaining eighteen numbered paragraphs, all of which have Respondent acknowledging and agreeing to features and limitations on his margin accounts with HD Brous that are, as per HD Brous's arrangements with Alex, Brown, serviced by Alex, Brown.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

According to the affidavit of Robert Brous, Respondent signed the Agreement "in the course of opening his account." Brous Affidavit at 2. It became clear at the oral argument that, consistent with the normal business practices of HD Brous, Petitioner presented the Agreement to Respondent along with a "new account form" and "account transfer documents." The "new account form," Exhibit B attached to the affidavit of Robert Brous, consists of one page and provides no details as to the features and limitations of the business relationship between Petitioner and Respondent. The "account transfer documents" perform the job suggested by their title, but provide no details whatever as to the business relationship between Petitioner and Respondent. The Agreement, presented to Respondent by Petitioner, is the only document of substance offered by either party relating to the business relationship formed between the parties when Respondent opened his account with Petitioner.

The Agreement is not, as counsel for Petitioner want the Court to believe, an agreement solely between and affecting Respondent and Alex, Brown. The Agreement makes reference to Petitioner no fewer than twenty times. That is so, notwithstanding the fact that HD Brous's name does not appear in the Agreement. The Agreement's references are to the "Financial Services Organization," and to the "correspondent." It is not disputed that HD Brous is the subject of these references. As examples, in numbered paragraph 2 Respondent agrees to delegate authority to Petitioner; in numbered paragraphs 3, 11, and 13 Respondent describes how Petitioner will be involved in the financing and handling of his accounts; in numbered paragraph 4 Respondent agrees to make certain disclosures to Petitioner; in numbered paragraph 14 Respondent sets forth the procedure by which he can object to Petitioner's handling of his funds and accounts; in numbered paragraph 19 Respondent recites an agreement amongst the parties that any disputes between them will be sent to arbitration pursuant to the Federal Arbitration Act.

**\*5** These facts and the form of the Agreement itself make the absence of Petitioner's signature on the document irrelevant. In its form and content the Agreement demonstrates that Respondent has been informed of and

agrees to certain features and requirements of his account with HD Brous. It documents Respondent's *acceptance* of terms on an offer of services extended by Petitioner and Alex, Brown. According to the Agreement, these terms and information relating to the respective duties of the parties were provided to Respondent by Petitioner. The Agreement itself was, according to Robert Brous, provided to Respondent by Petitioner. The terms documented in the Agreement are Petitioner's terms of service. The Agreement does no more or less than document that Respondent, at the time he opened his account with Petitioner, understood and accepted these terms. Pursuant to terms documented in the Agreement, Petitioner began to perform services for Respondent and to claim benefits from their business relationship. Petitioner is, therefore, bound to abide by the terms of the Agreement.

The grammatical construction of the Agreement also provides strong evidence that it documents an agreement between the parties as opposed to creating one. Most paragraphs in the Agreement are animated by a first-person present tense declarative such as "I acknowledge," "I agree," and "I authorize." These paragraphs present a picture of duties, conditions, and limitations being proposed to Respondent with Respondent acting affirmatively to accept them. Consistent with the use of these first-person declarations, the duties, acknowledgments, and agreements found in these paragraphs are uniquely Respondent's.

The contrasting choice of the phrase "It is agreed" at the beginning of paragraph 19 is, in this context, quite revealing. The use of the third-person singular present tense indicative in combination with the past participle clearly communicate the fact that the speaker, here Respondent, is reporting rather than acting. Specifically, he is reciting, from an objective point of view, an agreement between Alex, Brown, HD Brous, and Respondent, "that all past, present, or future controversies between myself, any persons having an interest in my account, Alex, Brown, [HD Brous], or any of the employees or affiliates of either ... shall be submitted to arbitration pursuant to the Federal Arbitration Act."

If Petitioner did not, as its counsel now claims, intend or want to be bound by contract terms that it presented to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

Respondent for his acceptance, then it could have taken action to avoid any commitment. It could have disclaimed the contract terms set forth in Respondent's acceptance. Having done so, Petitioner could have altered the Agreement or negotiated a separate and superceding agreement. At the very least, a representative of HD Brous, one of whom was present when Respondent signed, could have manifested an unwillingness to be bound by the arbitration clause in numbered paragraph 19 before accepting the signed Agreement and commencing a business relationship with Respondent. Petitioner did none of these things.

**\*6** The title "Agreement" may be misleading to Petitioner, but the Court suspects not. Petitioner presented to Respondent the terms set forth in the Agreement. Petitioner was present when Respondent accepted these terms. The terms accepted by Respondent document details pertaining to the business relationship being formed between Petitioner and Respondent. Respondent specifically names Petitioner as a beneficiary of his acceptance of terms. Agreement at para. 2 ("I intend that my Financial Service Organization be a beneficiary of this Agreement"). Petitioner, through its officer Robert Brous, is also the first party to use the Agreement as evidence of contract terms between itself and Respondent. All of this suggests that Petitioner knows that the Agreement accurately reports the terms of its business relationship with Respondent. Petitioner certainly relied upon this being the case in its petition.

Petitioner made an offer of financial services to Respondent. Respondent accepted. Petitioner presented an Agreement to Respondent. According to Respondent's reports in the Agreement, Petitioner provided information and explanation pertinent to the contract terms described in the Agreement. Respondent signed the Agreement. Petitioner accepted it without alteration and without disclaiming Respondent's report, at paragraph 19 of the Agreement, that he, Petitioner, and Alex, Brown had agreed to arbitrate "all past, present, or future controversies" between them. Petitioner has not produced any other document of substance that purports to set additional or alternative terms for its contract relationship with Respondent. After the Agreement was signed, Petitioner accepted funds from Respondent and

acted as his "Financial Services Organization." On this basis the Court concludes that the terms documented in the Agreement are binding upon Petitioner as part of its contract relationship with Respondent.

### 2. Petitioner is Estopped from Disclaiming the Agreement to Arbitrate

Even if the Agreement were, as counsel for Petitioner now claim, a contract between Respondent and Alex, Brown only, HD Brous is a named beneficiary of the Agreement. Petitioner has also sought and accepted significant benefits from the Agreement. Having knowingly accepted benefits from the Agreement, Petitioner is estopped from disclaiming the agreement to arbitrate found in paragraph 19 of the Agreement.

The obligation to arbitrate is created by contract. It follows that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960).* " 'It does not follow, however, that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." ' *Thomson-CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995) (quoting *Fisser v. International Bank,* 282 F.2d 231, 233 (2nd Cir., 1960). To the contrary, it is well-established that "non-signatories to an arbitration agreement may nevertheless be bound [to arbitrate] according to ordinary principles of contract and agency." *McAllister Bros. v. A & S Transportation,* 621 F.2d 519, 524 (2nd Cir., 1980) (citations omitted); *Delloitte Noraudit A/S v. Delloitte Haskins & Sells,* 9 F.3d at 1060, 1064 (2nd Cir.1993). In *Thomson-CSF, S.A. v. American Arbitration Ass'n* the Second Circuit specified five principles in particular: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.". 64 F.3d 773, 776 (2d Cir.1995). *See also Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97 (2nd Cir., 1999). Estoppel is the principle most relevant on the present facts.

**\*7** "A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

containing an arbitration clause." *American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir., 1999) (citing *Thomson-CSF, 64 F.3d at 778-779); Deloitte Noraudit A/S,* 9 F .3d at 1064; *Smith/Enron Cogeneration,* 198 F.3d at 98. If Petitioner here was an intended beneficiary of the Agreement, knew that it was an intended beneficiary of the Agreement, and knowingly accepted benefits from the Agreement then it cannot selectively repudiate the obligation to arbitrate set forth in the Agreement. *See Thomson-CSF, 64 F.3d at 778, 779; Deloitte Noraudit,* 9 F .3d at 1064.

In the January 21, 2004 hearing counsel for Plaintiffs claimed that HD Brous is not a third-party beneficiary to the Agreement and did not, in fact, receive any benefits from the Agreement. Both assertions are wrong.

At the January 21, 2004 hearing and again in the letter to the Court counsel for Plaintiff's relied, misleadingly, on *DuPont De Nemours & Co. v. Rhone Poulenc,* 269 F.3d 187 (3rd Cir., 2001) to argue that Petitioner is not a beneficiary of the Agreement. Critical to the Third Circuit's analysis in that case was the fact that DuPont was not a named beneficiary to the contract. *See DuPont,* 269 F.3d at 196. That is not the case here.

Petitioner is, in fact, a knowing and intended beneficiary of the Agreement. In numbered paragraph 2 of the Agreement it is stated that "I intend that my Financial Services Organization be a beneficiary of this Agreement." As counsel for Petitioner admitted at oral argument, Petitioner is the "Financial Services Organization" contemplated here and throughout the Agreement. Given that Petitioner gave the Agreement to Respondent, as it has to many other clients, Petitioner knew, or should have known, that it was an intended beneficiary. At the least, counsel for Petitioner could not properly claim, without caveat or limitation, that it was not.

Counsel's claim that Petitioner has not received and accepted actual benefits from the Agreement is also inaccurate. According to the affidavit of Robert Brous, Respondent completed the Agreement in the course of opening his account with Petitioner. Brous Affidavit at 2. In addition to being a foundational document for their business

relationship, the Agreement sets forth, in general and specific terms, how the relationship will function. The other documents provided by Petitioner are, by comparison to the Agreement, mere bureaucratic necessities. The Agreement is the document that does the most to establish and define the working relationship Petitioner and Respondent entered into. All of the benefits that accrued to Petitioner from this relationship over the next twenty-seven months flow from the Agreement and the authority granted by Respondent to Petitioners in the Agreement.

Though Petitioner is not a signatory to the Agreement, the fact that the Agreement intentionally benefits Petitioner by establishing the terms of its business relationship with Respondent is sufficient to bind Petitioner to the terms of the Agreement. *See MAG Portfolio Conslut v. Merlin Biomed,* 268 F.3d 58, 63 (2nd Cir., 2001) (interpreting *American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349 (2d Cir., 1999)). If a contract containing an arbitration clause is entered into between parties with at least the partial purpose of benefitting a third party and that party accepts those benefits, the third party may not disclaim its duty to arbitrate under the agreement. *Tencara,* 170 F.3d at 351. The Agreement clearly intends to benefit Petitioner by establishing its business relationship with Respondent. Knowing, as it did, about the Agreement and having claimed the benefits of the relationship described in the Agreement, Petitioner is estopped from disclaiming its duty to submit to arbitration under the Agreement.

**\*8** In addition to these general benefits Petitioner has also relied upon the Agreement to claim benefits in the present litigation. In paragraph 10 of his Affidavit, Robert Brous, citing the Agreement, asserts that Maryland and federal statues of limitation govern Respondent's arbitration claims. On page 3 of the Answer and Motion for More Definite Statement, Petitioner, referring to the Agreement, repeats this assertion. On page 4 of its petition to the Supreme Court of the State of New York, Petitioner makes the same assertion, again relying upon the Agreement.

The Second Circuit confronted a similar situation in *World Omni Fin. Corp. v. ACE Capital Re Inc.,* 64 Fed. Appx. 809, 2003 U.S.App. LEXIS 8441 (2nd Cir., May 2, 2003). There the plaintiff made damage claims that were derived

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

from a contract to which it is not a signatory. When a defendant attempted to invoke the arbitration clause of that same contract, the plaintiff disclaimed the contract. In their Summary Order, the panel found that the plaintiff was estopped from making the argument that it was not bound by the arbitration clause since, amongst other reasons, it had attempted to derive direct benefits from the contract containing the clause in the very same litigation. Counsel's maneuvering on behalf of the Petitioner in the case at bar is directly analogous. Petitioner laid claim to the Agreement when it sought to limit Respondent's choice of substantive law. Having relied upon the Agreement for substantive benefit in this litigation, Petitioner is estopped from disclaiming its obligation to arbitrate under the Agreement. *See Tencara* 170 F.3d at 353; *Thomson-CSF* 64 F.3d at 778, 779.

In the January 28, 2004 letter to the Court, counsel for Petitioner suggest that, while Petitioner may be bound by some terms of the Agreement (presumably the choice of law clause), it is not necessarily bound by the arbitration clause in paragraph 19 because "the court may separately consider and parse various provisions of the contract." January 28 Letter at 2. Completing the inference, counsel cite *Zimring v. Coinmach Corp.,* No. 00 Civ. 8111, 2000 WL 1855115 (S.D.N.Y., Dec. 19, 2000), where, counsel reports, a company representative who "signed [a] portion of [the] agreement but did not sign [the] arbitration clause is not bound to arbitrate."

This argument and the reliance on *Zimring* are bewildering, if not frivolous. The facts presented to Judge McKenna in *Zimring* were entirely different from those here. In that case the plaintiff took affirmative steps to specifically limit his participation in the contract to two particular provisions. *Zimring* at *1. Judge McKenna rightly concluded that, in those circumstances, the plaintiff intended *not* to be bound by other provisions that he did not sign. In the case at bar, while Petitioner did not sign the Agreement, it is specifically named as a participant in and a beneficiary of the arbitration agreement in numbered paragraph 19.

**\*9** The Court is convinced that the form of the Agreement, the content of the Agreement, and the circumstances under which it was signed prove that Petitioner is a party to the

contract described in the Agreement, including the agreement to arbitrate. Even if the Agreement is read as a two-party contract to which Petitioner is not a party, Petitioner is an intended beneficiary of the Agreement. Petitioner knew that it was a beneficiary; and Petitioner accepted benefits from the Agreement. Furthermore, Petitioner has used the Agreement as a sword against Respondent in the course of this litigation. Having knowingly accepted and sought benefits under the Agreement, Petitioner may not disclaim its duties under numbered paragraph 19, where it is identified as a party to the agreement to arbitrate.

*B. Petitioner's Statute of Limitations Defenses are for Arbitrators to Decide*

Having held that Petitioner is bound by the terms of the Agreement, the Court will now consider the impact of the arbitration clause on the present petition. To this end, it is appropriate and necessary to consider the text of the arbitration clause. In its entirety, it reads:

It is agreed that all past, present, or future controversies between myself, any persons having an interest in my account, Alex, Brown, my Financial Service Organization, or any of the employees or affiliates of either, concerning any transaction or the construction, performance, or breach of this or any other agreement pertaining to securities and other property, whether entered into prior [sic], on or subsequent to the date hereof, including but not limited to claims of fraud in the inducement, shall be submitted to arbitration pursuant to the Federal Arbitration Act. Any arbitration under this Agreement shall be conducted before the National Association of Securities Dealers, Inc. ("NASD") or any other securities industry self-regulatory organization of which Alex, Brown or your correspondent is a member, in accordance with the rules then obtaining of such organization. The award of the arbitrator(s), or a majority of them, shall be final and judgment upon such award may be entered in any court having jurisdiction. No person shall bring a putative or certified class action to arbitration, nor [sic] seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action, or who is a member of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                     Page 8
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
(Cite as: 2004 WL 376555 (S.D.N.Y.))

putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

Under well-settled United States Supreme Court and Second Circuit case law, the federal courts are generally obliged to refrain from interfering with the authority assigned to arbitrators by parties to arbitration agreements. *See generally Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79 (2002); *EEOC v. Waffle House,* 534 U.S. 279 (2002); *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52 (1995); *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468 (1988); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1 (1983); *Shaw Group, Inc. v. Triplefine International Corp.,* 322 F.3d 115 (2nd Cir., 2003); *Painewebber, Inc. v. Bybyk,* 81 F.3d 1193 (2nd Cir., 1996); *Porta Systems Corp. v. Aponte,* 00 Civ. 0087, 2000 U.S. Dist. LEXIS 20824 (S.D.N.Y., January 25, 2000).

*10 When the parties to a dispute have entered into an arbitration agreement, a court's only functions to ensure that there is an agreement to arbitrate, that the agreement is enforceable, and that the issues presented to the arbitrators are within the scope of the arbitration agreement. *See Howsam,* 537 U.S. at 83; *At & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649 (1986). The Court has held that the agreement to arbitrate found in numbered paragraph 19 of the Agreement is binding on the parties to this litigation. The only issue remaining for the Court to decide is, then, whether or not Petitioner's proposed statute of limitations defense falls within the scope of this agreement.

This is what courts have called a "question of arbitrability." "[Q]uestions of arbitrability" are "issues for judicial determination *unless* the parties clearly and unmistakably provide otherwise." *At & T Technologies, Inc. v. Communications Workers,* 475 U.S. at 649 (emphasis added). Parties may, then, "provide" that even threshold issues of arbitrability are to be decided by arbitrators. In the Second Circuit, issues relating to timeliness are treated as

issues of arbitrability. *See Bybyk,* 81 F.3d at 1199.

The agreement to arbitrate mentions no state law. To the contrary, it specifically refers to the Federal Arbitration Act. Therefore, federal law and precedent should guide this Court in reading and evaluating the scope of the agreement. Supreme Court precedent provides that " 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration'....Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25 (1983)). Here, there is no doubt.

The arbitration clause is a classic example of a broad-form arbitration agreement. Under the law of this Circuit, the scope of such agreements includes issues relating to timeliness. *See Bybyk,* 81 F.3d at 1199-1200 ("The parties' broad grant of power to the arbitrators is unqualified by any language carving out substantive eligibility issues (with or without specific reference to timeliness) for resolution by the courts. PaineWebber is thus unable to overcome the presumption established in the first of the above-listed provisions that 'any and all controversies' are to be arbitrated. An objective reading of the Agreement, therefore, leads us to conclude that the parties intended to arbitrate issues of arbitrability."); *Porta Systems,* 2000 U.S. Dist. LEXIS 20824 at *2-*4; *Coleman & Co. v. Giaquinto,* 00 Civ. 1632, 2000 U.S. Dist. LEXIS 16215 at *7 (Nov. 9, 2000). Since Petitioner is bound by the Agreement, it is bound to arbitrate "all past, present, or future controversies" between itself and Respondent, including its proposed statute of limitations defenses. The petition is, therefore, denied.

C. *N.Y. CPLR § 7502 Does Not Trump the Federal Arbitration Act, Second Circuit Precedent, or United States Supreme Court Precedent in this Case.*

*11 Counsel for Petitioner seeks to have this Court decide on the merits a proposed statute of limitations defense. This remedy is sought based on counsel's conclusion that this Court must act under N.Y. CPLR § 7502(b), which provides that a party to an arbitration may assert a statute of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 9
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
(Cite as: 2004 WL 376555 (S.D.N.Y.))

limitations defense before "the court." This Court does not agree.

Counsel for Petitioner reaches their conclusion because, as they note in Petitioner's Reply, the sole basis for the subject matter jurisdiction of this Court in the present case is 28 U.S.C. 1332. Given this fact, counsel conclude that the Court must apply N.Y. CPLR § 7502(b) because, in diversity cases, "state substantive law must be applied." Reply at 1. [FN3]

> FN3. The Court need not test this argument to reach a decision on the present petition. Consistent with this Court's holding, *supra,* the parties' agreement to arbitrate reigns supreme. According to the terms of their agreement, all controversies between them, including questions of arbitrability, must be sent to arbitration. Any rights or options provided by law, New York law included, are subject to the terms of that bargain. *See Porta Systems,* 2000 U.S. Dist. LEXIS 20824 at *2-*4. Thus, the Court need not rule on the status and impact of N.Y. CPLR § 7502(b). Given the role that this statute plays in HD Brous's petition and in counsel's arguments in support of the petition, however, a brief discussion of this choice of law issue is appropriate.

It is a general rule that federal courts sitting in diversity apply state substantive law. *See Semtek v. Lockheed Martin,* 531 U.S. 497 (2001); *Gasperini v. Center for Humanities,* 518 U.S. 415 (1996); *Hanna v. Plumer,* 380 U.S. 460 (1965); *Guaranty Trust Co. v. York,* 326 U.S. 99 (1945); *Erie v. Tompkins,* 304 U .S. 64 (1938). However, the conclusion proposed by counsel for Petitioner, that this general rule requires that this Court apply N.Y. CPLR § 7502(b) in this case, relies on two premises that Petitioner does not defend. The first is that the state law that should apply in this diversity action is New York law. The second is that the N.Y. CPLR § 7502(b) is "substantive law" within the meaning of this designation under *Erie v. Tompkins* and its progeny. [FN4] Counsel's conclusion is wrong because both of these premises are false.

> FN4. In fact, counsel for Petitioner, in another

context and because they must, on page 11 of Petitioner's Reply, argue that N.Y. CPLR § 7502(b) is procedural rather than substantive law. This issue is discussed, *infra,* in the sanctions section of this Opinion.

New York law would likely not be the appropriate source of substantive law in this case. This Court has already held that the Margin Account Agreement recites binding terms of contract between the parties. Numbered paragraph 17 of the Agreement states, in an objective mode, that "the rights of the parties [shall be] determined in accordance with the laws of the State of Maryland and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof." Just as the parties have bargained to refer controversies between them to arbitration, they have bargained to have these controversies decided according to Maryland and federal law. Were it called to rule on this issue here, this Court would be loth to deny the parties the fruits of this bargain. [FN5] On this basis, the Court would likely not impose New York law on the parties. [FN6]

> FN5. It is worth noting that the general choice of law provision found in numbered paragraph 17 of the Agreement does not limit or modify the terms and scope of the arbitration agreement. *See Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 63 (1995); *Bybyk,* 81 F.3d at 1200; *Coleman,* 2000 U.S. Dist. LEXIS 16215 at *9; *Smith Barney v. Sacharow,* 91 N.Y.2d 39, 49 (N.Y., 1997).

> FN6. In its petition to the State court, Petitioner, relying on the Agreement, argues for this same conclusion. Counsel reverses this position in the Reply. This reversal is discussed, *infra,* in the sanctions section of this Opinion.

If the Court was to apply New York substantive law in this case, it would not apply N.Y. CPLR § 7502(b). Citing *Erie v. Tompkins,* among other authorities, counsel for Petitioner asserts that, in this case, "state substantive law must be applied." Reply at 1. Counsel assumes, without arguing, that New York Civil Procedure Law and Rules Section 7502(b) is substantive rather than procedural. It is not.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



"Federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini,* 518 U.S. at 427. The section at issue here, 7502(b), is found in the New York Civil Procedure Rules and Law. Of course, this title alone does not determine the true nature of N.Y. CPLR 7502(b). N.Y. CPLR § 5501(c) has, for example, been determined to provide some substantive rights that trump federal procedural rules in diversity cases. *See e.g. Gasperini,* 518 U.S. at 427-430; *Presley v. United States Postal Serv.,* 317 F.3d 167, 173 (2nd Cir., 2003). Similarly, the Supreme Court has held that state rules establishing when an action commences trump Federal Rule of Civil Procedure 3 in diversity cases. *See Walker v. Armco Steel Corp.,* 446 U.S. 740, 750-752 (1980) (reaffirming *Ragan v. Merchants Transfer & Warehouse Co.,* 337 U.S. 530 (1949)). Here, however, the designation of § 7502(b) as "Procedur[al]" is not merely a matter of title, it is an accurate description.

**\*12** Classification of a law as "substantive" or "procedural" is not always a transparent task. Since *Erie,* however, the Supreme Court has offered significant and helpful guidance to district courts embarking on this analysis. *Guaranty Trust Co. v. York* established the long-lived outcome-determinative test, which asks of a particular law: "Does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?" *Guaranty Trust,* 326 U.S. at 109. This is, it seems, the rule invoked by counsel in Petitioner's Reply, when it is claimed that "[s]ince the removal petition rests on diversity jurisdiction, there is no reason for this Court to reach a different result than a state court would in ruling on Brous' [sic] petition." Reply at 3. In *Hanna v. Plumer,* the Court refined the *Guaranty Trust* rule, pointing out that the outcome-determinative test was just one way to assess "the twin aims of the Erie rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna,* 380 U.S. at 468. *See also Semtek,* 531 U.S. at 504 (citing and applying the rule from *Hanna* ).

In *Hanna v. Plumer,* the Supreme Court instructed federal courts to ask "whether application of the [State's] rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly

discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court." *Hanna,* 380 U.S. at 468. In *Hanna,* the Court was confronted with a situation in which one of two competing rules of service would have ended the litigation before consideration of the case on the merits. The other would have allowed the case to continue. The choice between these two competing provisions would, on this basis, have determined the outcome of the case. Moreover, it would have provided obvious motivations for forum shopping.

The situation in this case is much different. N.Y. CPLR § 7502(b) does not limit or expand the spectrum of possible defenses available to Plaintiff. It does not establish special rules of review. It does not affect burdens of proof. It does not shift or alter critical elements of a statute of limitations defense. It only empowers New York courts to consider petitions asserting that arbitration claims are time barred. Assuming that there are right and wrong answers to the questions posed by Petitioners proposed statute of limitations defense, the outcome should not be different if a court considers the defense as opposed to an arbitrator. On this basis, the Court is not convinced that N.Y. CPLR § 7502(b) is, in any way, outcome determinative. Its only effect is to allow courts to consider timeliness concerns rather than leaving these issues to arbitrators.

**\*13** It is also hard to believe that N.Y. CPLR § 7502 would sponsor rampant forum shopping. Whether Petitioner's defenses are reviewed by a court or a panel of arbitrators, the same legal standards will apply. The same relevant facts will be presented. Either body would be asked to play the same basic game of connecting the dots. *See e .g. Zoll v. Ruder Finn, Inc.,* Nos. 02 Civ. 3652 and 01 Civ. 1339, 2004 WL 42260 at \*3 (S.D.N.Y., Jan. 7, 2004.). It is hard to believe that potential litigants would spend time forum shopping solely in order to have these questions of arbitrability decided by a court rather than by an arbitrator, or vice-versa.

Forum shopping concerns are particularly muted in cases involving N.Y. CPLR § 7502 because parties have already,

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 11
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

by definition, done their shopping. As a general rule, parties can only be compelled to submit to arbitration if they have already agreed to arbitrate controversies between them. *See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960).* As discussed *infra,* where parties have agreed to arbitrate, questions of arbitrability, including statute of limitations defenses, are within the purview of the courts unless the parties have already agreed to submit them to arbitration. This is true in both the federal system and in the New York courts. Where parties have agreed to send questions of arbitrability to arbitration, however, New York courts and federal courts agree that the bargain should be respected. *See Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 63 (1995); *Painewebber, Inc. v. Bybyk,* 81 F.3d 1193, 1199 (2nd Cir. 1996); *Smith Barney Shearson Inc. v. Sacharow,* 91 N.Y.2d 39 (N.Y., 1997). This is certainly true here, where the Federal Arbitration Act is specified in the arbitration clause. *See Sacharow,* 91 N.Y.2d at 47-49; *Prudential Securities v. Mandt,* 205 A.D.2d 424, 424-425 (N.Y.App.Div. 1st, 1994) ("the court committed reversible error in determining that the Federal Arbitration Act did not preempt a New York court's jurisdiction to determine the timeliness of the appellant's claims.").

Here the parties have elected to have all controversies between them sent to arbitration under the Federal Arbitration Act. They could have reached another bargain. *See e.g. Coleman,* 2000 U.S. Dist. LEXIS 16215 at *8-*9. They did not. Under federal law and New York law, courts are required to respect the bargains of parties to arbitration agreements. N.Y. CPLR § 7502(b) does not give New York state courts exclusive right to determine the merit of statute of limitations defenses in arbitration cases. It simply provides them with the power to do so as a function of the more general rights of parties to have their disputes settled by a court of law.

The broad-form arbitration agreement entered into by the parties provides clear evidence of the parties' intention to have all controversies between them arising from their business relationship settled by an arbitrator rather than a judge. That is the bargain of mutual consideration they have made. This Court will not upset it, as it has been directed

not to by the Second Circuit and the United States Supreme Court. This Court holds that all controversies between these parties, including Petitioner's proposed defenses, should and will go to arbitration pursuant to the terms of their agreement to arbitrate.

### III. THE POSSIBLE IMPOSITION OF SANCTIONS AGAINST COUNSEL FOR PETITIONER

*\*14 Rule 11(b), Fed.R.Civ.P.,* provides, in part, that by presenting to the court a pleading, written motion, or other paper, an attorney is certifying that "(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law ..." If the court determines, "after notice and a reasonable opportunity to respond," that Rule 11(b) has been violated, the court may sanction an attorney. Rule 11(c). Sanctions may be sought by a party on motion, Rule 11(c)(1)(A), or the court on its own initiative "may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm or party to show cause why it has not violated subdivision (b) with respect thereto."

"Due process requires that courts provide notice and an opportunity to be heard before imposing any kind of sanctions." *Nuwesra v. Merrill Lynch, Fenner & Smith, Inc., 174 F.3d 87, 92 (2d Cir.1999)* (citations and internal quotation marks omitted). In the case at bar, the Respondent has not made a motion for sanctions. But I am considering on my own initiative whether Petitioner's attorneys should be sanctioned. In this circumstance, this Court is required "to apprise [Petitioner's counsel] of the specific conduct alleged to be sanctionable," and to give counsel "a reasonable opportunity to respond." *Id.* at 92, 93. The discussion in Part III of this Opinion is intended to apprise counsel of the areas of the Court's concern. A reasonable opportunity for counsel to respond will be provided in the Order to Show Cause with which this Opinion concludes. [FN7]

> FN7. I note in passing that "[t]he district court possesses the inherent power to levy sanctions. Neither the adoption of 28 U.S.C. § 1927, a federal statute authorizing sanctions, nor the Federal Rules

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of Civil Procedure displace the inherent power of the court to sanction." *Hotel St. George Associates v. Morgenstern,* 819 F.Supp. 310, 322 (S.D.N.Y.1993). The same due process concerns apply, whatever the source of the district court's sanctioning authority.

*A. Maintenance of Contradictory Claims*

At different times in papers filed with the Court and in oral arguments made in support of these papers, counsel make contradictory claims. The Court is particularly concerned by three reversals of convenience. First, in the initial petition to the State court, counsel, relying on the Affidavit of Robert Brous, assert that the terms of the Margin Account Agreement are binding on the parties. In the Reply brief submitted to this Court, counsel reverse this position, without reference to their previous position. Second, and by extension, in the initial petition counsel claim that Maryland and federal law should be applied to Respondent's claims. In the Reply brief submitted to this Court, counsel, again without reference to their previous position, assert that New York law should rule. [FN8] Third, in the Reply brief itself counsel argue, initially, that N.Y. CPLR § 7502(b) is "substantive law" under *Erie v. Tompkins* and its progeny. Later in the same brief, however, counsel contend, because they must, that N.Y. CPLR § 7502(b) is merely procedural law.

> FN8. These first two examples involve the original petition filed in State court. In removal cases, such as this, papers originally filed in State court cannot, of themselves, be the basis for Rule 11 sanctions. *See Stiefvater Real Estate, Inc. v. Hinsdale,* 812 F.2d 805 (2d Cir., 1987). In this case, however, the Court's concern is not with the petition itself or with claims therein. The present concern is with the shift of position in the Reply filed with this Court and with counsel's attempt to prejudice Respondent by the timing of these reversals.

None of these contradictory arguments is made in the alternative. [FN9] In fact, counsel do not, for obvious reasons, even point out the contradictions. They certainly do not provide any explanation. Rather, counsel exhibit a pattern of shifting their position at their convenience. Without providing the Court with explanation for these shifts, the contradictions give rise to an inference that at least one half of each mutually exclusive pairing is a potential violation of Rule 11(b)(2). Furthermore, counsel's maintenance of these contradictions of convenience in papers submitted to the Court may, of itself, be sanctionable under Rule 11.

> FN9. In the case of the third example, counsel's contradictory arguments are part of a single argument. On pages 1, 2, and 7 of the Reply counsel argues that N.Y. CPLR § 7502(b) is substantive law, concluding that it must be applied by this Court sitting in diversity. On page 11 of the Reply counsel assert that N.Y. CPLR § 7502(b) is merely procedural in order to escape from the choice of law provision in numbered paragraph 17 of the Margin Account Agreement, which they fear might trump their *Erie* argument on pages 1 and 2. Counsel do not take note of, much less explain, this contradiction in the hope, one supposes, that, having denied Respondent a chance to point out the problem, the Court would not recognize the contradiction on its own.

*15 Counsel's behavior in this regard is particularly troublesome since it effectively denied Respondent an opportunity to respond. In the first two cases, counsel took a position in the petition to the State court, reversing themselves in the Reply after Respondent had filed his Response. In the third, counsel maintained contradictory positions within the same argument newly made in the Reply. In all three cases, counsel's strategic timing denied Respondent of an opportunity both to respond to arguments newly made in Reply and to point out counsel's irreverent inconsistency.

Moreover, counsel attempted, at the oral argument, to capitalize on this "omission." There and then, counsel faulted Respondent for not presenting reasons why Petitioner should be bound to the terms of the Margin Account Agreement. Counsel repeats this charge in their January 28, 2004 letter to the Court. As the Court pointed out to counsel at the oral argument, Respondent had no

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
(Cite as: 2004 WL 376555 (S.D.N.Y.))

reason to make such arguments in his Response. Robert Brous recognized the Agreement in his affidavit submitted with the original petition. Furthermore, in the original petition, counsel not only did not disclaim the terms of the Agreement, they actively relied upon them. The timing of these reversals and counsel's attempt to capitalize on them are subject to sanction under Rule 11.

While not all oral statements to a Court are sanctionable under Rule 11, counsel's conduct at oral argument clearly enjoys a close enough nexus to the underlying papers to bring it within the scope of Rule 11. See O'Brien v. Alexander, 101 F.3d 1479 (2d. Cir., 1996). Counsel's conduct in this regard is also subject to sanctions under 28 U.S.C. § 1927 as evidence of "dilatory tactics." See U.S. v. International Brotherhood of Teamsters, 948 F.2d 1338, 1345 (2d. Cir., 1991).

B. Misleading Use of Authority

In papers filed with the Court and in oral argument expanding upon and supporting these papers, counsel for Petitioner have made inappropriate and misleading use of authority.

First, on page 2 of the Reply and again at the oral argument counsel cited Smith Barney v. Sacharow, 91 N.Y.2d 39, 47 (N.Y., 1997) for the proposition that "a New York state court would enjoin the arbitration under CPLR 7502." Reply at 2. Counsel repeated this use of Sacharow in the January 28, 2004 letter to the Court, stating that "[i]t is clear that a New York Court would have enjoined the arbitration pursuant to CPLR § 7502." January 28 Letter at 3, citing Sacharow, among other cases. In fact, the New York Court of Appeals' holding in Sacharow is quite the opposite. The Court held that, under the broad-form arbitration agreement entered into by the parties before them, a proposed statute of limitations defense should be decided by arbitrators. Smith Barney v. Sacharow, 91 N.Y.2d 39, 47 (N.Y., 1997). The Court so held despite the fact that the parties had also agreed to have their disputes resolved under New York law. Id. at 47-49.

*16 Second, in the Reply, counsel cite Coleman & Co. v. Giaquinto, 236 F.Supp.2d 288, 300 (S.D.N.Y., 2002) for the

general proposition that "Federal courts sitting in diversity have applied CPLR 7502 in removed cases to enjoin arbitrations on state statute of limitations grounds." Reply at 2. Counsel rely on this citation for similar propositions throughout the Reply, at oral argument, and in the January 28, 2004 letter. Judge Chin's actual and particularized holding in the cited case is "that by expressly providing for New York law to govern the arbitration itself, the parties intended for the Court, rather than an arbitrator, to decide petitioners' statute of limitations defense." Id. at 294.

In support of this holding, Judge Chin cites, but does not expand upon, his earlier decision in the same case, reported at Coleman & Co. v. Giaquinto, 00 Civ. 1632, 2000 U.S. Dist. LEXIS 16215 (Nov. 9, 2000). There, Judge Chin does follow N.Y. CPLR § 7502(b). His choice to do so, however, turns on a choice of law provision in the body of the arbitration clause before him that specifically incorporated New York law. This, Judge Chin concludes, evidenced an intention by the parties to have the court decide timeliness issues. Absent this effort, Judge Chin points out, the broad-form agreement would have led him to conclude that the parties intended to have timeliness issues and other issues of arbitrability decided by an arbitrator.

In this earlier decision, Judge Chin also notes that a general choice of law provision found elsewhere in the business agreement would not have led him to conclude that New York law was part of the arbitration agreement in particular. Judge Chin has since been vindicated in this belief by Shaw Group, Inc., et al. v. Triplefine International Corp., 322 F.3d 115, 123 (2d Cir. 2003) (citing and quoting with approval the year 2000 holding in Coleman "that provision for 'agreement and its enforcement' to be governed by New York law did not evidence parties' intent to be bound by New York arbitration law).

The agreement to arbitrate in the Margin Account Agreement makes no mention of New York law. The general choice of law provision in numbered paragraph 17 mentions only Maryland and federal law. The arbitration clause mentions no other legal authority than the Federal Arbitration Agreement. Despite counsel's representation to the contrary, then, Coleman unambiguously supports Respondent in this case. By citing the squib paragraph in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



later *Coleman* decision, counsel for Petitioner seems to attempt to mislead this Court as to the nature and impact of Judge Chin's decision in *Coleman.*

Third, counsel for Petitioner cite the Second Circuit's decision in *SG Cowen Securities Corp. v. Messih,* 224 F.3d 79 (2d Cir., 2000) for the proposition that "[f]ederal courts sitting in diversity have applied CPLR 7502 in removed cases to enjoin arbitrations on state statute of limitations grounds.". Reply at 2. This case did not deal with an arbitration agreement nor did it concern N.Y. CPLR § 7502(b). The issue before the Second Circuit in *SG Cowen* was the applicability of N.Y. CPLR § 7502(c), which contemplates the provision of injunctive relief in support of arbitration. The specific issues in *SG Cowen* had to do with what considerations should guide decisions to grant injunctive relief. While the proposition forwarded by counsel, that courts in this District have applied N.Y. CPLR § 7502, is general enough to find support in *SG Cowen,* reference to that case is misleading in the context of counsel's argument in the Reply, which is limited to N.Y. CPLR § 7502(b).

*17 Fourth, in the Reply, at page 11, and at oral argument, counsel claim that because Petitioner did not sign its Margin Account Agreement Petitioner is not bound by its terms. In support of this argument, counsel cite *E.I. DuPont De Nemours v. Rhone Poulenc,* 269 F.3d 187 (3rd Cir., 2001). As is evident, *DuPont* is a Third Circuit case. While it might be persuasive authority before this Court, counsel fails to cite significant contrary authority in this Circuit. *See, e.g., American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999); *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97 (2nd Cir., 1999); *Thomson-CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773 (2d Cir.1995); *Delloitte Noraudit A/S v. Delloitte Haskins & Sells,* 9 F.3d at 1060 (2nd Cir.1993); *McAllister Bros. v. A & S Transportation,* 621 F.2d 519, 524 (2nd Cir., 1980); *Fisser v. International Bank,* 282 F.2d 231 (2nd Cir., 1960). Failures to cite and address contrary authority are subject to Rule 11 sanction. *See Blissett v. Casey,* 969 F.Supp. 118, 124 (N.D.N.Y., 1997); *Allstate Ins. Co. v. Administratia Asigurarilor,* 163 F.R.D. 196 (S.D.N.Y.1995).

In addition to this omission, counsel distorted the holding in *DuPont* at the oral argument and again on page 2 of the January 28, 2004 letter. In both of these instances, counsel cited *DuPont* for the proposition that Petitioner is not bound by the arbitration clause because it has not sought or asserted benefits derived from the arbitration clause in particular. This is an obvious misstatement of the law and of the holding in *DuPont.* The doctrine of estoppel in the context of arbitration agreements is designed to "prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." *DuPont,* 269 F.3d at 200 (citing *Tencara,* 170 F.3d at 353). Contrary to counsel's representations, then, the key holding in *DuPont* is that "a non-signatory should not be permitted to embrace a contract for some purposes and then disclaim that same contract's unfavorable terms." *Amkor Technology v. Alcatel Business Systems,* 278 F.Supp.2d 519, 521-522 (E.D.P.A., 2003) (citing *DuPont,* 269 F.3d at 200).

Fifth, in the January 28, 2004 letter, counsel cite *Zimring v. Coinmach Corp.,* No. 00 Civ. 8111, 2000 WL 1855115 (S.D.N.Y., Dec. 19, 2000) in support of the proposition that, while Petitioner may be bound by some terms of the Agreement, it is not bound by the arbitration clause in numbered paragraph 19 because "the court may separately consider and parse various provisions of the contract." January 28 Letter at 2. This use of *Zimring* is misleading. The facts in that case were not at all similar to this case. There the plaintiff took affirmative steps to limit his participation in the contract. *Zimring* at *1. Here, Petitioner took no such steps. Furthermore, Petitioner, as Respondent's Financial Services Organization, is specifically referenced in the arbitration agreement found in paragraph 19 of the Margin Account Agreement.

*18 These citations to authority are problematic because they might support an inference that counsel attempted to mislead the Court.

*C. Factual Misrepresentations*

Arguing in support of their contention that Petitioner is not bound by the terms of the Margin Account Agreement, counsel stated, at the oral argument, that Petitioner was not

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 15
Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)
**(Cite as: 2004 WL 376555 (S.D.N.Y.))**

a beneficiary of the Agreement. This is not so. Not only is Petitioner, as the Financial Services Organization, referred to numerous times in the Agreement, it is specifically named as an intended beneficiary in numbered paragraph 2.

*D. Maintaining a Frivolous Petition*

While this Court has spilled considerable ink in setting forth the reasons that it will deny the present petition, that ink need not have been spent. Despite counsel for Petitioner's claims to the contrary, and consistent with the analysis above, the facts and law are clear in this case. Petitioner entered into a business relationship with Respondent. In initiating this relationship, Petitioner presented Respondent with certain terms. As is demonstrated by the Agreement, Respondent accepted those terms.

Robert Brous, in his affidavit, seemed to appreciate these facts. Counsel, recently, conveniently, and without evidence or cause, have sought to disclaim these terms. Counsel have also misrepresented and abused key authorities. A proper evaluation of Petitioner's obligations and the relevant case law in this Circuit leave no question that this petition is without merit. What little hay it makes is due exclusively to counsel's sanctionable activities. Respondent's Response made much of this evident. Counsel should have abandoned the petition and allowed the matter to go to arbitration. Instead, Counsel made matters worse and worse for themselves by their conduct in their Reply, at oral argument, and in the January 28, 2004 letter to this Court.

IV. CONCLUSION

For the foregoing reasons the Court makes the following ORDER:

1. The petition to stay or enjoin the arbitration pending before the New York Stock Exchange is denied. The petition is dismissed, with prejudice. The arbitration will proceed according to the rules and procedures of the New York Stock Exchange.

2. Counsel for Petitioner who signed the papers in this case are directed to file written submissions on or before March 31, 2004, showing cause why they have not violated Rule 11(b)(2) as the result of the filings and oral presentations

described in Part III of this opinion.

3. Since a district court's *sua sponte* sanctioning of an attorney does not authorize the court to award the opposing party its attorney's fees, an award that can be made only by motion, *Nuwesra,* 174 F.3d at 94-95, counsel for Petitioner need not serve copies of its submissions on counsel for Respondent.

4. After considering the written submissions of Petitioner's counsel, the Court will schedule a hearing at which counsel may make such further submissions as they may be advised, and respond to such questions as may occur to the Court.

**\*19** It is SO ORDERED.

Not Reported in F.Supp.2d, 2004 WL 376555 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv08385 (Docket) (Oct. 23, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB G

**Westlaw.**

Not Reported in F.Supp.2d                                                                                                   Page 1
Not Reported in F.Supp.2d, 1999 WL 1063233 (S.D.N.Y.), 81 Fair Empl.Prac.Cas. (BNA) 1488, 79 Empl. Prac.
Dec. P 40,328
**(Cite as: 1999 WL 1063233 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
Kim MOORNING-BROWN, Plaintiff,
v.
BEAR, STEARNS & CO., INC., Defendant.
**No. 99 CIV 4130 JSR HBP.**

Nov. 23, 1999.

*OPINION AND ORDER*

PITMAN, Magistrate J.

I. *Introduction*

**\*1** Defendant Bear, Stearns & Co., Inc. ("BSCI") moves (1) to stay this action and to compel arbitration and (2) for its costs, disbursements and attorney's fees in bringing this motion. For the reasons set forth below, BSCI's motion to stay the action and to compel arbitration is granted; its motion for costs and attorney's fees is denied. [FN1]

> FN1. This motion has been referred to me for general pretrial supervision and to report and recommend with respect to dispositive motions. Since the relief sought in the present motion is not dispositive of plaintiff's claim, I may properly decide the motion and not merely recommend a resolution. *All Saint's Brands, Inc. v. Brewery Group Denmark, A/S,* 57 F.Supp.2d 825, 833 (D.Minn.1999); *Herko v. Metropolitan Life Ins. Co.,* 978 F.Supp. 149, 150 (W.D.N.Y.1997).

II. *Facts*

Plaintiff, proceeding *pro se,* commenced this civil rights action alleging that BSCI had discriminated against her on the basis of race, gender and national origin.

As set forth in the complaint, plaintiff, an African-American female and a citizen of the United States by birth, was initially hired by BSCI as a secretary on March 2, 1992. At the time she was initially hired, plaintiff signed the following document:

MEMO

To       All Employees

From     Stephen A. Lacoff

Subject  ARBITRATION AGREEMENT
         --------------------

In consideration of employment with Bear Stearns, all employees hereby agree to submit to final and binding arbitration any and all claims, controversies of any nature whatsoever and disputes arising out of or related in any way to their employment at Bear Stearns, including only by way of example and not by limitation, any and all claims related to hiring, employment and cessation of employment. Employees specifically agree, without limiting the interpretation of this section, to forego litigation and to submit to arbitration all claims under Title VII (equal Employment Opportunity Act), under the Federal Age Discrimination Employment Act (ADEA), under any other applicable employment or human rights laws, rules and regulations, including, but not limited to, any city and state laws [and claims under the Employment Retirement Income Security Act (ERISA).] Said arbitration shall be conducted only by a panel of the New York Stock Exchange, Inc., American Stock Exchange or National Association of Securities Dealers, Inc., as Bear Stearns, in its sole discretion, shall elect. If any portion of this agreement is found unenforceable that portion shall fail while the remainder of this agreement continues in full force and effect.

ACKNOWLEDGED AND ACCEPTED:

Kim Moorning-Brown

/s/ Kim Moorning-Brown        March 2, 1992

(Exhibit A to the Affidavit of Anne F.P. Corwin, sworn to July 12, 1999 (emphasis in original)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 1999 WL 1063233 (S.D.N.Y.), 81 Fair Empl.Prac.Cas. (BNA) 1488, 79 Empl. Prac.
Dec. P 40,328
**(Cite as: 1999 WL 1063233 (S.D.N.Y.))**

After receiving her Bachelor's degree in computer programming in 1994, plaintiff applied for a position in BSCI's Information Services Department. According to plaintiff, she was interviewed and then informed that she did not qualify.

Plaintiff next alleges that she applied again for a position in the Information Services Department after she received her Masters degree in Information Management in January 1997. After interviewing again, plaintiff was given a position in BSCI's Information Services Department's training program, commencing in April, 1997.

**\*2** From May 1997 through September 1998, plaintiff alleges she was subjected to a series of discriminatory and retaliatory acts. Among other things, plaintiff alleges that she was subjected to a number of unwanted amorous advances from her supervisor, which she rejected with the consequence that she unjustly received unfavorable reviews and undesirable assignments. Plaintiff also alleges that her work was altered by her supervisor to make it appear that she was incompetent and that her supervisor made derogatory race-based remarks during the same period in which plaintiff was treated less favorably than other employees in the department.

In July 1997, plaintiff executed the following agreement:
> In consideration of my employment or continued employment with Bear, Stearns & Co. Inc., ... I hereby agree to forego litigation and action in court and to submit to final and binding arbitration any and all claims, controversies of any nature and disputes of any nature whatsoever arising out of or in any way related to my employment at Bear Stearns or its termination ("Claims") including, but not limited to, Claims relating to hiring, terms and conditions of employment, and cessation of employment, Claims for breach of express or implied contract or covenant, tort Claims, Claims for discrimination including, but not limited to, Claims brought under Title VII, the federal Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), the Older Workers Benefit Protection Act ("OWBPA"), the Pregnancy Discrimination Act, Claims under any other applicable federal, state or local laws, rules and regulations,

including, by way of example but not limitation, those covering sexual harassment, and all city and state laws and ordinances and decisional law and any Claims under the Employee Retirement Income Security Act ("ERISA").

\* \* \*

I, Kim Moorning-Brown (Employee name), have read the foregoing statements and agree to the terms as a condition of my employment or continued employment.

/s/ Kim Moorning-Brown    July 22, 1997

Kim Moorning-Brown

(Exhibit A to the Affidavit of Robert N. Holtzman, sworn to August 6, 1999).

Plaintiff left BSCI's employ in September 1998.

III. *Analysis*

A. *Motion to Stay Pending Arbitration*

Four factors are relevant to a motion to stay an action pending arbitration:
> A court asked to stay proceedings pending arbitration must resolve four issues: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*Oldroyd v. Elmira Sav. Bank,* 134 F.3d 72, 75-76 (2d Cir.1998), *citing Genesco Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987). *See also Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 121 (2d Cir.1991); *Bird v. Shearson Lehman/American Express, Inc.,* 926 F.2d 116, 118 (2d Cir.1991).

**\*3** Applying these four factors to this case compels the conclusion that a stay pending arbitration is appropriate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 3
Not Reported in F.Supp.2d, 1999 WL 1063233 (S.D.N.Y.), 81 Fair Empl.Prac.Cas. (BNA) 1488, 79 Empl. Prac.
Dec. P 40,328
(Cite as: 1999 WL 1063233 (S.D.N.Y.))

*1. Existence of Arbitration Agreement*

Both the agreement plaintiff signed at the commencement of her employment and the agreement she signed on July 22, 1997, constitute, on their face, agreements by plaintiff to arbitrate all claims arising out of plaintiff's employment with BSCI.

Plaintiff argues that she should be relieved of her obligations under the arbitration agreement because (1) BSCI has waived its right to seek arbitration through its delay in seeking arbitration, (2) the putative agreement to arbitrate is not bilateral, (3) she did not read the arbitration agreement before she signed it and (4) it constitutes an unconscionable contract of adhesion.

Plaintiff's waiver argument is not persuasive. In view of the strong federal policy in favor of arbitration, waiver of an arbitration agreement "is not to be lightly inferred." *Carcich v. Rederi A/B Nordie,* 389 F.2d 692, 696 (2d Cir.1968); *accord Leadertex v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 25 (2d Cir.1995). Rather, a waiver will be found only when the party against whom waiver is asserted has engaged in substantial litigation activity resulting in prejudice to the party asserting waiver.

> [A] party waives its right to arbitration when it engages in protracted litigation that prejudices the opposing party. *See Doctor's Assocs., [Inc. v. Distajo,* 107 F.3d 126, 131 (2d Cir.1997) ]; *Cotton v. Slone,* 4 F.3d 176, 179 (2d Cir.1993); *Kramer v. Hammond,* 943 F.2d 176, 179 (2d Cir.1991). "[P]rejudice as defined by our cases refers to the inherent unfairness--in terms of delay, expense, or damage to a party's legal position--that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Doctor's Assocs.,* 107 F.3d at 134.... Thus, we have found that a party waived its right to arbitration when it engaged in extensive pre-trial discovery and forced its adversary to respond to substantive motions, *see Con-Tech Assocs. v. Computer Assocs. Int'l, Inc.,* 938 F.2d 1574, 1576-77 (2d Cir.1991), delayed invoking arbitration rights by filing multiple appeals and substantive motions while an adversary incurred unnecessary delay and expense, *see Kramer,* 943 F.2d at 179, and engaged in discovery procedures not available in arbitration, *see Zwitserse Maatschappij Van*

*Leyensverzekering En Lijfrente v. ABN Int'l Capital Mkts. Corp.,* 996 F.2d 1478, 1480 (2d Cir.1993) (per curiam). *PPG Indus., Inc. v. Webster Auto Parts, Inc.,* 128 F.3d 103, 107 (2d Cir.1997). Plaintiff claims that BSCI is guilty of delay here because it did not seek arbitration as soon as plaintiff first advised it of her grievance. Neither my research, nor the parties', has found any case in which such delay has been found to constitute a waiver of an arbitration agreement. Moreover, plaintiff has not explained how this alleged delay prejudiced her in any way. Thus, plaintiff's waiver argument is rejected.

*\*4* Plaintiff next claims that the arbitration agreement is invalid because it is not bilateral and imposes no obligation on BSCI to arbitrate its claims against plaintiff. Even if I assume this construction of the agreement is correct, it does not invalidate the agreement. The existence of an arbitration agreement is governed by the " 'substantive law of arbitrability" ' *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.,* 473 U.S. 614, 626 (1985), *quoting Moses H. Cone Memorial Hosp v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983), "which comprises generally accepted principles of contract law." *Genesco Inc. v. T. Kakiuchi & Co., supra,* 815 F.2d at 845. As a matter of contract law, there is no requirement that both parties to a contract offer the same consideration. In this case, plaintiff's promise to arbitrate is supported by BSCI's offer of employment to plaintiff and its continued employment of plaintiff. No additional consideration is necessary.

Plaintiff's third argument--that she did not read the arbitration agreement before she signed it--is insufficient as a matter of law. Plaintiff is conclusively presumed to be familiar with the terms of an agreement that she signed. *Smith V. Lehman Bros., Inc.,* 95 Civ. 10326(JSM), 1996 WL 383232 at * 1 (S.D.N.Y. July 8, 1996); *Degaetano v. Smith Barney, Inc.,* 95 Civ. 1613(DLC), 1996 WL 44226 at \*7- \*8 (S.D.N.Y. Feb. 5, 1996); *Maye v. Smith Barney, Inc.,* 897 F.Supp. 100. 106-08 (S.D.N.Y.1995).

Plaintiff's final argument concerning the validity of the agreement--that the arbitration agreement constitutes an unconscionable contract of adhesion--is also legally defective. Although there can be no doubt that plaintiff did not have bargaining power equal to BSCI with respect to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 1999 WL 1063233 (S.D.N.Y.), 81 Fair Empl.Prac.Cas. (BNA) 1488, 79 Empl. Prac.
Dec. P 40,328
**(Cite as: 1999 WL 1063233 (S.D.N.Y.))**

terms of her employment contract, that fact does not render the agreement unenforceable. *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 33 (1991) ("mere inequality in bargaining power ... is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context."). *See also Hart v. Canadian Imperial Bank of Commerce,* 43 F.Supp.2d 395, 400 (S.D.N .Y.1999); *Desiderio v. NASD,* 2 F.Supp.2d 516, 520 (S.D.N.Y.1998), *aff'd,* 191 F.3d 198 (2d Cir.1999).

### 2. *Scope of the Arbitration Agreement*

Both arbitration agreements signed by plaintiff expressly refer to Title VII claims of the type asserted here. Thus, there can be no issue that the claims asserted are within the scope of the arbitration agreement.

### 3. *Arbitrability of Plaintiff's Claim*

Any doubt in this Circuit concerning the arbitrability of Title VII claims has been eliminated by the Court of Appeals' recent decision in *Desiderio v. NASD,* 191 F.3d 198 (2d Cir.1999), in which the Court held that an employment agreement requiring the arbitration of claims asserted under Title VII was enforceable and did not violate the employee's rights under Title VII. After noting that the party asserting non-arbitrability bears the burden of persuasion, the Court found no inconsistency between the mandatory arbitration and the provisions of Title VII:

**\*5** Compulsory arbitration does not defeat the right to compensatory and punitive damages, or fee shifting because an arbitrator is also empowered to grant this kind of relief. Moreover, it is untenable to contend that compulsory arbitration conflicts with the [Civil Rights Act of 1991's] provision for the right to a jury trial, because *Gilmer [v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (1991) ] ruled that compulsory arbitration clauses could be enforced in claims under the ADEA, a statute that explicitly provides for jury trials. *See Rosenberg [v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 11 (1st Cir.1999) ]. Nor are we convinced that the underlying purposes of Title VII and the 1991 Civil Rights Act inherently conflict with the imposition of compulsory arbitration.

191 F.3d at 205. After noting that inconsistent legislative

history could not outweigh clear statutory language, the Court concluded that Desiderio had "not met her burden of showing that with respect to claims under Title VII, Congress intended to preclude the waiver of judicial remedies." 191 F.3d at 206. [FN2]

> FN2. Even before the decision in *Desiderio,* the "overwhelming weight of authority in this circuit [found] arbitration of Title VII claims to be appropriate." *Raiola v. Union Bank of Switzerland, LLC,* 47 F.Supp.2d 499, 505 (S.D.N.Y.1999) (collecting cases).

Thus, plaintiff's claim is arbitrable.

### 4. *Number of Claims Subject to Arbitration*

Since plaintiff asserts only one claim, this factor is inapplicable here.

### 5. *Summary*

Since all relevant factors weigh in favor of arbitration, BSCI's motion to stay this matter and to compel arbitration is granted.

### B. *Attorney's Fees*

Although BSCI seeks attorney's fees in its notice of motion, it entirely ignores the issue in the affidavits and memoranda submitted in support of its motion.

Neither the Federal Arbitration Act nor those portions of plaintiff's employment agreement submitted to me contain any provision for the award of attorney's fees. The only attorney's fee provision even remotely applicable here is that contained in Title VII itself, 42 U.S.C. § 2000e-5(k), which provides that a prevailing party in a Title VII action may recover its attorney's fees. This section cannot provide a basis for the award of attorney's fees to BSCI for at least two reasons. First, the granting of BSCI's motion to compel arbitration does not implicate cate the merits of plaintiff's claim in any way. Thus, BSCI is not a prevailing party within the meaning of Title VII.

Second, the standards for an award of attorney's fees to a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 1999 WL 1063233 (S.D.N.Y.), 81 Fair Empl.Prac.Cas. (BNA) 1488, 79 Empl. Prac.
Dec. P 40,328
**(Cite as: 1999 WL 1063233 (S.D.N.Y.))**

prevailing employer in a Title VII action are substantially
different from the standard by which attorney's fees are
awarded to a prevailing plaintiff. Although a prevailing
Title VII plaintiff is entitled to attorney's fees as a matter of
course, attorney's fees are very rarely awarded to a
prevailing Title VII defendant. A prevailing defendant may
recover its attorney's fees only upon a showing that the
plaintiff's "claim was frivolous, unreasonable, or groundless,
or that the plaintiff continued to litigate after it clearly
became so." *Christiansburg Garment Co. v. EEOC,* 434
U.S. 412, 422 (1978). BSCI has not come anywhere close to
making this showing. To the contrary, BSCI's motion for
attorney's fees, unsupported by fact or law, is, itself,
frivolous.

IV. *Conclusion*

**\*6** For all the foregoing reasons, BSCI's motion to stay this
action and to compel arbitration is granted. BSCI's motion
for attorney's fees is denied.

**Motions, Pleadings and Filings (Back to top)**

• 1:99cv04130 (Docket) (Jun. 08, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB H

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1698622 (S.D.N.Y.)
**(Cite as: 2004 WL 1698622 (S.D.N.Y.))**

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Dorothea PERRY, Plaintiff,
v.
NEW YORK LAW SCHOOL and Collegis, Inc.,
Defendants.
**No. 03 Civ. 9221(GBH).**

July 28, 2004.

*MEMORANDUM OPINION & ORDER*
DANIELS, J.

**\*1** Plaintiff brings this action against her former employers, New York Law School ("NYLS") and Collegis, Inc. ("Collegis"), alleging violations of Title VII, New York State and City law, and the Fair Labor Standards Act. [FN1] Defendant Collegis moves to dismiss or alternatively to suspend the proceeding and compel arbitration pursuant to the Federal Arbitration Act ("FAA"). For the reasons stated below, defendant's motion to compel arbitration is granted, and plaintiff's claims are dismissed against Collegis.

> FN1. Defendant NYLS is a law school located in New York, New York. Defendant Collegis provides technology and management services to various educational institutions, including NYLS.

*BACKGROUND*
Plaintiff was hired by NYLS in April 1990 as a Coordinator of User Services to provide technical support to the NYLS community. Her responsibilities included the support of hardware and software as well as communication assistance for users at NYLS. In November 1997, the computer support function at NYLS was contracted out to Collegis, a higher education services company. In connection with the commencement of her employment with Collegis, plaintiff signed an employment agreement with Collegis that required any disputes "arising out of or concerning the interpretation or application of" the employment agreement

to be resolved exclusively by arbitration under the Rules of the American Arbitration Association ("AAA"). [FN2] Simmons Affidavit Ex.5 p. 4, ¶ 11.

> FN2. Although plaintiff alleges that during the relevant time period, defendant NYLS and defendant Collegis were individually, and jointly, plaintiff's employer within the meaning of Title VII, the Human Rights law, and the Executive Law, *see* Complaint at 2, ¶ 5, in her affidavit she states that she "was employed by defendant Collegis, from November 1, 1997 through October 22, 2002, when [she] was terminated due to alleged job performance." Affidavit of Dorothea Perry in Opposition to the Collegis' Motion to Dismiss or to Compel Arbitration at 1, ¶ 3. She further states that her initial state court action "arose out of [her] employment and termination by defendant Collegis...." *Id.* at 2, ¶ 5.

Plaintiff claims that during her employment she was "subjected to racially offensive comments and behavior" by the Executive Director of Collegis in violation of Title VII of the Civil Rights Act of 1964, the New York City Human Rights Law, and the New York State Human Rights Law. Complaint p. 7, ¶ 23. Plaintiff further alleges that in June 2002, during the course of working on a law professor's computer, she and a co-worker discovered a file of pornographic images of young girls. Plaintiff claims that this created a "hostile work environment" because the images were "perverse and degrading to women." Plaintiff alleges that she reported the child pornography to the Executive Director, but no legal action was taken against the professor until plaintiff personally visited the Federal Bureau of Investigation to discuss the matter. The professor was eventually investigated, arrested, and sentenced after he pled guilty to possessing child pornography.

In June 2002, plaintiff was placed on employment "probation" and subsequently terminated in October 2002. In her complaint, plaintiff alleges that Collegis and NYLS subjected her to (1) race and color discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.,* the New York State Human Rights Law, N.Y. Executive Law § 290 *et. seq.,* and the New York

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 1698622 (S.D.N.Y.)
**(Cite as: 2004 WL 1698622 (S.D.N.Y.))**

City Human Rights Law, N.Y. Admin. Code § 8-101, *et. seq.;* (2) retaliation in violation of these laws; and (3) violations of the Fair Labor Standards Act, 29 U.S.C. § 216, *et. seq.* and New York Labor Law by failing to pay her compensation for overtime.

Plaintiff argues that Collegis and NYLS terminated her employment in retaliation for her opposition to their racial discrimination and her complaints about the child pornography in violation of Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law. Plaintiff further claims that although she was consistently required to work more than forty hours per week, she was never paid overtime compensation as required by the Fair Labor Standards Act and New York Labor Law.

*2 On October 21, 2003, plaintiff filed a complaint in New York Supreme Court, New York County, naming NYLS and Collegis as defendants. Collegis filed and served a demand for arbitration with the AAA on November 5, 2003. The AAA sent a letter to all parties on November 12, 2003, informing them that the defendants had properly paid their $375.00 filing fee and requesting that plaintiff remit her capped filing fee of $125.00. Plaintiff failed to do so by the deadline given by the AAA, and on November 24, 2003, the AAA sent a letter to all parties informing them that the filing requirements were incomplete, and AAA returned the original files. On November 20, 2003, NYLS and Collegis removed the case to the United States District Court for the Southern District of New York. Defendant Collegis filed the instant motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(3), and 12(b)(6), or alternatively to suspend these proceedings and to compel arbitration.

### DISCUSSION
I. *Motion to Compel Arbitration*

Under the FAA, a district court may stay proceedings if it finds a valid arbitration agreement and may compel arbitration when a party refuses to comply with that agreement. 9 U.S.C.S §§ 3-4. When considering a motion to compel arbitration, there are four issues the Court must resolve. *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.,* 239 F.Supp.2d 332, 335 (S.D.N.Y.2002). It must determine: first, whether the parties agreed to arbitrate; second, whether

the issues raised fall within the scope of their agreement; third, whether Congress intended the plaintiff's claim to be non-arbitrable; and fourth, when some but not all of the claims are arbitrable, whether to stay the balance pending arbitration. *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987).

Plaintiff does not deny that she entered into the employment agreement to arbitrate with Collegis, nor does she deny that the issues she has raised fall within the scope of that agreement. [FN3] The agreement states:

> FN3. On a motion to dismiss, the Court limits its consideration to: (1) factual allegations in the complaint; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents that are "integral" to the complaint. *Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 498 (S.D.N.Y.2003)(citing *Brass v. American Films Technologies,* 987 F.2d 142, 150 (2d Cir.1993); *Chambers v., Time Warner Inc.,* 282 F.3d 147, 153 (2d Cir.2002)). The arbitration agreement between the parties is integral to the complaint and the instant motion. *Schnall v. Marine Midland Bank,* 225 F.3d 263, 266 (2d Cir.2000); accord *Merrill Lynch,* 2003 WL 21500293, at *1 (noting that "documents 'integral' to the complaint and relied upon in it, even if not attached or "incorporated by reference" can be considered on a motion to dismiss).

"The Corporation agrees to comply with all applicable laws, regulations, or ordinances governing this employment, including but not limited to Title VII of the Civil Rights Act ... and [its] state or local counterpart ..."
"All disputes arising out of or concerning the interpretation or application of this Agreement, including without being limited to any claims that the application of this Agreement or the termination of the employment relationship established by this Agreement violates any federal, state, or local law, regulation, or ordinance (including but not limited to those set forth in paragraph 10 above), shall be resolved timely and exclusively by arbitration pursuant to the Rules of the American

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1698622 (S.D.N.Y.)
**(Cite as: 2004 WL 1698622 (S.D.N.Y.))**

Arbitration Association (AAA) ..."
Simmons Affidavit Ex.5 p. 4, ¶ 10, 11. Further, the Second
Circuit has squarely held that Congress intended Title VII
claims to be subject to arbitration. *Desiderio v. NASD,* 191
F.3d 198, 204-205 (2d Cir.1999). *See also Martens v. Smith
Barney,* 238 F.Supp.2d 596, 601 (S.D.N.Y.2002); *Zouras v.
Goldman Sachs Group, Inc.,* 2003 U.S. Dist. LEXIS 14514
(S.D.N.Y.2003). State and local discrimination claims are
also arbitrable. *See Fletcher v. Kidder, Peabody & Co.,* 81
N.Y.2d 623, 638 (N.Y.1993); *see also Martin v. SCI Mgmt.
L.P.,* 296 F.Supp.2d 462, 467 (S.D .N.Y.2003). FLSA
claims are also arbitrable. *See Martin,* 296 F.Supp.2d at
467; *see also Adkins v. Labor Ready, Inc.,* 303 F.3d 496,
506 (4th Cir.2002).* Having found that all claims at issue are
subject to arbitration, there is no need to consider whether to
stay any non-arbitrable claims against Collegis while the
arbitration proceeds.

*a. Fee Sharing*

**\*3** Plaintiff contends, however, that the arbitration
agreement she signed is unenforceable because its fee
sharing provision makes the cost of arbitration prohibitively
high and prevents her from vindicating her statutory rights.
Her argument, however, is without merit.

The arbitration agreement states "[t]he parties shall share
equally all costs of arbitration excepting their own attorneys
fees." Simmons Affidavit Ex. 5 p. 4, ¶ 11. Plaintiff claims
that under this provision, she will have to pay, in advance of
arbitration, a fee of $11,750.00. In calculating this projected
cost, plaintiff used the AAA fee schedule for disputes
arising from "individually negotiated employment
agreements."

However, the dispute in this case arises not from an
"individually negotiated employment agreement," but from
an "employer-promulgated plan." This is made clear in the
letter sent by the AAA to all parties on November 12, 2003:
"[t]he Association has determined that this dispute arises
from a *plan ...*" Mancher Affirmation Ex. 1 [emphasis
added]. The AAA rules provide that "[a]ny questions or
disagreements about whether a matter arises out of an
employer-promulgated plan or an individually-negotiated
agreement shall be determined by the AAA and its

determination shall be final." AAA National Rules for the
Resolution of Employment Disputes, Mancher Affirmation
Ex. 2 ("AAA Rules") p. 14. Thus, the proper fee schedule to
consult in determining plaintiff's financial burden in this
case is the fee schedule for employer-promulgated plans.

According to the proper AAA fee schedule, the employee
fee is capped at $125.00. AAA Rules p. 13. Although this is
inconsistent with the provision in the arbitration agreement
stating that all fees will be split equally, the AAA rules
provide that when there is an adverse material inconsistency
between the arbitration agreement and the AAA rules, the
latter will apply. AAA Rules p. 5. Moreover, even if the
arbitration agreement controlled, defendant Collegis has
represented to the court that it "waives the requirement that
the parties share the cost equally" Collegis Reply
Memorandum of Law p. 4.

A party who "seeks to invalidate an arbitration agreement
on the ground that arbitration would be prohibitively
expensive ... bears the burden of showing the likelihood of
incurring such costs." *Green Tree Fin. Corp. v. Randolph,*
531 U.S. 79, 92 (2000). Here, plaintiff has not shown that
she will incur more than $125.00 for arbitration, nor has she
shown that this capped fee will be prohibitively expensive
for her. Courts in this circuit have held that where the
plaintiff has not shown that she will incur more than
$125.00, the burden of showing prohibitive costs has not
been met. *See Chamois v. Countrywide Home Loans,* 2003
U.S. Dist. LEXIS 23202 (S.D.N.Y.2003) (where the
defendant has offered to pay all costs but the $125.00 filing
fee, plaintiff has not met burden of showing prohibitive
costs). In *Gruber v. Louis Hornick & Co.,* 2003 U.S. Dist.
LEXIS 8764 (S.D.N.Y.2003), the court found it "clear that
under the fee schedule for 'employer-promulgated' [plans],
plaintiff is not effectively precluded from vindicating her
rights due to the fees of arbitrating." Thus, plaintiff has not
met her burden for invalidating the arbitration agreement on
the grounds of prohibitive costs.

*b. Timely Filing Requirements*

**\*4** Plaintiff also contends that the arbitration agreement is
unenforceable because defendant Collegis failed to timely
complete the filing requirements for arbitration, and so

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 4
Not Reported in F.Supp.2d, 2004 WL 1698622 (S.D.N.Y.)
**(Cite as: 2004 WL 1698622 (S.D.N.Y.))**

defaulted on the opportunity to arbitrate. For the reasons stated below, this argument is also without merit.

The arbitration agreement signed by parties provides that "[a]rbitration must be demanded within three hundred (300) calendar days of the time when the demanding party knows or should have known of the event or events giving rise to the claim." Simmons Affidavit Ex. 5 p. 4, ¶ 11. The parties agree that defendants should have first known about the events giving rise to the claim when plaintiff filed her previous claim in state court on January 9, 2003 (or a day later when service was effected on Collegis). [FN4] The deadline for demanding arbitration was therefore November 5 or 6, 2003. Defendant Collegis filed a demand for arbitration on November 5, 2003, and remitted its portion of the filing fee. The deadline for plaintiff to remit her portion of the filing fee of $125.00 was November 17, 2003.

> FN4. Prior to bringing this suit, on January 9, 2002, plaintiff filed a separate suit against Collegis and NYLS in the Supreme Court of the State of New York, County of New York alleging that she was discharged from her employment with Collegis in retaliation for reporting the existence of child pornography on a NYLS professor's computer, a claim which is at least similar to the claim in the instant case, although the original complaint sought relief only under the New York City Human Rights Law. The New York Supreme Court dismissed plaintiff's complaint for failure to state a cause of action. The parties in this case disagree about whether the instant case is thereby barred under the doctrine of res judicata. The issue of res judicata is not before the Court, however, and in deciding the instant motion to compel arbitration, the Court need not reach that question.

The AAA returned the filings on November 24, 2003 because plaintiff had failed to remit her filing fee, stating that it "cannot maintain files for incomplete cases." Perry Affidavit Ex. C. Plaintiff draws the conclusion that there was no proper demand for arbitration within the deadline specified by the arbitration agreement, and that defendants have therefore defaulted on the opportunity to arbitrate the case, "due to Collegis's failure to complete the filing

requirements." Perry Affidavit, ¶ 10.

Notwithstanding that it was plaintiff, not defendants, who failed to complete the filing requirements, this issue is not for the Court to decide and cannot defeat the motion to compel arbitration. The AAA rules provide, "[a]ny dispute over such issues shall be referred to the arbitrator." AAA Rules p. 6. The Supreme Court has held that in matters concerning the time limit rules involved in an arbitration dispute, courts should defer to the arbitrator. Thus, in *Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 85 (2002), the Supreme Court found that "the applicability of the [National Association of Securities Dealers] time limit rule is a matter presumptively for the arbitrator, not for the judge."

The Supreme Court has similarly held that any doubt concerning arbitrability "should be resolved in favor of arbitration, whether the problem at hand is the construction of contract language itself or an allegation of waiver, delay, or a like defense to arbitrability," *Moses H. Cone Mem'l Hosp. V. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983). *See also Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 847 (2d Cir.1987).

*c. Dismissal*

Plaintiff's arguments that the arbitration clause should not be enforced have no merit. All the claims she raises against the defendant Collegis are subject to arbitration. The FAA provides that a district court, upon determining that an action before it is subject to an enforceable arbitration provision, "shall ... stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement ..." 9 U.S.C. § 3. Because all of plaintiff's claims are subject to arbitration, no useful purpose will be served by granting a stay of plaintiff's claims against Collegis and thus its action against the defendant is dismissed. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992) (same); *see also Mahant v. Lehman Bros.,* No. 99 Civ. 4421, 2000 WL 1738399, at *3-4 (S.D.N.Y. Nov. 22, 2000); *E. Fish Co. v. South Pac. Shipping Co., Ltd.,* 105 F.Supp.2d 234, 241-42 & n. 10 (S.D.N.Y.2000); *Aerotel,* 99 F.Supp.2d at 374; *Berger v. Cantor Fitzgerald Secs.,* 967 F.Supp. 91, 96 (S.D.N.Y.1997).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                        Page 5
Not Reported in F.Supp.2d, 2004 WL 1698622 (S.D.N.Y.)
**(Cite as: 2004 WL 1698622 (S.D.N.Y.))**

**\*5** Defendant Collegis' motion to compel arbitration is granted. Plaintiff's claims against defendant Collegis are dismissed.

  SO ORDERED:

Not Reported in F.Supp.2d, 2004 WL 1698622 (S.D.N.Y.)

    **Motions, Pleadings and Filings (Back to top)**

• 1:03cv09221 (Docket) (Nov. 20, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB I

Westlaw.

Not Reported in F.Supp.                                                          Page 1
Not Reported in F.Supp., 1996 WL 622024 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1506, 9 Wage & Hour
Cas.2d (BNA) 510, 9 NDLR P 27
**(Cite as: 1996 WL 622024 (S.D.N.Y.))**

**C**

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
Fred PILANSKI, Plaintiff,
v.
METROPOLITAN LIFE INSURANCE CO., Steven
Filoramo & Associates, and Steven
Filoramo, Defendants.
**No. 95 Civ. 10292 DC.**

Oct. 28, 1996.

Former employee brought action against former employer alleging violations of Title VII, Americans with disabilities Act (ADA), the Family and Medical Leave Act (FMLA), New York Human Rights Law, and New York City Administrative Code's antidiscrimination provisions. Former employer moved to compel arbitration. The District Court, Chin, J., held that former employee's allegations that he was discouraged from reading Uniform Application for Securities Industry Registration or Transfer, which required him to arbitrate disputes with employer, and was denied the opportunity to complete application were insufficient to void the contract, even if true.

Motion granted.

Mulligan & Sipser by William J. Sipser, New York City, for plaintiff.

Davidoff & Malito LLP by Richard L. Steer, New York City, for defendants.

*MEMORANDUM DECISION*
CHIN, District Judge:

**\*1** In this employment discrimination case, defendants Metropolitan Life Insurance Company ("MetLife"), Steven Filoramo & Associates ("SFA"), and Steven Filoramo ("Filoramo") move pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.,* to compel arbitration and to stay these proceedings pending arbitration. Alternatively, defendants move to dismiss certain of plaintiff's claims for failure to state a claim upon which relief may be granted.

Because plaintiff Fred Pilanski ("Pilanski") executed an agreement requiring him to arbitrate "any dispute, claim or controversy" between him and MetLife, his former employer, defendants' motion to compel arbitration is granted. Hence, I do not reach the merits of defendants' motion to dismiss several of Pilanski's claims.

*BACKGROUND*

Plaintiff worked for MetLife as a sales representative from approximately January 1993 to on or about January 21, 1994. As part of his employment at MetLife, Pilanksi registered with the National Association of Securities Dealers, Inc. (the "NASD"). This registration process required that he sign a form entitled "Uniform Application for Securities Industry Registration or Transfer" ("Form U-4"), which he did on February 3, 1993, containing the following arbitration clause:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in a court of competent jurisdiction.

This arbitration clause was directly preceded by the heading "THE APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY." The Form U-4 was in turn signed by Steven Filoramo on behalf of MetLife, also on February 3, 1993. (Def.Ex. A). Plaintiff does not challenge defendants' assertion that his application was accepted. Indeed, plaintiff states that when he inquired about his application, he was told, at least initially, that "everything was okay." (Pilanski Aff. ¶ 5).

At the time plaintiff signed the Form U-4, the NASD Code of Arbitration Procedure provided for the mandatory arbitration of, *inter alia:*

> any dispute, claim or controversy arising out of or in connection with the business of any member of the Association ... between or among members and associated persons.

Plaintiff does not dispute that MetLife is a "member" of the NASD, and that both plaintiff and Filoramo, as MetLife employees, were "associated persons" during the relevant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1996 WL 622024 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1506, 9 Wage & Hour
Cas.2d (BNA) 510, 9 NDLR P 27
**(Cite as: 1996 WL 622024 (S.D.N.Y.))**

time period. [FN1]

> FN1. The NASD Code's arbitration provision was
> amended for clarification in October 1993 to
> explicitly cover employment suits. However, I
> need not resolve which version of the NASD Code
> applies here, because both versions compel
> arbitration. *Friedman v. Metropolitan Life Ins. Co.,*
> No. 95 Cv. 10096, at 4 (S.D.N.Y. June 18, 1996).

Plaintiff alleges that during his employment at MetLife he
was subjected to a sexually offensive and hostile work
environment. He contends he suffered retaliatory
discrimination after testifying at a sexual harassment
hearing brought by a female co-worker against defendants.
Plaintiff also contends that after he was disabled as the
result of a car accident in or about September 1993,
defendant Filoramo attempted to interfere with plaintiff's
receipt of disability benefits. According to plaintiff,
defendants also failed to properly designate plaintiff's
absence as disability leave under the Family and Medical
Leave Act (the "FMLA").

*2 Based on these allegations, plaintiff filed claims against
MetLife, SFA, and Filoramo under (1) Title VII of the Civil
Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §
2000e *et seq.;* (2) the Americans with Disabilities Act of
1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.;* (3) the
FMLA, 29 U.S.C. § 2601 *et seq.;* (4) the New York Human
Rights Law; and (5) the New York City Administrative
Code's anti-discrimination provisions. Plaintiff seeks
declaratory and injunctive relief as well as damages.

### DISCUSSION

Plaintiff argues that the arbitration clause is unenforceable
because plaintiff did not knowingly and voluntarily agree to
waive his rights to seek a remedy in court. This argument is
unpersuasive.

[1] It is well-settled that the FAA establishes a federal
policy favoring arbitration. *Shearson/American Express,
Inc. v. McMahon,* 482 U.S. 220, 225- 26 (1991); *Scherk v.
Alberto-Culver Co.,* 417 U.S. 506, 510-11 (1974). The FAA
requires the federal courts to enforce arbitration agreements
with the same vigor that the courts enforce other contracts.

*Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219
(1985). The Second Circuit has held that " 'arbitration
should be ordered unless it may be said with positive
assurance that the arbitration clause is not susceptible of an
interpretation that covers the asserted dispute.' " *McMahan
Securities Co. v. Forum Capital Markets L.P.,* 35 F.3d 82,
88 (2d Cir.1994) (quoting *S.A. Mineracao Da
Trinidade-Samitri v. Utah Int'l Inc.,* 745 F.2d 190, 194-95
(2d Cir.1984)). More specifically, "courts in this district
have repeatedly held that a Form U-4, incorporating by
reference the language of the *pre*-amendment NASD Code,
binds the signatory to arbitrate disputes arising out of his
employment with a member firm, including employment
discrimination claims." *Friedman v. Metropolitan Life Ins.
Co.,* No. 95 Cv. 10096, at 5 (S.D.N.Y. June 18, 1996)
(citations and footnotes omitted).

[2] Plaintiff argues that he did not knowingly and
voluntarily waive his rights because the Form U-4 was
presented to him "simply for signature." (Pilanksi Aff. ¶ 4).
He contends that he was discouraged from reading the form
and denied the opportunity to complete the application
himself. He contends further that defendants completed the
Form U-4 either prior to or after securing plaintiff's
signature. (Pl.Mem. at 4).

[3] These allegations, however, are not sufficient to void the
contract, even if they are true. Plaintiff is "bound by the
terms of the [a]greement, including the arbitration
provision," unless he can demonstrate "special, mitigating
circumstances, such as duress or coercion." *Degaetano v.
Smith Barney, Inc.,* 1996 WL 44226, at *5 (S.D.N.Y.1996);
*see also Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S.
20, 33 (1991). Under New York law, to establish a claim of
economic coercion or duress a plaintiff must show:

(1) a threat, (2) which was unlawfully made, and (3)
caused involuntary acceptance of contract terms, (4)
because the circumstances permitted no other alternative.

*3 *Degaetano,* 1996 WL 44226, at *5 (quoting *Kamerman
v. Steinberg,* 891 F.2d 424, 431 (2d. Cir.1989)).

[4] Here, plaintiff has not alleged any threat, much less an
unlawful one, nor has plaintiff argued that he had no
alternative other than to sign the Form U-4. Discouragement
of review of a contract does not constitute a threat. *See, e.g.,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1996 WL 622024 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1506, 9 Wage & Hour
Cas.2d (BNA) 510, 9 NDLR P 27
**(Cite as: 1996 WL 622024 (S.D.N.Y.))**

*Maye v. Smith Barney, Inc.,* 897 F.Supp. 100, 106-08
(S.D.N.Y.1995) (allegations of inadequate opportunity to
read agreement insufficient to void arbitration agreement);
*Friedman,* No. 95 Cv. 10096, at 6-7 (allegations of
discouragement of review of arbitration provision
insufficient to void arbitration agreement). As Judge Wood
observed in *Friedman,* the presumption that one who signs a
contract knows and assents to its contents "is especially true
where, as here, the Form U-4 specifically cautioned the
signer that its content should be read." *Id.* at 7.

[5] Plaintiff also alleges that the contract was invalid
because there was no mutual assent, contending again that
he did not understand contents of the Form U-4 because he
was discouraged from reading it. (Pl.Mem. at 5). Again,
however, under New York law, one who "signs or accepts a
written contract, in the absence of fraud or other wrongful
act on the part of another contracting party, is conclusively
presumed to know its contents and to assent to them...."
*Maye,* 897 F.Supp. at 108 (citations omitted). Here, plaintiff
has not alleged, much less demonstrated, that defendants
engaged in any fraud or other wrongful act. Accordingly, I
find that plaintiff entered into a valid and enforceable
agreement to arbitrate.

### *CONCLUSION*

Defendants' motion to compel arbitration is granted, and this
action is stayed pending completion of the arbitration
proceedings. All of plaintiff's claims asserted in this case are
to be arbitrated. The case will be placed on my suspense
docket pending notice from the parties that the arbitration
proceedings have been completed or otherwise resolved.

SO ORDERED.

Not Reported in F.Supp., 1996 WL 622024 (S.D.N.Y.), 73
Fair Empl.Prac.Cas. (BNA) 1506, 9 Wage & Hour Cas.2d
(BNA) 510, 9 NDLR P 27

**Motions, Pleadings and Filings (Back to top)**

• 1:95cv10292 (Docket) (Dec. 06, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB J

Not Reported in F.Supp.                                                                                           Page 1
Not Reported in F.Supp., 1997 WL 129396 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P 44,907
**(Cite as: 1997 WL 129396 (S.D.N.Y.))**

## C

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
Benjamin RICE, Plaintiff,
v.
BROWN BROTHERS HARRIMAN & CO., Defendant.
**No. 96 Civ. 6326(MBM).**

March 21, 1997.
Arlene Boop, Nina Koenigsberg, Alterman & Boop, New York City, for Plaintiff.

Andrea S. Christensen, John D. Geelan, John Roberti, Kaye Scholer Fierman Hays & Handler, New York City, for Defendant.

OPINION AND ORDER
MUKASEY, District Judge.

**\*1** Benjamin Rice sues Brown Brothers Harriman & Co. ("BBH"), his employer, claiming that BBH discriminated against him in his compensation and other conditions of his employment because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and New York City Human Rights Law, Administrative Code § 8-101 et seq. Plaintiff seeks also a declaratory judgment that his discrimination claims need not be arbitrated under an arbitration clause included in a securities industry registration form which he signed when he was hired. Defendant moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) and (6), or for summary judgment pursuant to Fed.R.Civ.P. 56, or in the alternative to compel arbitration and stay further proceedings pending conclusion of the arbitration pursuant to the Federal Arbitration Act ("F.A.A."), 9 U.S.C. §§ 3-4. For the reasons set forth below, defendant's motion to dismiss plaintiff's declaratory judgment claim and its motion to compel arbitration and stay these proceedings are granted.

I.
BBH provides private banking services, including investment, advisory, management and custodial services.

(Compl.¶ 7) Plaintiff, 66 years old, has been employed by BBH since 1983 and is now a securities analyst and manager. (*Id.* ¶ 13) He claims that BBH denied him the same job opportunities and compensation as younger employees. (*Id.* ¶¶ 23-26)

Around the time he commenced his employment, plaintiff signed a "Uniform Application for Securities Industry Registration or Transfer Form," commonly known as a U-4. (*Id.* ¶ 15; Geelan Aff., Ex. B) The U-4 provided:
   I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by laws of the organizations with which I register, as indicated in Question 8.
(Geelan Aff., Ex. B) In answer to Question 8, which asked with which organizations plaintiff planned to register, Rice checked the box labelled NYSE ("New York Stock Exchange"). (*Id.*) NYSE Rule 347 provides:
   Any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party....
(Geelan Aff., Ex. C) Plaintiff is a registered representative on the NYSE and defendant is a member organization. (Compl.¶ 14)

Plaintiff asserts age discrimination claims under federal, state and local law. He claims that the U-4 arbitration clause does not cover age discrimination claims. (*Id.* ¶ 19) Further, plaintiff argues that even if the clause does compel arbitration of age discrimination claims, plaintiff did not knowingly and voluntarily waive his right to a judicial forum for such claims. (Id.¶¶ 20-22, 32-35)

II.
**\*2** This action is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and by New York contract law. Under 9 U.S.C. § 3:
   If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 2
Not Reported in F.Supp., 1997 WL 129396 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P
44,907

**(Cite as: 1997 WL 129396 (S.D.N.Y.))**

that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3 (1994). Further, section 4 of the F.A.A. provides that a federal court may compel a party to proceed to arbitration if the party fails, refuses or neglects to honor an agreement to arbitrate. 9 U.S.C. § 4 (1994). To determine whether to stay proceedings and compel arbitration, a court must engage in a four-part inquiry:

First, it must determine whether the parties agreed to arbitrate ...; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable ...; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

*Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987). If this inquiry yields a finding that the matter is arbitrable, the court must send the parties to arbitration; there is no room for discretion. *Id.*

A. *Agreement to Arbitrate*

Plaintiff does not deny that he signed the U-4 form. The U-4 requires that all matters subject to arbitration under the rules of the NYSE be arbitrated. NYSE Rule 347 requires that any employment dispute between a registered representative and a member organization be arbitrated. Plaintiff is a registered representative on the NYSE, defendant is a member organization, and therefore plaintiff agreed to arbitrate claims arising from his employment.

B. *Scope of the Arbitration Clause*

Enforcement of an arbitration agreement in relation to a particular claim "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Tech., Inc. v. Communications Workers,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Under the U-4's arbitration clause, and NYSE Rule 347, plaintiff was required to arbitrate any dispute "arising out of

... employment." Rule 347 is broad, and therefore must be read to include all employment disputes. Accordingly, plaintiff's claim that defendant discriminated against him in the condition of employment on account of his age is an employment dispute covered by this language. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Chisholm v. Kidder, Peabody Asset Management, Inc.,* 810 F.Supp. 479, 481 (S.D.N.Y.1992).

C. Arbitrability of Statutory Claims

**\*3** It is well settled that age discrimination claims brought under the ADEA and under state and local law are subject to arbitration. *Gilmer,* 500 U.S. at 27-28; *Fletcher v. Kidder, Peabody & Co.,* 81 N.Y.2d 623, 634, 601 N.Y.S.2d 686, 692, 619 N.E.2d 998, *cert. denied,* 510 U.S. 933 (1993). In *Gilmer,* the Supreme Court held in circumstances remarkably similar to these--a securities industry employee, registered with the NYSE, who had signed a U-4 form with the same arbitration clause--that ADEA claims are subject to arbitration to the same extent as other claims. *Gilmer,* 500 U.S. at 27-28. The Court reasoned that neither the text of the ADEA nor its legislative history shows a Congressional intent to preclude arbitration of ADEA claims, and that the ADEA's purpose was not inconsistent with arbitration. *Id.*

Similarly, in *Fletcher,* the New York Court of Appeals held that state law discrimination claims under New York Executive Law § 296(1)(a) are arbitrable. *Fletcher,* 81 N.Y.2d at 634, 601 N.Y.S.2d at 692, 619 N.E.2d 998. The Court stated that "the arbitrability of statutory discrimination claims is henceforth to be determined by reference to Congress' intent with regard to alternative dispute resolution of that class of claims." *Id.* at 688. The Court found in light of *Gilmer* and the Court of Appeals' own reading of Congressional intent, Congress intended that discrimination claims be arbitrable. *Id.* at 690-92.

*Fletcher's* reasoning would apply also to local law-based discrimination claims. The *Fletcher* Court stated that "[w]here the right is predicated on a State or local statute rather than on a congressional enactment, ... the courts are obliged to draw an analogy to the equivalent Federal law, where possible, and to consider Congress' intentions with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1997 WL 129396 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P
44,907
**(Cite as: 1997 WL 129396 (S.D.N.Y.))**

regard to the rights created by that law." *Id.* at 690. Therefore, the arbitrability of a discrimination claim under local law, such as the New York City Human Rights Law, is determined by reference to Congressional intent. As the *Fletcher* Court noted, Congressional intent favors arbitrating discrimination claims. Accordingly, discrimination claims under New York City Human Rights Law also are arbitrable.

The fourth part of the inquiry--whether nonarbitrable claims should be stayed pending the completion of arbitration on arbitrable claims--is inapplicable here because all of plaintiff's claims are arbitrable.

### D. *Knowing and Voluntary Agreement to Arbitrate Age Discrimination Claims*

Although the mandated four-part inquiry appears to compel arbitration, plaintiff argues that his claim need not be arbitrated because he did not knowingly and voluntarily agree to arbitrate age discrimination claims. He asserts three different theories in support of this conclusion. First, plaintiff claims that he was never told that discrimination claims are arbitrable under the U-4 arbitration clause. "When deciding whether the parties agreed to arbitrate a certain matter ..., courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995). Under New York law, a party's subjective knowledge of the contents of a contract at the time he signs it is irrelevant. *See Schmidt v. Magnetic Head Corp.,* 97 A.D.2d 151, 157, 468 N.Y.S.2d 649, 654 (2d Dep't 1983). Rather, "one 'who signs and accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them.' " *Maye v. Smith Barney Inc.,* 897 F.Supp. 100, 108 (S.D.N.Y.1995) (quoting *Metzger v. Aetna Ins., Co.,* 227 N.Y. 411, 125 N.E. 814 (1920)); *see also Genesco, Inc.,* 815 F.2d at 845 ("Under general contract principles a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such obligation.").

\*4 Here, plaintiff claims that he "was not told and had not

*sic* ] idea that the rules of the New York Stock Exchange could be read to require arbitration of the present claims I bring for age discrimination." (Rice Aff. ¶ 2) However, under New York law, plaintiff's subjective knowledge of the scope of the arbitration clause is irrelevant and he is presumed to have agreed to all the terms of the contract, including the broad arbitration clause in NYSE Rule 347, which on its face encompasses discrimination claims. *See, e.g., Smith v. Lehman Bros., Inc.,* No. 95 Civ. 10326, 1996 WL 383232, at *1 (S.D.N.Y. July 8, 1996) ("As such assertions [that plaintiff was not aware of arbitration clause] alone do not constitute economic duress, coercion, or fraud, Smith is conclusively presumed to have assented to submit his claims to arbitration."); Hall v. *Metlife Resources/Div. of Metro. Life Ins. Co.,* No. 94 Civ. 0358, 1995 WL 258061, at *2-3 (S.D.N.Y. May 3, 1995) (holding arbitration clause binding where plaintiffs claimed in affidavits that they were unaware that U-4's which they signed contained arbitration clauses).

To the extent that plaintiff might seek to rely on *Prudential Insurance Company of America v. Lai,* 42 F.3d 1299 (9th Cir.1994), *cert. denied,* 516 U.S. 812, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995), for the proposition that an explicit waiver of the right to a judicial forum or actual knowledge of such a waiver is required to arbitrate a discrimination claim, I follow other courts in this district in rejecting that rule. *See DeGaetano v. Smith Barney, Inc.,* No. 95 Civ. 1613, 1996 WL 44226, at *7 (S.D.N.Y. Feb.5, 1996); *Hall,* 1995 WL 258061, at *3-4; *Pitter v. Prudential Life Ins. Co. of Amer.,* 906 F.Supp. 130, 139-40 (S.D.N.Y.1995); *Maye,* 897 F.Supp. at 107; *see also Beauchamp v. Great West Life Assurance Co.,* 918 F.Supp. 1091, 1098 (E.D.Mich.1996). Moreover, unlike the arbitration clause in *Lai,* NYSE Rule 347 explicitly covers employment disputes. *See, e.g., Topf v. Warnaco, Inc.,* 942 F.Supp. 762, 771 (D.Conn.1996) (distinguishing *Lai* because arbitration clause "refer[s] specifically to the arbitrability of any controversy arising out of an employment relationship."); *Golenia v. Bob Baker Toyota,* 915 F.Supp. 201, 205 (S.D.Cal.1996) (same).

Second, plaintiff claims in the complaint that defendant fraudulently induced him to sign the arbitration clause. However, plaintiff has since abandoned this claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 4
Not Reported in F.Supp., 1997 WL 129396 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P
44,907
**(Cite as: 1997 WL 129396 (S.D.N.Y.))**

(Christensen Aff., Ex. D) Thus, plaintiff has shown no special circumstances which can overcome the presumption of knowing and voluntary agreement to the full scope of the arbitration clause.

Third, plaintiff argues that the Older Workers Benefit Protection Act of 1990, Pub.L. No. 101-433, title II, 104 Stat. 978, 983-84 (1990) ("OWBPA") (codified at 29 U.S.C. § 626), which amended the ADEA, bars arbitration of this ADEA claim because it imposes high standards for a knowing and voluntary waiver of a judicial forum in ADEA claims, which were not met here. The OWBPA provides that "[a]n individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1) (1994). It then provides that a waiver is not considered knowing and voluntary unless certain general requirements are met, including that the waiver is written in an understandable manner, that it refers specifically to the ADEA, that it does not waive rights arising after the waiver is executed, that it is in return for consideration which is in addition to anything of value to which the individual is already entitled, that the waiving party is advised to consult an attorney, and that the waiving party is given seven days to revoke the waiver after its execution. 29 U.S.C. § 626(f)(1)(A)-9 (E), (G). In addition to these general requirements, the statute requires also that an individual be given 21 days to consider the waiver. 29 U.S.C. § 626(f)(1)(F)(i). However, if the "waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees," the individual must be given 45 days to consider the waiver and must be informed of details concerning the group or class being offered the program. 29 U.S.C. § 626(f)(1)(F)(ii), (H). In addition, a "waiver in settlement of a charge filed with the Equal Employment Opportunity Commission, or an action filed in court by the individual or the individual's representative" alleging age discrimination must meet the general requirements listed above and the waiving party must be given a "reasonable period of time" within which to consider the settlement agreement. 29 U.S.C. § 626(f)(1)- (2).

*5 Plaintiff's reliance on the statute is misplaced in part because the arbitration clause in plaintiff's U-4 was executed

before the OWBPA was enacted. The Act provides that the waiver requirements "shall not apply with respect to waivers that occur before the date of enactment of this Act." Old Workers Benefit Protection Act, Pub.L. No. 101-433, § 202, 104 Stat. 978, 984 (1990); *see also* Ulvin v. Northwestern Nat'l Life Ins. Co., 943 F.2d 862, 866 (8th Cir.1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992). The plain meaning of the word "occur" is that the waiver is signed or executed. Therefore, the most logical interpretation of this statutory provision is that the OWBPA's waiver requirements do not apply to waivers executed before the statute's enactment. Rice signed the U-4 on August 12, 1983 (Geelan Aff., Ex. B), and Congress enacted the OWBPA on October 16, 1990. Any waiver of judicial forum in the U-4 "occurred" well before the enactment of the OWBPA. Accordingly, the OWBPA waiver requirements do not apply to the arbitration clause at issue in this case.

Even if I were to interpret the OWBPA as providing that a waiver of the right to a judicial forum through an arbitration clause does not "occur" until the claim arises and there is occasion for the waiver to be invoked, and that therefore the arbitration clause is covered by the statute, plaintiff's argument would still fail because Congress intended the OWBPA requirements to apply to the waiver only of substantive ADEA claims, and not procedural rights such as the right to a judicial forum. As the Fifth Circuit noted:

Congress, through the OWBPA, has protected terminated employees who waive their substantive rights under ADEA in exchange for a more favorable severance package; however, we find no clear indication that Congress was likewise concerned with protecting employees who agree to arbitrate claims that may arise during the course of their employment.

*Williams v. Cigna Fin. Advisors. Inc.,* 56 F.3d 656, 661 (5th Cir.1995).

There are several indications that Congress intended the OWBPA waiver requirements to apply only to waivers of substantive rights or claims under the ADEA, and not to arbitration agreements. First, the text of the OWBPA shows that, as the Fifth Circuit noted, "Congress' primary concern [in the OWBPA] was with releases and voluntary separation

Not Reported in F.Supp.                                                                                                    Page 5
Not Reported in F.Supp., 1997 WL 129396 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P 44,907
(Cite as: 1997 WL 129396 (S.D.N.Y.))

agreements in which employees were forced to waive their rights." *Williams,* 56 F.3d at 660. The statute states that the waiver provisions apply to the waiver of "any right or claim under this chapter." 29 U.S.C. § 626(f)(1). The reference to rights "under this chapter" would seem to refer to substantive rights conferred by this chapter of the code--*i.e.,* the right to sue for age discrimination--rather than to procedural rights. In addition, the statute refers specifically to additional safeguards for exit incentive or other termination programs and to settlements of claims filed by individuals or the EEOC, all of which engage substantive rights.

**\*6** Moreover, the statute does not refer specifically to arbitration or other procedures. The Supreme Court has endorsed a distinction between waivers of substantive rights and waivers of procedural rights: "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Therefore, it is significant that the OWBPA does not refer specifically to waivers of procedural rights collateral to ADEA claims such as the right to a judicial forum or a jury trial. *See* Douglas E. Abrams. *Arbitrability in Recent Federal Civil Rights Legislation: The Need for Amendment,* 26 Conn. L.Rev. 521, 584 n. 187 (1994) (noting that omission of reference to arbitration in statute "stands in stark contrast to legislation which, for nearly two decades, had referred specifically to arbitration when the lawmakers intended to reach the mandate's effect on agreements covering claims under a particular statute."). Absent such reference, there is no reason to interpret the statute to restrict arbitration clauses.

Second, the legislative history of the OWBPA is consistent with an interpretation of the statute as applying to waivers of ADEA claims but not to waivers of procedural rights such as the right to a judicial forum or a jury trial. The Senate Report states that the purpose of the waiver provisions is to "ensure[ ] that older workers are not coerced or manipulated into waiving their rights to seek legal relief under the ADEA." Sen. Rep. No. 623, 101st Cong., 2d Sess. 5 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1510. In

addition, the Congressional Budget Office in a letter to the Chairman of the Senate Committee on Labor and Human Resources discussing cost estimates, noted that the bill was intended to alleviate the problem of "some employers ... requiring employees, particularly those accepting retirement and other exit incentive offers, to sign waivers of the right to bring cases of age discrimination against the employer." *Id.* at 1542-43. Under the heading "Minority Views," the Report notes that the OWBPA sets forth a "series of stringent requirements that must be met by employers seeking waivers or releases of claims under the [ADEA]." *Id.* at 1563-64. None of these documents mention arbitration and all seem to confirm that Congress intended the OWBPA waiver provisions to apply to substantive claims.

Third, if the statute were interpreted to cover waivers of the right to a judicial forum or a jury, that would undermine the traditional federal policy favoring arbitration. Under the OWBPA, an "individual ... [may] not waive rights or claims that may arise after the date the waiver is executed." 29 U.S.C. § 626(f)(1)(C). Pre-dispute arbitration clauses necessarily waive rights--*i.e.,* the right to a judicial forum--that arise after they are executed. As the *Williams* court noted,

**\*7** If we were to hold that an arbitration clause in a U-4 Registration had to comply with the OWBPA's waiver provisions, we would in effect be holding that employers and employees could never enforce a pre-dispute agreement to arbitrate. We decline to remove from the province of arbitration all pre-dispute agreements absent a clear indication that Congress intended such a result.

*Williams,* 56 F.3d at 661. The *Williams* court overstated the impact of applying the OWBPA waiver provisions to arbitration clauses because the waiver rules would apply to ADEA claims only. However, that Court was correct that reading the statute to cover arbitration clauses would effectively eliminate the arbitrability of ADEA claims. Such a result would be contrary to the distinct federal policy favoring arbitration, *see Moses H. Cone Memorial Hosp., v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."), which was reaffirmed specifically in reference to discrimination claims by the Civil Rights Act of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                         Page 6
Not Reported in F.Supp., 1997 WL 129396 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P
44,907
**(Cite as: 1997 WL 129396 (S.D.N.Y.))**

1991, *see* The Civil Rights Act of 1991, Pub.L. No. 102-166, § 118, 105 Stat. 1081 (1991) ("Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of federal law amended by the title.").

Finally, applying of the OWBPA waiver provisions to waivers of a judicial forum would conflict with Supreme Court precedent holding that ADEA claims are arbitrable. *See Gilmer,* 500 U.S. at 27-28. *Gilmer* was decided in 1991, after the OWBPA was passed and with full knowledge of its waiver provisions. *Gilmer,* 500 U.S. at 29 n. 3. The Court wrote that "Congress, however, did not explicitly preclude arbitration or other non-judicial resolution of claims, even in its recent amendments to the ADEA." *Id.* at 26-27. However, reading the OWBPA to apply to waivers of a judicial forum would undermine the quoted statement from *Gilmer* by undermining the validity of pre-dispute arbitration clauses for ADEA claims.

Other courts have found also that "the OWBPA ... only bars the waiver of substantive rights and not the waiver of a particular judicial forum in which to adjudicate those rights." *Kahalnik v. John Hancock Funds, Inc.,* No. 95 C 3933, 1996 WL 145842, at *3 (N.D.Ill. March 27, 1996); *see also Nieminski v. John Nuveen & Co.,* No. 96 C 1960, 1997 WL 43241, at * 7 (N.D.Ill. Jan.3, 1997) ("[W]e believe that the Form U-4 does not violate the OWBPA because the OWBPA only bars the waiver of substantive rights and not the waiver of a particular forum in which the adjudicate those rights.").

Having determined that plaintiff agreed to arbitrate his age discrimination claims, I must dismiss plaintiff's declaratory judgment claim, compel arbitration and stay these proceedings pending the completion of that arbitration. 9 U.S.C. §§ 3-4 (1994).

**\*8** Defendant moves also for costs and attorneys' fees pursuant to Fed.R.Civ.P. 11. Although I have rejected plaintiff's arguments, I find that they pass the straight-face test, and therefore deny defendant's motion for sanctions.

\* \* \*

For the foregoing reasons, defendant's motions to dismiss plaintiff's declaratory judgment claim and to compel arbitration and stay the proceedings are granted.

SO ORDERED.

Not Reported in F.Supp., 1997 WL 129396 (S.D.N.Y.), 73 Fair Empl.Prac.Cas. (BNA) 1210, 71 Empl. Prac. Dec. P 44,907

**Motions, Pleadings and Filings (Back to top)**

• 1:96cv06326 (Docket) (Aug. 21, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB K

Westlaw.

Not Reported in F.Supp.                                        Page 1
Not Reported in F.Supp., 1997 WL 452392 (S.D.N.Y.)
**(Cite as: 1997 WL 452392 (S.D.N.Y.))**

☞

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Patricia SCHUETZ, Plaintiff,
v.
CS FIRST BOSTON CORPORATION, Defendant.
**No. 96 Civ. 5557(DC).**

Aug. 8, 1997.

Gary Trachten, Kudman, Trachten & Kessler, New York, New York, for Plaintiff.

Neal D. Haber, Moss & Boris, P.C., New York, New York, for Defendant.

**MEMORANDUM DECISION**

CHIN, District Judge.

*1 In this employment discrimination case, defendant CS First Boston Corporation ("First Boston") moves pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 et seq., to compel arbitration. In addition, First Boston requests that the case be dismissed, without prejudice, if the matter is submitted to arbitration. Because plaintiff Patricia Schuetz ("Schuetz") executed an agreement requiring her to arbitrate "any dispute, claim or controversy" between her and First Boston, defendant's motion to compel arbitration is granted, as is the request to dismiss. This action is dismissed, without prejudice to reinstatement in the event further proceedings are necessary following the arbitration.

**BACKGROUND**

Plaintiff was hired by First Boston on November 18, 1991 and assigned to the New York City office. In February 1994, Schuetz was transferred to First Boston's office in London. Schuetz alleges that while in that office, Richard Dubbs, a co-worker, purposefully undermined her performance. Schuetz further alleges that when she complained to First Boston's management, it sided with Dubbs. In August 1995, after being transferred back to New York, Schuetz was fired.

In July 1996, Schuetz filed the complaint in this matter. She asserts that both with regard to the terms and conditions of her employment and the decision to terminate her employment, First Boston acted in a discriminatory manner toward her because of her sex. Schuetz alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York City Human Rights Law, and the New York State Human Rights Law.

Prior to working with First Boston, plaintiff was employed by Toronto Dominion Bank. (Schuetz Aff.Ex. A). While working at that bank, Schuetz registered with the National Association of Securities Dealers, Inc. ("NASD"). This registration process required that she sign a form entitled "Uniform Application for Securities Industry Registration or Transfer" ("Form U-4"). When Schuetz joined First Boston, she again executed a Form U-4--this time for the purpose of transferring her NASD registration to her new employer. (Id.). The Form U-4 contains the following arbitration clause:

  I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, ... that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD] as may be amended from time to time....

(Id.). At the time plaintiff signed the Form U-4, the NASD Code of Arbitration Procedure provided for the mandatory arbitration of, inter alia:

  any dispute, claim or controversy arising out of or in connection with the business of any member of the Association ... between or among members and associated persons.

(Di Trapani Aff.Ex. D).

There is no dispute that First Boston is a "member" of the NASD, and that plaintiff, as a First Boston employee, was an "associated person[ ]." Thus, First Boston asserts that the express terms of the arbitration provision and NASD Code require plaintiff to arbitrate the claims she now asserts in her complaint. Plaintiff, however, asserts that she is not bound by the arbitration provision in the Form U-4, and that even if she were, the NASD Code of Arbitration Procedure does not compel the arbitration of employment disputes.

**DISCUSSION**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                        Page 2
Not Reported in F.Supp., 1997 WL 452392 (S.D.N.Y.)
**(Cite as: 1997 WL 452392 (S.D.N.Y.))**

**A. Motion to Compel Arbitration**

**\*2** In determining whether I should compel arbitration of this action, I must determine (1) whether the parties agreed to arbitrate; (2) the scope of the agreement; and (3) whether Congress intended Title VII claims to be arbitrated. *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987). [FN1]

> FN1. *Genesco* also identifies a fourth issue for the Court to consider--*i.e.,* whether to stay the balance of the case pending arbitration, if I were to determine that some, but not all, of the claims in the case were arbitrable. Because I find that all of plaintiff's claims are arbitrable, however, I need not reach this fourth issue.

**1. *Agreement to Arbitrate***

In the present case, although Schuetz does not deny that she knowingly and voluntarily signed the Form U-4 containing the arbitration clause, she makes two arguments concerning her agreement to arbitrate disputes with First Boston. First, Schuetz argues that when she was presented with the Form U-4 to sign, no one pointed out or discussed the arbitration provision with her and thus she did not fully understand it. Second, plaintiff argues that she was not aware that employment disputes had to be arbitrated and, thus, did not knowingly waive her right to seek judicial redress for such disputes. Accordingly, Schuetz asserts that First Boston has failed to prove an agreement to arbitrate. I disagree.

**a) *Knowledge of Agreement***

Under New York law, a signatory to an agreement is "bound by the terms of the [[[a]]greement, including the arbitration provision," unless she can demonstrate "special, mitigating circumstances, such as duress or coercion." *Degaetano v. Smith Barney, Inc.,* No. 95 Civ. 1613, 1996 WL 44226, at \*5 (S.D.N.Y. Feb. 5, 1996); *see also Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 33, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). To establish duress or coercion a plaintiff must show:

  (1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4)

because the circumstances permitted no other alternative. *Degaetano,* 1996 WL 44226, at \*5 (quoting *Kamerman v. Steinberg,* 891 F.2d 424, 431 (2d. Cir.1989)). Here, plaintiff has not alleged any threat, much less an unlawful one. Thus, Schuetz has failed to demonstrate any special, mitigating circumstances and it must be presumed that she assented to every provision in the Form U-4. This presumption is further supported by the fact that the arbitration clause was directly preceded by the heading "THE APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY." (Schuetz Aff .Ex. A). Finally, Schuetz concedes that she agreed to arbitrate all disputes required to be arbitrated by the NASD code. (Pl. Mem. at 11). [FN2] Accordingly, plaintiff's argument that she did not agree to arbitrate disputes between her and First Boston is rejected.

> FN2. Footnote 2 at page 11 of plaintiff's memorandum of law states that "plaintiff does *not* contend the Form U-4 is ... unenforceable insofar as it requires her to arbitrate disputes that are required by the November last NASD Code."

**b) *Waiver***

Schuetz next argues that, even if it is determined that she agreed to arbitrate disputes that arise between her and First Boston, she nevertheless did not knowingly waive her right to seek judicial redress for Title VII claims because she was not aware that such claims would be included in the arbitration agreement at the time she signed the Form U-4. Schuetz asserts, therefore, that requiring her to arbitrate her Title VII claims would violate Congress's intent that "a Title VII plaintiff ... [not] be forced to ... arbitrate her claims [[[unless]] she has knowingly agreed to submit such disputes to arbitration." *Prudential Ins. Co. of America v. Lai,* 42 F.3d 1299, 1305 (9th Cir.1994), *cert. denied,* 516 U.S. 812, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995). This argument is rejected.

**\*3** At the time Schuetz signed the Form U-4, she had already been a registered representative and a member of the NASD for five years. Also, as indicated on her Form U-4, Schuetz had taken and successfully passed the Series 7 test. As part of that test, Schuetz was required to become familiar with the rules of the NASD, including the rules requiring

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the arbitration of disputes between her and her employer. *See Feinberg v. Bear, Stearns & Co., Inc.,* No. 90 Civ. 5250, 1991 WL 79309, at *3 (S.D.N.Y. May 3, 1991). Thus, plaintiff's claim of ignorance as to the requirement to arbitrate employment disputes is unpersuasive and does not vitiate her agreement with First Boston. *Id.* Accordingly, I find that Schuetz knowingly waived her right to have her Title VII claims heard in court.

**B. *Scope of Agreement***

Having determined that an agreement to arbitrate disputes existed between Schuetz and First Boston, I must next determine the scope of that agreement. Plaintiff makes two arguments with respect to the scope of the agreement to arbitrate. First, Schuetz argues that the language of 1991 NASD Code--*i.e.,* the language in effect at the time she signed the U-4--does not require the arbitration of employment disputes. Second, Schuetz argues that she is not bound by the 1993 changes to the language of the NASD Code that explicitly state that employment disputes are covered by the arbitration provision in the Form U-4. Both of these arguments are unpersuasive. [FN3]

> FN3. Because I find that Schuetz is bound by the NASD Code to arbitrate all employment disputes between her and First Boston, I need not reach the merits of First Boston's argument that Schuetz was also required to arbitrate disputes pursuant to the NYSE rules and regulations.

**a. *Scope of 1991 NASD Code***

By signing the Form U-4, Schuetz agreed to arbitrate "any dispute, claim or controversy" between her and First Boston "arising out of or in connection with the business of [First Boston]." (Schuetz Aff.Ex. A; Di Trapani Aff.Ex. D). Schuetz argues that this language is not broad enough to cover employment disputes between her and First Boston. I disagree.

It is well-settled that the FAA establishes a federal policy favoring arbitration. *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 225- 26, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1991); *Scherk v. Alberto-Culver Co.,* 417 U.S.

506, 510-11, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Moreover, the Second Circuit has held that " 'arbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *McMahan Securities Co. v. Forum Capital Markets L.P.,* 35 F.3d 82, 88 (2d Cir.1994) (quoting *S.A. Mineracao Da Trinidade-Samitri v. Utah Int'l Inc.,* 745 F.2d 130, 194 (2d Cir.1984)). In the present case, I find that the language of the arbitration clause can certainly be interpreted to cover employment disputes as such disputes "aris[e] out of or in connection with the business" of First Boston. Other courts considering this question have overwhelmingly come to the same conclusion. *See, e.g., Smith v. Lehman Bros., Inc.,* No. 95 Civ. 10326, 1996 WL 383232, at *2, (S.D.N.Y. July 8, 1996) (interpreting the NASD, as it existed in 1991, to compel arbitration of employment related disputes); *Scott v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 89 Civ. 3749, 1992 WL 245506, at *6 (S.D.N.Y. Sept.14, 1992) (same); *Feinberg v. Bear, Stearns & Co., Inc.,* 1991 WL 79309, at *4 (S.D.N.Y. May 3, 1991); *Armijo v. Prudential Ins. Co.,* 72 F.3d 793 (10th Cir.1995) (same); *Kidd v. Equitable Life Assurance Society,* 32 F.3d 516 (11th Cir.1994) (same). Accordingly, I find that Schuetz is bound by the language of the NASD Code in effect at the time she signed the Form U-4--*i.e.,* the 1991 NASD Code--to arbitrate the disputes she asserts in her complaint.

**b. *Amendments to NASD Code***

**\*4** In addition to plaintiff's obligation to arbitrate employment disputes pursuant to the 1991 NASD Code, I also find that she is bound by the 1993 amendments [FN4] to the NASD Code. Paragraph two of the Form U-4 signed by Schuetz states:

> FN4. Section 1 of the NASD Code now provides for "the arbitration of any dispute, claim or controversy arising out of or in connection with the business of any member of the Association, *or arising out of the employment or termination of employment of associated person(s) with any member.*" (NASD Manual (CCH) ¶ 3701) (emphasis added).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                      Page 4
Not Reported in F.Supp., 1997 WL 452392 (S.D.N.Y.)
**(Cite as: 1997 WL 452392 (S.D.N.Y.))**

I hereby apply for registration with the organizations and states indicated in Item 10 as may be amended from time to time and, ... I submit myself to the jurisdiction of such states and organizations and hereby certify that I agree to abide by, comply with and adhere to all the provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations *as are or may be adopted, changed or amended from time to time....*

(Schuetz Aff.Ex. A) (emphasis added). First Boston asserts that the plain language of this paragraph requires Schuetz to arbitrate not only those claims covered by the 1991 Code but also claims that may become covered as a result of amendments to the NASD Code. Schuetz, however, argues that she is not bound, and did not agree to be bound, by any amendments to the NASD Code. Specifically, she argues that paragraph five of the Form U-4--the arbitration provision--"fails to establish an objective agreement to arbitrate disputes that the NASD Code would at a later date, by future amendment to its rules, make subject to mandatory arbitration ." (Pl. Mem. at 7). Thus, plaintiff's arguments against being bound by amendments to the NASD Code are premised solely on her interpretation of paragraph five. Schuetz does not, however, discuss the language of paragraph two, which clearly states that "I agree to abide by, comply with and adhere to all the ... by-laws and rules and regulations [of the NASD] *as are or may be adopted, changed or amended from time to time.*" Thus, any ambiguities in paragraph five are irrelevant, as paragraph two clearly requires Schuetz to be bound by the NASD Code as that code is changed from time to time. *See Scher v. The Equitable Life Assurance Society,* 866 F.Supp. 776, 778 (S.D.N.Y.1994) (holding that plaintiff who signed a Form u-4 in 1983 must abide by 1993 amendments to NASD Code). Accordingly, plaintiff's argument that she is not bound by the 1993 amendments to the NASD Code is rejected.

## C. *Scope of FAA*

The final question to be answered in determining whether plaintiff's claims must be arbitrated is whether Congress intended Title VII claims to be arbitrable. The clear answer to this question is yes. In *Gilmer v. Interstate/Johnson Lane*

*Corp.,* the Supreme Court held age discrimination claims, asserted under the Age Discrimination in Employment Act, were subject to the mandatory arbitration provisions in the Form U-4. 500 U.S. 20, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Subsequent to that decision, numerous courts, including this court, have held that the Supreme Court's holding in *Gilmer* is equally applicable to Title VII proceedings. *See, e.g., Maye v. Smith Barney, Inc.,* 897 F.Supp. 100, 108 (S.D.N.Y.1995); *Smith v. Lehman Bros., Inc.,* No. 95 Civ. 10326, 1996 WL 383232, at *2, (S.D.N.Y. July 8, 1996); *Scott v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 89 Civ. 3749, 1992 WL 245506, at *6 (S.D.N.Y. Sept.14, 1992); *Feinberg v. Bear, Stearns & Co., Inc.,* 90 Civ. 5250, 1991 WL 79309, at *4 (S.D.N.Y. May 3, 1991). *See also Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161 (5th Cir.1992); *Mago v. Shearson Lehman Hutton, Inc.,* 956 F.2d 932 (9th Cir.1992); *Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305 (6th Cir.1991). In addition, the New York Court of Appeals has held that claims asserted under the New York State Human Rights Law can be arbitrated. *Fletcher v. Kidder, Peabody & Co.,* 81 N.Y.2d 623, 601 N.Y.S.2d 686, 693-94, 619 N.E.2d 998 (N.Y.), *cert. denied,* 510 U.S. 993, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). Moreover, plaintiff's assertion that arbitration should not be compelled in this case because arbitration would deprive her of her right to discovery is without merit. This same argument has already been considered and rejected by the Supreme Court. *See Gilmer,* 500 U.S. at 31. Thus, I find that there is no bar to arbitration of plaintiff's claims.

## B. *Motion To Dismiss*

*5 First Boston argues that upon referral of this matter to arbitration, the Court should dismiss this action without prejudice. Defendant asserts that no purpose will be served by placing this matter on the Court's suspense calendar. I agree. In the event further proceedings in this Court become necessary after completion of the arbitration proceedings, however, either side may request reinstatement and I will reinstate the action.

## CONCLUSION

Defendant's motion to compel arbitration is granted, and this action is stayed pending completion of the arbitration

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                  Page 5
Not Reported in F.Supp., 1997 WL 452392 (S.D.N.Y.)
**(Cite as: 1997 WL 452392 (S.D.N.Y.))**

proceedings. All of plaintiff's claims asserted in this case are
to be arbitrated. The complaint is dismissed, without
prejudice to reinstatement in the event post-arbitration
judicial proceedings become necessary.

SO ORDERED.

Not Reported in F.Supp., 1997 WL 452392 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:96cv05557 (Docket) (Jul. 24, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB L

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2001 WL 873204 (S.D.N.Y.)
**(Cite as: 2001 WL 873204 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dana TUSKEY, Plaintiff,
v.
VOLT INFORMATION SCIENCES, INC., Volt Services
Group, Steve Shaw, Louise Ross
and John Sexton, each in their official and individual
capacities, Defendants.
**No. 00CIV7410DABGWG.**

Aug. 3, 2001.
Law Offices of Daniel Cherner, New York, By Daniel
Cherner, Esq., for Plaintiff.

Jenkins & Gilchrist Parker Chapin LLP, New York, By
Sharon H. Stern, Esq., for Defendants Volt Information
Sciences, Inc., Volt Services Group and Louise Ross.

OPINION AND ORDER
GORENSTEIN, Magistrate J.

**\*1** The defendants in this employment discrimination case
have moved to compel arbitration of the plaintiff's claims
pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq.,
and to stay this action pending the outcome of the
arbitration. They also seek to strike the plaintiff's jury
demand. For the reasons stated below, the defendants'
motion to compel arbitration and stay proceedings is
granted. Thus, the Court need not reach the request to strike
the jury demand. [FN1]

> FN1. While the parties have not raised the issue,
> the Court notes that a motion to stay an action and
> compel arbitration is not a motion for dispositive
> relief as set forth in 28 U.S.C. § 636(b)(1)(A).
> Accordingly, such a motion may be decided by a
> Magistrate Judge. See, e.g., Touton, S.A. v. M.V.
> Rizcun Trader, 30 F.Supp.2d 508, 510
> (E.D.Pa.1998); Herko v. Metropolitan Life Ins.,
> 978 F.Supp. 149, 150 (W.D.N.Y.1997).

FACTUAL BACKGROUND
Plaintiff Dana Tuskey brought this action seeking relief
under Title VII, 42 U.S.C. § 2000e et seq.; the New York
State Human Rights Law, New York Exec. Law § 296 et
seq.; and common-law claims of breach of contract and
intentional infliction of emotional distress. All of Tuskey's
claims relate to her employment with Volt Information
Sciences, Inc ("Volt").

The complaint alleges that Tuskey was first employed by
Volt in March 1998. Complaint ¶ 9. Volt is a corporation
listed on the New York Stock Exchange and is engaged in
the business of providing, among other things, technical and
clerical services in a consulting capacity to other businesses.
Id. ¶ 4. Tuskey's first position at Volt was as a technical
recruiter in its Advanced Technology Services ("ATS")
division of Volt. Id. ¶ 10. Sometime during November or
December 1998, Tuskey was made Branch manager of
Volt's ATS division office located in Woodbridge, New
Jersey. Id. ¶ 12.

Shortly after being promoted to the Branch Manager
position, Tuskey entered into an employment agreement
with Volt in connection with her position as Branch
Manager. See Affidavit of Dana Tuskey in Support of
Plaintiff's Opposition to Defendant's Motion to Compel
Arbitration dated March 20, 2001 at ¶ 2 (hereinafter,
"Tuskey Aff."). The employment agreement contained the
following arbitration provision:

*7. AGREEMENT TO ARBITRATE DISPUTES.*

> Any dispute, controversy or claim arising out of,
> involving, affecting or related to this Agreement, or
> breach of this Agreement, or arising out of, involving or
> related in any way to your employment or the conditions
> of your employment or the termination of your
> employment, including but not limited to disputes,
> controversies or claims arising out of or related to the
> actions of the Company's other employees, under Federal,
> State and/or local laws, shall be resolved by final and
> binding arbitration in accordance with the applicable rules
> of the American Arbitration Association in the state
> where you are or were last employed by the Company.
> The arbitrator shall be entitled to award reasonable
> attorneys' fees and costs to the prevailing party. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2001 WL 873204 (S.D.N.Y.)
**(Cite as: 2001 WL 873204 (S.D.N.Y.))**

award shall be in writing, signed by the arbitrator, and shall provide the reasons for the award. Judgment upon the arbitrator's award may be filed in and enforced by any court having jurisdiction. This Agreement to Arbitrate Disputes does not prevent you from filing a charge or claim with any governmental agency as permitted by applicable law.

**\*2** *See* Employment Agreement Letter dated December 16, 1998, ¶ 7 (hereinafter "Employment Agreement"), reproduced as Exhibit B to Affidavit of Howard B. Weinreich in Support of Defendants' Motion to Compel Arbitration and Stay Action, dated February 16, 2001 (hereinafter, "Weinreich Aff."). Tuskey signed the Agreement on December 21, 1998. Employment Agreement at 8.

Tuskey signed an additional document concerning her employment with Volt on July 27, 1999. *See* Amendment Number 1, dated June 20, 1999 (Annexed as Exhibit A to Tuskey Aff.) (hereinafter "Amendment"). The Amendment was denominated "amendment Number 1" to the Employment Agreement. *Id.* at 1. It states that it "modifie[s]" only "Paragraph 17 of the [Employment Agreement]." Amendment at 1. Following this statement are a number of terms that relate exclusively to Tuskey's compensation. Amendment at 1-2. Paragraph 17 of the original Employment Agreement also relates exclusively to compensation.

On February 11, 2000, Tuskey filed a charge of sex discrimination and retaliation with the EEOC. Complaint ¶ 46. Subsequent to the filing of this charge, Volt terminated Tuskey's employment. *Id.* ¶ 47. On July 3, 2000, Tuskey received a right to sue letter from the EEOC. *Id.* ¶ 48. On September 29, 2000, Tuskey filed her Complaint in this case. Each factual allegation relates to her employment and termination at Volt.

On April 18, 2001, the defendants filed their motion to compel arbitration, to stay these proceedings pending its outcome, and to strike the plaintiff's jury demand.

### DISCUSSION
### I. MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act provides that

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. The following four factors apply in determining whether or not a court should stay an action and compel arbitration under the Federal Arbitration Act:

[F]irst, [the Court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of the agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

*Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987) (internal citations omitted). If the four factors are answered in the affirmative, the Court must grant the application to stay the proceedings and compel the arbitration. *See, e.g., PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir.1996).

**\*3** Tuskey has not challenged the applicability of the second and fourth factors. Accordingly, we will examine only (1) the agreement to arbitrate and (2) whether the claims are arbitrable.

### A. *Agreement to Arbitrate*

As previously described, the Employment Agreement signed by Tuskey contained an "Agreement To Arbitrate Disputes" clause. Employment Agreement ¶ 7. In her response to the defendants motion and the accompanying affidavit, Tuskey does not contest that she signed the Employment Agreement. Rather, she appears to make three arguments to avoid its effect: (1) that the arbitration agreement is unenforceable because she did not understand it and it was never explained to her, *see* Tuskey Aff., ¶¶ 3, 5,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 873204 (S.D.N.Y.)
(Cite as: 2001 WL 873204 (S.D.N.Y.))

Page 3

8; Plaintiff's Memorandum of Law In Opposition to Defendants' Motion to Compel Arbitration and Stay the Action or Alternative, to Strike the Jury Demand (hereinafter, "Plaintiff's Memorandum") at 5-6; (2) that the Employment Agreement was nullified by the Amendment, Plaintiff's Memorandum at 7-8; and (3) that the arbitration agreement did not contain "any specific waiver [of her statutory right to sue] as contemplated by the courts." Plaintiff's Memorandum at 5.

*1. Enforceability of the Arbitration Agreement.* With respect to the enforceability of the Employment Agreement, Tuskey makes numerous assertions in her affidavit that she did not "understand" the agreement, Tuskey Aff., ¶¶ 5, 8; that it was never "properly explained" to her, *id.* ¶ 3; that she did not "have the opportunity to negotiate any of [its] terms" or "consult with an attorney," *id.* ¶¶ 4, 5; and that she was "told" she "had to" sign it, *id.* ¶ 7. In her memorandum of law, however, Tuskey never makes clear why she believes those assertions are relevant. She states only that "[t]here was no level playing field here" and seems to analogize her situation to those cases holding that an employee cannot be bound by an agreement to arbitrate that has never been ratified by an employee because it is contained in a collective bargaining agreement. *See* Plaintiff's Memorandum at 5. Tuskey cites to just two cases in support of her argument on this point: *Bird v. Shearson Lehman/American Express, Inc.,* 926 F.2d 116 (2d Cir.1991), and *Genesco, supra. See* Plaintiff's Memorandum at 5. These cases, however, have no relevance to her argument. *Bird* rejected an effort to avoid an arbitration agreement and *Genesco* enforced an agreement that had not even been signed by the party against whom it was being enforced.

As *Genesco* notes, arbitration agreements are to be interpreted "under federal law, which comprises generally accepted principles of contract law." *Genesco,* 815 F.2d at 845. Contract law is clear that parties are "conclusively" bound by the contracts they sign whether or not the party has read the contract as long as there is no fraud, duress or some other wrongful act of the other party. *See, e.g, State Bank of India v. Star Diamonds, Inc.,* 901 F.Supp. 177, 179 (S.D.N.Y.1995) (party is legally bound by his or her

signature to a contract and is conclusively presumed to know its contents and to assent to them); *Maines Paper and Food Service Inc. v. Adel,* 256 A.D.2d. 760, 761 (3d Dep't 1998) (holding that the rule applies even where the plaintiff suffers from "an inability to understand the English language") (citing cases); *Freda v. McNamara,* 254 A.D.2d 251, 252-53 (2d Dep't 1998) (plaintiff was bound by papers signed by him even though they were not explained to him); *Schmidt v. Magnetic Head Corp.,* 97 A.D.2d 151, 157 (2d Dep't 1983) (party's subjective knowledge of the contents of a contract at the time he signs it is irrelevant).

*4 These same principles have been applied to arbitration clauses. *See, e.g., Hart v. Canadian Imperial Bank of Commerce,* 43 F.Supp.2d 395, 405 (S.D.N.Y.1999) ("plaintiff's subjective knowledge of the scope of the arbitration clause is irrelevant and he is presumed to have agreed to all the terms of the contract") (citing cases); *Smith v. Lehman Bros., Inc.,* 1996 WL 383232 at *1 (S.D.N.Y. July 8, 1996) (plaintiff's assertion that he was not aware of arbitration clause does "not constitute economic duress, coercion, or fraud, [because he] is conclusively presumed to have assented to submit his claims to arbitration"); *Mave v. Smith Barney Inc.,* 897 F.Supp. 100, 108 (S.D.N.Y.1995) ("one who signs or accepts a written contract ... is conclusively presumed to know its contents and assent to them") (citations and internal quotation marks omitted); *Hall v. Metlife Resources/Div. of Metro. Life Ins. Co.,* 1995 WL 258061, at *2-3 (S.D.N.Y. May 3, 1995) (arbitration clause binding where plaintiffs claimed in affidavits that they were unaware that forms they signed contained arbitration clauses). Thus, Tuskey's allegations that she did not "understand" the agreement or had no opportunity to negotiate the clause are irrelevant. This is all the more so in a case where the plaintiff herself alleges she was a capable, well-paid professional hired for managerial positions with significant job responsibilities. *See* Complaint ¶ ¶ 11-14; Amendment at 1-2.

*2. Effect of the Amendment.* Tuskey also argues that the Employment Agreement was superseded by the Amendment, which does not contain an arbitration clause. *See* Plaintiff's Memorandum at 7-8; Tuskey Aff., ¶¶ 9-10. This argument is frivolous. The Amendment states that it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

...



Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 873204 (S.D.N.Y.)
**(Cite as: 2001 WL 873204 (S.D.N.Y.))**

"constitute[s] amendment Number 1 ... to your Employment Agreement dated December 16, 1998" and that "*Paragraph 17 of the Agreement* is modified" by the contents of the Amendment. Amendment at 1 (emphasis added). As noted, the contents of the Amendment relate exclusively to Tuskey's compensation, which was also the topic of paragraph 17 of the Employment Agreement. Nowhere does the Amendment purport to supersede or modify the other 17 paragraphs of the Employment Agreement, which included the arbitration clause.

*3. Plaintiff's Waiver.* Finally, Tuskey argues that "the arbitration clause in this case does not contain any specific waiver as contemplated by the courts," Plaintiff's Memorandum at 5, arguing that "it contains a general, boilerplate provision which really carries no meaning whatsoever." *Id.* at 5-6. This argument is also frivolous. Tuskey is apparently referring to the Supreme Court's decision in *Wright v. Universal Maritime Serv. Corp.,* 525 U.S. 70 (1998), in which the Court held that it would not "infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated." ' *Id.* at 80 (citing cases). *See* Plaintiff's Memorandum at 4-5. *Wright,* however involved a clause in a collecting bargaining agreement that provided for arbitration only of "matters under dispute," which *Wright* noted could refer merely to matters disputed under the collective bargaining agreement. 525 U.S. at 80. Here, by contrast, the language of the arbitration clause is absolutely clear that "[a]ny dispute, controversy or claim arising out of, involving, affecting or related in any way to [Tuskey's] employment ... or the termination of [Tuskey's] employment" would be resolved by "final and binding arbitration." Employment Agreement ¶ 7. It would be difficult to imagine a clearer and more specific agreement to arbitrate. [FN2]

> FN2. Tuskey's additional allegation that the Employment Agreement was not given to her until nine months after she was first employed by Volt, Tuskey Aff. at ¶ 2, is similarly unavailing. Tuskey does not explain the legal relevance of this fact to the arbitrability of her claims. To the extent that her argument can be construed as a claim that there

was lack of consideration for her promise to arbitrate, Tuskey's submissions concede that she continued her employment following the signing of the Employment Agreement. *See* Complaint ¶¶ 30-46; Tuskey Aff. ¶ 9, 10. Continued employment is adequate consideration for agreements entered into by the parties after employment has commenced. *See* Zellner v. Stephen D. Conrad, *M.D., P.C.,* 183 A.D.2d 250, 256 (2d Dep't 1992) (continued employment is sufficient consideration for covenant not to compete signed after employment had already commenced); *cf. Andre v.* *Gaines Berland, Inc.,* 1996 WL 383239 at *2 (S.D.N.Y. July 8, 1996)* (continued maintenance of customer account sufficient consideration for agreement to arbitrate disputes between client and brokerage firm signed after brokerage relationship was already established).

*B. Arbitrability of Title VII Claims*

**\*5** The Second Circuit has ruled that claims arising under Title VII are arbitrable. *See* Desiderio v. NASD, 191 F.3d 198, 206 (2d Cir.1999); *see also* Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35 (1991) (claims brought under the Age Discrimination in Employment Act are arbitrable); *PriceWaterhouse-Coopers* LLP v. Rutlen, 2000 WL 460478 at *2 (S.D.N.Y. April 20, 2000)* ("consistent with [ ] federal policy ... Title VII claims, like other federal statutory claims, are arbitrable"); *Mahant* v. Lehman Bros., 2000 WL 1738399 at *3 (S.D.N.Y. November 22, 2000)* (citing cases). Tuskey concedes that *Desiderio* is controlling authority but argues that it is "incorrect and flawed." Plaintiff's Memorandum at 3. Obviously, this Court is bound by its holding.

The plaintiff also argues that the FAA does not apply to labor and employment contracts, *see* 9 U.S.C. § 1 (excluding from coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commercce"), relying on *Circuit City Stores, Inc. v. Adams,* 194 F.3d 1070 (9th Cir.1999). Subsequent to the filing of plaintiff's brief, however, the Supreme Court reversed the Ninth Circuit's decision in *Circuit City. See* Circuit City Stores, Inc. v.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                           Page 5
Not Reported in F.Supp.2d, 2001 WL 873204 (S.D.N.Y.)
**(Cite as: 2001 WL 873204 (S.D.N.Y.))**

*Adams,* 121 S.Ct. 1302 (2001). The Court squarely held that
the FAA does not exclude employment contracts from the
scope of arbitrable claims.

II. *MOTION FOR STAY*

Section 3 of the Federal Arbitration Act provides that the
district court shall stay the trial of an action brought "upon
any issue referable to arbitration under an agreement in
writing for such arbitration." 9 U.S.C. § 3. *See also
McMahan Sec. Co. v. Forum Capital Markets,* 35 F.3d 82,
85 (2d Cir.1994) ("Under the Federal Arbitration Act ..., a
district court must stay proceedings if satisfied that the
parties have agreed in writing to arbitrate an issue or issues
underlying the district court proceeding."). Because the
plaintiff's claims are subject to arbitration, this action must
be stayed.

                              Conclusion
For the foregoing reasons, defendants' motion to compel
arbitration and to stay this action is granted. The Clerk is
requested to place the matter on the suspense calendar
pending any motion to confirm the arbitrator's award.

SO ORDERED.

Not Reported in F.Supp.2d, 2001 WL 873204 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2:00cv07410 (Docket) (Sep. 29, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB M

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 103433 (S.D.N.Y.)

**(Cite as: 2001 WL 103433 (S.D.N.Y.))**

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Vernon WRIGHT, Plaintiff,

v.

SFX ENTERTAINMENT INC., SFX Radio Network, Inc.,
Clear Channel Communications,
Inc., and Steven Saslow, Defendants.

**No. 00 CIV 5354 SAS.**

Feb. 7, 2001.

Jonathan Ben-Asher, Beranbaum Menken Ben-Asher &
Fishel LLP, New York, New York, for Plaintiff.

Gerald D. Silver, Anne L. Quintal, Winston & Strawn, New
York, New York, for Defendants SFX Entertainment, Inc.,
SFX Radio Network, Inc., and Clear Channel
Communications, Inc.

Richard Schaeffer, Brandon T. Davis, Teresa Boyle,
Dornbush Mensch Mandelstam & Shaeffer, LLP, New
York, New York, for Defendant Steven Saslow.

*OPINION AND ORDER*

SCHEINDLIN, J.

*1 Vernon Wright brings this action against SFX
Entertainment, Inc., SFX Radio Network, Inc., Clear
Channel Communications, Inc. (collectively, the "Corporate
Defendants"), and Steven Saslow, asserting state law claims
for breach of contract, fraud, promissory estoppel and racial
discrimination in violation of the New York City Human
Rights Law, N.Y.C. Admin. Code, § 8-107 et seq., and the
New York State Human Rights Law, Exec. Law § 296 et
seq. [FN1] The Corporate Defendants move, pursuant to the
Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., to
compel arbitration of plaintiff's claims and to dismiss or stay
this action. In the event that the Corporate Defendants'
motion is granted, defendant Saslow cross moves to stay
this action pending arbitration. For the foregoing reasons,
the Corporate Defendants' motion to compel arbitration is
granted and Saslow's motion to stay this action is denied.

FN1. The Complaint is ambiguous concerning
which claims are asserted against Saslow.
Although Saslow contends that only the breach of
contract claim is asserted against him, *see*
Memorandum of Law in Support of Defendant
Steven Saslow's Cross-Motion to Stay this Action
Pending Arbitration ("Saslow Mem.") at 1, plaintiff
maintains that all claims against the Corporate
Defendants, except for the race discrimination
claim under the New York State Human Rights
Law, are asserted against Saslow. *See* Plaintiff's
Memorandum of Law in Opposition to Defendant
Steven Saslow's Cross-Motion to Stay this Action
Pending Arbitration at 3 and n.1. This dispute need
not be resolved at this time.

I. BACKGROUND

A. The Underlying Facts

In March 1993, plaintiff, a black male, began working at
Urban Entertainment Corp. ("Urban Entertainment"), which
later became SJS Entertainment Corp. ("SJS"). *See*
Complaint ¶¶ 48, 87. Plaintiff contends that he was induced
to accept this employment based on Saslow's intentionally
false representations. *See id.* ¶¶ 38-40, 47. Saslow, an
officer of Urban Entertainment, promised plaintiff, *inter
alia,* a high salary, commissions, and partial ownership of
the company. *See id.* ¶¶ 28, 33, 34, 37. Over the next several
years, Saslow continued to promise plaintiff that he would
become an "owner" of Urban Entertainment and would soon
be "rich." *See id.* ¶¶ 56, 58-61, 74, 76, 97, 101-103, 112,
117, 118, 121. In early 1998, Saslow informed the staff that
SJS had been sold to SFX Entertainment, Inc. ("SFX"), and
assured plaintiff, once again, that he had already been
"taken care of" and would become rich. *Id.* ¶ ¶ 129, 130.
Saslow made these statements and promises knowing that
they were not true. *See id.* ¶¶ 44, 45, 53, 92, 93, 123, 124,
154, 155.

On October 17, 1998, SFX terminated Saslow's
employment. *See id.* ¶ 158. Shortly thereafter, in November,
1998, plaintiff was promoted to "Vice President and General
Sales Manager" of SFX Radio Network, Inc. ("SFX
Radio"). *Id.* ¶ 167. Approximately one year later, on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 103433 (S.D.N.Y.)
**(Cite as: 2001 WL 103433 (S.D.N.Y.))**

November 19, 1999, plaintiff was terminated. *See id.* ¶ 180.

B. The Arbitration Agreement

Prior to his termination, on February 3, 1999, plaintiff executed an "Arbitration, Confidentiality, and At-Will Employment Agreement" with SFX Radio (the "Agreement"). The Agreement includes a confidentiality provision, a non-compete clause, and an at-will employment provision. *See* Agreement, Ex. B to 10/20/00 Affidavit of Gerald D. Silver, counsel to the Corporate Defendants ("10/20/00 Silver Aff."), at 1-2. Also included in the Agreement is an arbitration clause, which states:

*2 3. Arbitration

(a) Except to the extent otherwise provided by law, *any claim of any nature* alleging a violation of law by the Company and *arising out of, or related to, the Employee's employment with the Company or the termination thereof,* that might otherwise be subject to litigation, including but not limited to any claim of unlawful retaliation or civil rights violation, wrongful termination of employment, violation of public policy, or unlawful discrimination or harassment ... *shall be submitted to and resolved by final and binding arbitration. ...*

(b) The arbitration shall be conducted ... in accordance with the then existing rules of practice and procedure of the Judicial Arbitration and Mediation Services [ ("JAMS") ] or its successor....

(c) The arbitrator shall not have the right to add to, subtract or modify any of the terms of this Agreement, nor shall he or she have the power to decide the justice or propriety of any specific provisions, which by the terms of this Agreement, are reserved solely to the Company's discretion.

IF A DISPUTE OR CLAIM ARISES ALLEGING A VIOLATION OF LAW BY THE COMPANY, THE PARTIES AGREE TO WAIVE ANY RIGHTS EACH MAY HAVE TO A JURY OR COURT TRIAL AND TO USE BINDING ARBITRATION TO RESOLVE ALL SUCH DISPUTES BETWEEN THEM.

*Id.* at 2-3 (underscored emphasis added, bold and capitalization in original).

The Agreement also includes a notice of claim provision, which states in relevant part:

4. Representations

(b) If I am already employed by the Company at the time of executing this Agreement:

I ACKNOWLEDGE AND CONFIRM THAT I HAVE NO CLAIMS AGAINST THE COMPANY, OR ANY OF ITS AFFILIATES, AND I HAVE NO AGREEMENTS OR UNDERSTANDINGS WITH THE COMPANY, OR ANY OF ITS AFFILIATES, THAT ARE INCONSISTENT WITH THE TERMS SET FORTH IN THIS AGREEMENT, UNLESS I DELIVER WRITTEN NOTICE OF ANY SUCH CLAIMS AND ALLEGED AGREEMENTS AND UNDERSTANDINGS TO THE PRESIDENT OF THE COMPANY, WITHIN THREE (3) BUSINESS DAYS OF EXECUTING THIS AGREEMENT.

*Id.* at 3 (emphasis in original).

II. DISCUSSION

A. The Corporate Defendants' Motion to Compel Arbitration

The FAA provides that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In deciding whether to compel arbitration, a district court must determine: (1) whether there is an agreement to arbitrate; (2) the scope of that agreement to arbitrate; (3) whether Congress intended the federal statutory claims, if any are asserted, to be nonarbitrable; and (4) whether to stay proceedings relating to any non-arbitrable claims pending arbitration. *See Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987); *Mahant v. Lehman Bros.,* No. 99 Civ. 4421, 2000 WL 1738399, at *1 (S.D.N.Y. Nov. 22, 2000).

*3 Plaintiff does not--nor could he--dispute the second, third, or fourth *Genesco* factors. The scope of the arbitration provision in the Agreement is clearly broad enough to encompass each of plaintiff's claims against the Corporate Defendants. *See Collins & Aikman Prods. Co. v. Building Sys., Inc.,* 58 F.3d 16, 20 (2d Cir.1995) (stating that a clause requiring "[a]ny claim or controversy arising out of or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2001 WL 103433 (S.D.N.Y.)
**(Cite as: 2001 WL 103433 (S.D.N.Y.))**

relating to th[e] agreement" to be submitted to arbitration is the "paradigm of a broad clause" warranting "a presumption that the claims are arbitrable"). Moreover, plaintiff does not assert any federal statutory claims. [FN2] *See Mahant,* 2000 WL 1738399, at *3. Rather, plaintiff focuses on the first factor, arguing that the Agreement is unenforceable. Specifically, plaintiff contends that the three day notice of claim provision in paragraph 4(b) is unconscionable [FN3] and that the entire Agreement is a contract of adhesion. [FN4] *See* Plaintiff's Memorandum of Law in Opposition to the Corporate Defendants' Motion to Compel Arbitration ("Pl.Mem.") at 15-16, 19-22. Plaintiff's argument is unavailing because the determination as to whether the Agreement is unenforceable must be made by the arbitrator, not this Court.

> FN2. The only statutory claims asserted here--discrimination claims under the New York State and City Human Rights Laws--are arbitrable. *See Mahant,* 2000 WL 1738399, at *3 (citing *Fletcher v. Kidder, Peabody & Co., Inc.,* 81 N.Y.2d 623, 635 (1993)).

> FN3. An unconscionable contract is one where "there is an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ' *Desiderio v. National Ass'n of Secs. Dealers,* 207 (2d Cir.1999) (citation omitted).

> FN4. As explained by the Second Circuit:
> A court will find adhesion only when the party seeking to rescind the contract establishes that the other party used "high pressure tactics," or "deceptive language," or that the contract is unconscionable. "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms."
> *Klos v. Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997) (quoting *Aviall, Inc. v. Ryder Sys., Inc.,* 913 F.Supp. 826, 831 (S.D.N.Y.1996)).

## 1. The *Prima Paint* Doctrine

In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402-04 (1967), the Supreme Court held that, under the FAA, a challenge to the making of a contract generally, as opposed to the making of the arbitration provision specifically, must be decided by the arbitrator. The Court adopted the view of the Second Circuit that "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." *Id.* at 402.

Although *Prima Paint* involved a claim that the underlying contract was induced by fraud, its holding is not limited to such claims. As stated by the First Circuit:
> The teaching of *Prima Paint* is that a federal court must not remove from the arbitrators consideration of a substantive challenge to a contract unless there has been an independent challenge to the making of the arbitration clause itself. The basis of the underlying challenge to the contract does not alter the severability principle. [FN5]

>> FN5. Leading commentators on arbitration law have summarized the reach of *Prima Paint:*
>> [T]he separability doctrine [of *Prima Paint* ] has been applied to numerous issues affecting arbitrability other than fraud. These include: illegality; consensual requirements such as whether a draft was intended to be a finalized contract and mutual mistake; authority issues, such as ultra vires; supervening event issues, such as frustration of purpose; consensual defenses, such as duress, "overreaching," and unconscionability; procedural requirements such as time limits on submission of claims against seller for defective goods; and statute of limitations running on the contract containing the arbitration clause.
>> 2 Ian R. Macneil et al., *Federal Arbitration Law* § 15.3.2, at 15:26 to 15:27 (1999) (footnotes omitted) (*"Federal Arbitration Law"* ).

*Unionmutual Stock Life Ins. Co. of Am. v. Beneficial Life*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2001 WL 103433 (S.D.N.Y.)
**(Cite as: 2001 WL 103433 (S.D.N.Y.))**

*Ins. Co., 774 F.2d 524, 529 (1st Cir.1985).* Claims of unconscionability and adhesion contracts are similarly included within the *Prima Paint* rule. *See Benoay v. Prudential-Bache Secs., Inc., 805 F.2d 1437, 1441 (11th Cir.1986)* ("If on the other hand, [plaintiff's] claims of adhesion [and] unconscionability ... pertain to the contract as a whole, and not to the arbitration provision alone, then these should be resolved in arbitration."). "As long as one party's agreement to arbitrate is supported by the other's, the agreements supply their own consideration, 'so objections to other parts of the contract, based on fraud or unconscionability or mistake or whatever, need not spill over to the arbitration clause." ' [FN6] *Belship Navigation, Inc. v. Sealift, Inc., 95 Civ. 2748, 1995 WL 447656,* at *5 (S.D.N.Y. July 28, 1995) (quoting *Matterhorn, Inc. v. NCR Corp., 763 F.2d 866, 869 (7th Cir.1985));* *see also Jeske v. Brooks, 875 F.2d 71, 75 (4th Cir.1989)* (stating that the alleged unconscionability of the entire contract must be decided by the arbitrator, not the court); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 637 F.2d 391, 398 (5th Cir.1981)* (same); *Dale v. Prudential-Bache Secs, Inc., 719 F.Supp. 1164, 1169 (E.D.N.Y.1989)* ("Even if plaintiff's alleged misunderstanding would void the agreement, a claim of fraudulent inducement, duress or unconscionability involves the formation of the entire contract and must be determined by the arbitrator."); *Brener v. Becker Paribas Inc., 628 F.Supp. 442, 446 (S.D.N.Y.1985)* ("Claims concerning duress, unconscionability, coercion, or confusion in signing should be determined by an arbitrator because those issues go to the formation of the contract.").

> FN6. However, the *Prima Paint* doctrine may not be applicable where the party resisting arbitration alleges "a bona fide claim of fraud in the factum." *Kyung In Lee v. Pacific Bullion (New York) Inc., 788 F.Supp. 155, 157 (E.D.N.Y.1992)* (collecting cases). "The distinction between fraud in the factum and fraud in the inducement is basic: Fraud in the factum occurs when the maker [of the note] is tricked into believing that which he is signing is something other than a promissory or obligatory note. By contrast, fraud in the inducement consists of misrepresentations that cause the maker of the note to enter the transaction." *Revak v. SEC Realty*

*Corp., 18 F.3d 81, 91 (2d Cir.1994)* (quotation marks and citations omitted). Plaintiff has not alleged a bona fide claim of fraud in the factum. Indeed, plaintiff signed the Agreement knowing that it contained an arbitration provision. *See* 10/3/00 Deposition of Vernon Wright, Ex. C to 10/20/00 Silver Aff., at 42, 70.

**\*4** With respect to the notice of claim provision, plaintiff has not demonstrated the requisite "nexus" between the allegedly unconscionable provision and the arbitration clause. *Campaniello Imps., Ltd. v. Saporiti Italia, S.p.A, 117 F.3d 655, 668 (2d Cir.1997)* ("Other courts in this Circuit have similarly required some nexus between the alleged fraud or misrepresentation and the arbitration clause in particular."). Not only is the notice of claim provision written in a separate part of the Agreement than the arbitration clause, but the word "arbitration" is never mentioned in paragraph 4(b). Indeed, paragraph 4(b) appears to apply to litigation in court as well. Moreover, paragraph 4(b) contains a complete waiver of all agreements and understandings that conflict with any of the terms of the Agreement--including the confidentiality provision, the at-will employment provision, and the non-compete clause--unless written notice is provided within three days of executing the Agreement. An attack on paragraph 4(b) is not an attack on the arbitration provision merely because the notice of claim provision may procedurally bar plaintiff from pursuing his claims in arbitration. *See Nuclear Elec. Ins. Ltd. v. Central Power & Light Co., 926 F.Supp. 428, 435 (S.D.N.Y.1996)* ("[A]t least some of the allegations that the contract is invalid [must] be specifically directed to the arbitration provision ... in order to permit the court to decide the issue.").

Similarly, plaintiff's contract of adhesion claim does not specifically address the arbitration provision. Rather, plaintiff contends that the circumstances under which the Agreement was signed demonstrate that defendants used "high pressure tactics" and "misleading" statements to force a "virtually one-sided" agreement on plaintiff. Pl. Mem. at 19-22. "Even though challenges are nominally made to the validity both of the arbitration clause and of the underlying contract, there must be allegations of at least some defects

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                        Page 5
Not Reported in F.Supp.2d, 2001 WL 103433 (S.D.N.Y.)
**(Cite as: 2001 WL 103433 (S.D.N.Y.))**

pertaining specifically to the arbitration clause itself, not solely as one of many clauses in an allegedly defective contract." 2 *Federal Arbitration Law* § 15.3.4, at 15:41.

2. Whether the Notice of Claim Provision is Arbitrable

Plaintiff argues that even if *Prima Paint* is applicable, [FN7] paragraph 3(c) of the Agreement--which prohibits the arbitrator from "decid[ing] the justice or propriety of any specific provisions" of the Agreement--prevents the arbitrator from determining whether the notice of claim provision is unconscionable. Pl. Mem. at 18. Therefore, plaintiff contends, this issue must be determined by the Court, notwithstanding *Prima Paint*. Once again, plaintiff's argument is unconvincing.

> FN7. Plaintiff wrongly contends that *Prima Paint* has been implicitly overruled or limited by the Supreme Court in *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995). That case held that, unless the contract specifies otherwise, the scope of an arbitration clause is to be determined by the court, rather than the arbitrator. By contrast, the *Prima Paint* court held that challenges to the making of a contract-- as opposed to the making of an arbitration provision--must be decided by the arbitrator. These two rulings are not in conflict. Indeed, following *First Options,* the Second Circuit has made clear that *Prima Paint* remains the law in this Circuit. *See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l Inc.,* 198 F.3d 88, 99 (2d Cir.1999); *Campaniello Imps.,* 117 F.3d at 666-68. Leading commentators agree. *See* 2 *Federal Arbitration Law* § 15.3.1, at 15:11 (1999 Supp.) ("Nothing in *First Options* ... suggests that the Supreme Court intends to undermine *Prima Paint.*").

It is well established that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-5 (1983). The Second Circuit has held that courts must construe arbitration clauses as broadly as possible, *see S.A. Mineracao da Trinidade-Samitri v. Utah Int'l, Inc.,* 745 F.2d 190, 194 (2d

Cir.1984), and that "language excluding certain disputes from arbitration must be 'clear and unambiguous' or 'unmistakably clear.' " *Wire Serv. Guild v. United Press Int'l, Inc.,* 623 F.2d 257, 260 (2d Cir.1980).

**\*5** The language in paragraph 3(c) limiting the power of the arbitrator "to decide the justice or propriety of any specific provision[ ]" is too ambiguous to foreclose the arbitrability of plaintiff's unconscionability claim. Interpreting paragraph 3(c) as broadly as plaintiff suggests would create a conflict between that provision and paragraph 3(b) of the Agreement, which provides that the arbitration will be conducted in accordance with the JAMS rules. Specifically, JAMS Rule 20 provides that "[i]n determining the Award, the Arbitrator will apply applicable law, including relevant statutes and statutes of limitations, to the facts found at the Arbitration." JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"), Ex. A to 11/27/00 Affidavit of Gerald D. Silver ("11/27/00 Silver Aff."), at 9. A claim that a contractual provision is unconscionable falls within a state's "applicable law." Because the Corporate Defendants drafted the Agreement, any ambiguity must be resolved against them. *See Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62 (1995) (applying common-law contract principles to interpret arbitration clause, including principle that ambiguities should be interpreted against the drafter); *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1199 (2d Cir.1996) (same). Therefore, despite its language, paragraph 3(c) does not prevent the arbitrator from determining that certain provisions of the Agreement are enforceable.

Moreover, in their reply memorandum of law, the Corporate Defendants stated:

    Plaintiff's claim that the arbitrator would not have the power to decide the "unconscionability" of the "notice of claim" provision ... is grossly off the mark.... [T]he "justice or propriety" language at [paragraph] 3(c) of the ... Agreement in no way limits the arbitrator's power to determine whether a provision in the agreement is *enforceable.*

Defendants' Reply Memorandum of Law in Further Support of Their Motion to Compel Arbitration, Dismiss the Complaint and/or Stay Proceedings ("Def. Reply Mem.") at 4 (emphasis in original). Based on their representation to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 6
Not Reported in F.Supp.2d, 2001 WL 103433 (S.D.N.Y.)
**(Cite as: 2001 WL 103433 (S.D.N.Y.))**

Court and to plaintiff, the Corporate Defendants are estopped from asserting in any arbitration proceeding to which plaintiff is a party that paragraph 3(c) prohibits the arbitrator from declaring the notice of claim provision unenforceable.

Accordingly, the Corporate Defendants' motion to compel arbitration is granted. [FN8]

> FN8. Plaintiff requests that the Court delay its ruling until after the Supreme Court's decision in _Circuit City Stores, Inc. v. Adams,_ 194 F.3d 1070 (9th Cir.1999), _cert. granted,_ 68 U.S.L.W. 3536 (U.S. May 22, 2000) (No. 99-1379), where the Ninth Circuit held that the FAA does not apply to employment contracts. However, the Ninth Circuit's decision is directly contrary to the holding of every other United States Court of Appeals, including the Second Circuit. _See Erving v. Virginia Squires Basketball Club,_ 468 F.2d 1064, 1069 (2d Cir.1972) ("In light of the strong national policy in favor of arbitration as a means of settling private disputes we see no reason to give an expansive interpretation to the exclusionary language of [FAA] Section 1."). Because there is no reason to believe that the Supreme Court will deviate from the majority rule, there is no reason to delay ruling on defendants' motion to compel arbitration.

### B. Stay of Proceedings

"Under Section 3 of the FAA, 9 U.S.C. § 3, a district court 'must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceedings." ' _WorldCrisa Corp. v. Armstrong,_ 129 F.3d 71, 74 (2d Cir.1997) (quoting _McMahan Secs. Co. L.P. v. Forum Capital Mkts. L.P._, 35 F.3d 82, 85 (2d Cir.1994)). As a result, the Corporate Defendants are entitled to a stay pending arbitration.

**\*6** However, Saslow is not a party to the Agreement and is not entitled to a stay of proceedings under Section 3 of the FAA. _See Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S,_ 943 F.2d 220, 224-25 (2d Cir.1991). Nonetheless, Saslow seeks

a stay pursuant to the Court's inherent power to control its docket. _See WorldCrisa Corp.,_ 129 F.3d at 76 ("[D]istrict courts, despite the inapplicability of the FAA, may stay a case pursuant to 'the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." ') (quoting _Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.,_ 339 F.2d 440, 441 (2d Cir.1964)). A defendant seeking such a stay bears the "heavy burden" of demonstrating " 'to the satisfaction of the court that [he] ha[s] not taken nor will [he] take any steps to hamper the progress of the arbitration proceeding, that the arbitration may be expected to conclude within a reasonable time, and that such delay as may occur will not work undue hardship." ' _Sierra Rutile Ltd. v. Katz,_ 937 F.2d 743, 750 (2d Cir.1991) (quoting _Nederlandse,_ 339 F.2d at 442). The issuance of a stay is firmly within a district court's discretion. _See American Shipping Line, Inc. v. Massan Shipping Indus., Inc.,_ 885 F.Supp. 499, 502 (S.D.N.Y.1995).

Saslow has not satisfied the heavy burden of demonstrating that he is entitled to a stay. _First,_ because an arbitration proceeding is not yet pending, it is impossible to predict whether the arbitration will conclude within a reasonable time. _Second,_ the possibility remains that plaintiff's claims against the Corporate Defendants will be dismissed on procedural grounds. [FN9] Therefore, contrary to Saslow's contention, the Court may not "gain the benefit of the factual and legal findings of the arbitration." Saslow Mem. at 9. _Third,_ a stay would work undue hardship on plaintiff. Saslow is the central actor in many of the events at issue in the arbitration--indeed, the allegations against him are the basis for plaintiff's claims against the Corporate Defendants. However, as a non-party witness in the arbitration, he cannot be compelled to appear at a pre-arbitration deposition. [FN10] _See Integrity Ins. Co. v. American Centennial Ins. Co.,_ 885 F.Supp. 69, 73 (S.D.N.Y.1995) (holding that the FAA does not authorize an arbitrator to compel non-party witnesses to appear for pre-arbitration depositions); _National Broad. Co. v. Bear Stearns & Co.,_ 165 F.3d 184, 187-88 (2d Cir.1999) ("[O]pen questions remain as to whether [9 U.S.C.] § 7 may be invoked as authority for compelling pre-hearing depositions and pre-hearing document discovery, especially where such

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2001 WL 103433 (S.D.N.Y.)
**(Cite as: 2001 WL 103433 (S.D.N.Y.))**

evidence is sought from non-parties ."); *cf.* Fed.R.Civ.P. 45 (authorizing a district court to issue a subpoena commanding a non-party to attend a deposition or produce documents). The interests of justice and judicial economy require that discovery proceed in this action. Accordingly, Saslow's cross motion to stay this action pending arbitration is denied.

> FN9. The Corporate Defendants have represented that they will assert the defense that plaintiff has waived any claims that predate the Agreement. *See* Def. Reply Mem. at 2-3.

> FN10. JAMS Rule 17 permits arbitrators to subpoena nonparty witnesses only for the arbitration hearing, not pre-arbitration depositions. *See* JAMS Rules at 8.

III. CONCLUSION

**\*7** For the reasons stated above, the Corporate Defendants' motion to compel arbitration and stay this action against them is granted. Saslow's cross motion to stay this action pending arbitration is denied. A conference is scheduled for February 26, 2001 at 4:30 p.m.

This decision, however, does not effect the holding in *Prima Paint,* as some courts wrongly contended. *See, e.g., Berger v. Cantor Fitzgerald Secs.,* 942 F.Supp. 963, 965 (S.D.N.Y.1996); *Aviall, Inc.,* 913 F.Supp. at 831; *Maye v. Smith Barney, Inc.,* 897 F.Supp. 100, 106 n.3 (S.D.N.Y.1995).

Not Reported in F.Supp.2d, 2001 WL 103433 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2001 WL 34611755 (Trial Pleading) Answer (Feb. 21, 2001)

• 2000 WL 34326089 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendant Steven Saslow's Cross-Motion to Stay this Action Pending Arbitration (Dec. 14, 2000)

• 2000 WL 34403525 (Trial Motion, Memorandum and

Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendant Steven Saslow's Cross-Motion to Stay this Action Pending Arbitration (Dec. 14, 2000)

• 2000 WL 34326064 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to the Corporate Defendants' Motion to Compel Arbitration (Nov. 27, 2000)

• 2000 WL 34326079 (Trial Motion, Memorandum and Affidavit) Defendants Memorandum of Law in Support of Their Motion to Compel Arbitration, Dismiss the Complaint and/or Stay Proceedings (Nov. 27, 2000)

• 2000 WL 34403522 (Trial Motion, Memorandum and Affidavit) Defendants Memorandum of Law in Support of Their Motion to Compel Arbitration, Dismiss the Complaint and/or Stay Proceedings (Nov. 27, 2000)

• 2000 WL 34403523 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to the Corporate Defendants' Motion to Compel Arbitration (Nov. 27, 2000)

• 2000 WL 34403521 (Trial Pleading) Complaint (Jul. 19, 2000)

• 1:00cv05354 (Docket) (Jul. 19, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.